# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK                                                                                    SUPERIOR COURT

| | |
|---|---|
| MAIRIN ROONEY,<br><br>Plaintiff,<br><br>v.<br><br>LEERINK PARTNERS, LLC<br><br>Defendant. | Civil Action No.: |

## **COMPLAINT AND JURY DEMAND**

## INTRODUCTION

In April 2021, SVB Leerink finally lured Mairin Rooney away from her senior position and career trajectory at Goldman Sachs & Co. LLC, with promises of guaranteed compensation and the position of Senior Managing Director, a reserved position in the banking industry. The promises were false.

Not only did Leerink fail to pay a substantial portion of that guaranteed compensation, as it turns out, the firm never intended to honor its commitment to the senior role either.

As to the guaranteed compensation, when it came time each year to make the payments set forth in Ms. Rooney's offer letter, Leerink failed, instead delivering promises of deferred cash and worthless unvested RSUs (this past year doing so nine months after they were due).

As to the role, Leerink knew when they were hiring Ms. Rooney that they would have to offer her a role and title reflective of her experience and industry stature stemmed from her tenure and success as an investment banker at one of the most well-known and respected

investment banks – Goldman Sachs – and the need to convey leadership, seniority and elevation within her new firm to her existing clients and relationships.

As it turns out, on information and belief, there was a pre-existing plan before Ms. Rooney began her employment to elevate virtually every one of Leerink's Managing Directors to the Senior Managing Director role – an *en masse* promotion not based upon merit that literally eliminated the role of Managing Director for the banking group and resulted in a fundamental shift of reporting structure, authority and daily responsibilities. By February 2022, Ms. Rooney's Senior Managing Director title was essentially meaningless, now shared with those a decade or more her junior in experience, negating the promises Leerink used to lure Ms. Rooney to join and breaching the terms of her offer letter.

Of course, Jeff Leerink's titles, Chairman *and* Chief Executive Officer, are publicized and used as marketing tools to win clients. And Ms. Rooney's supervisor, Dan Dubin, similarly broadcasts his two titles: Vice Chairman, Global Co-Head of Investment Banking *and* Global Co-Head of Healthcare Investment Banking. That is why it was no surprise that Ms. Rooney expressed her concern to Mr. Dubin and Mr. Leerink on several occasions about the bait and switch. In response, Mr. Dubin confirmed it was a problem *he had anticipated* and directed her to speak to Mr. Leerink, who acknowledged the problem and assured her that with time he would fix it. He did not, and after the year and a half Ms. Rooney spent giving Mr. Leerink the time, it became obvious he would never do so.

To that end, in October 2023, Ms. Rooney gave the firm written notice of her intent to resign for "Good Reason" for both the pay and title issues, with 45 days to cure. Not only did Leerink management refuse to cure, they retaliated, terminating Ms. Rooney's service early, withholding her earned wages, trashing her reputation by falsely informing her clients that she

2

had resigned without notice, and shutting her out. Ms. Rooney brings this action in response to Defendant's Wage Act violations, breach of contract and retaliation. Through their misconduct, Defendant has derailed Ms. Rooney's career and sullied the stellar reputation she worked more than a decade to establish. What's more, they are unwilling to pay the millions of dollars of guaranteed compensation they owe her pursuant to her offer letter.

## THE PARTIES

1. Plaintiff Mairin Rooney ("Ms. Rooney") is a senior banker who served as a Senior Managing Director at Leerink Partners LLC from August 2, 2021, through January 21, 2024. Ms. Rooney is a New York citizen.

2. Defendant is an investment bank with its principal place of business located in Boston, Massachusetts. Historically, Silicon Valley Bank owned and operated SVB Leerink LLC (the entity which hired Ms. Rooney, later renamed SVB Securities LLC) as a stand-alone operating entity which provided investment banking services. After Silicon Valley Bank collapsed and went into receivership, the management of SVB Securities LLC purchased the entity out of receivership and renamed it "Leerink Partners LLC", assuming all the employee contracts, operating licenses and other contracts of SVB Securities LLC.

3. Jeffrey Leerink ("Mr. Leerink") is the Chairman and Chief Executive Officer of Leerink Partners LLC.

4. Dan Dubin ("Mr. Dubin") is the Vice Chairman, Global Co-Head of Investment Banking and Global Co-Head of Healthcare Investment Banking at Leerink Partners LLC. Mr. Dubin was at all relevant times Ms. Rooney's direct supervisor.

## JURISDICTION AND VENUE

5. This Court's jurisdiction is based upon M.G.L. 212, §§ 3 and 4.

3

6. This Court's personal jurisdiction over Defendant is based upon M.G.L. 223A, §§ 2 and 3, because Defendant maintains its principal place of business, regularly transacts business, contracts to supply services and uses real property in Massachusetts.

7. Venue is proper in this County because Defendant does business in this County, it is the location of many of the actions that give rise to Plaintiff's claims, and because the compensation plan requires that this case "shall be brought" before the state or federal courts of Massachusetts.

8. Venue is further proper in the Business Litigation Session ("BLS"), pursuant to Superior Court Administrative Directive No. 17-1, because this matter involves complex investment banker compensation, not ordinarily seen in the Superior Court, and it would otherwise benefit from case management by the BLS.

9. Plaintiff has satisfied all prerequisites and conditions precedent necessary to entitle her to seek remedy in this case.

## STATEMENT OF FACTS

10. Ms. Rooney was working as a Managing Director in Healthcare Investment Banking in the Investment Banking Division of Goldman Sachs & Co. LLC for approximately four years when she was recruited by SVB Leerink LLC to be a Senior Managing Director. Ms. Rooney was enjoying a successful career at Goldman Sachs, where she was held in high esteem among her colleagues, peers and clients.

11. As part of the recruiting package, and as set forth more fully in her offer letter dated April 21, 2021, Ms. Rooney was promised "a minimum guaranteed bonus" for each of 2021, 2022 and 2023, to be paid in each case in February of the following year.

12. In both February 2022 and 2023, Leerink Partners failed to pay Ms. Rooney the

4

entirety of the guaranteed wages as set forth in her offer letter, electing instead to convey a substantial portion in contingent deferred cash payments and unvested RSUs of its predecessor's stock, instead of cash or its equivalent.  By way of example, with respect to the 2022 guaranteed payment, which was due in February 2023, Ms. Rooney was shortchanged by a substantial sum, which Defendant tried, but failed, to cure by granting unvested RSUs on December 21, 2023 – approximately nine months after they were contractually owed.  By way of further example, Defendant impermissibly put a substantial sum of Ms. Rooney's minimum guaranteed wages into a contingent deferral program to be paid out over multiple years into the future.

13. As part of the recruiting package, Ms. Rooney was also promised that she would serve as Senior Managing Director.  That title was a relatively exclusive one at Leerink, as only a few individuals held the title, compared to the Managing Directors of which there were dozens.  Further, to preserve her role, Ms. Rooney negotiated a clause into her offer letter to ensure a demotion from this title would be a breach of the terms of the agreement.

14. Managing Director and Senior Managing Director are two roles investment banks use to organize their hierarchy of employees, enabling them to present an array of experience and authority to current and prospective clients, while also delineating roles and responsibilities within the firm.

15. Defendant had previously attempted to recruit Ms. Rooney in 2020, to no avail. In 2021, after Leerink confirmed the rarity of the Senior Managing Director role, as well as the authority, responsibility and management which would come with the role, and the compensation package, Ms. Rooney agreed to move to Leerink.

16. On information and belief, prior to Ms. Rooney's start, Defendant had a plan in place to elevate virtually the entire staff of Managing Directors to Senior Managing Directors,

5

and knowingly misled Ms. Rooney during the recruitment process.

17. Indeed, by February 2022, Defendant elevated all Managing Directors in non-administrative roles to the position of Senior Managing Director ("SMD"), leaving only some administrative functions as Managing Directors – none of which are bankers. Elevating everyone else to SMD had the effect of making that title and role virtually meaningless for Ms. Rooney – an effective demotion that circumvented the terms of her offer letter.

18. In a discussion with Jeffrey Leerink on or about May 17, 2022, Ms. Rooney expressed her concern that with all the elevations to SMD, it had made the SMD title "diluted" and of "little value." In that call, which was recorded, Mr. Leerink agreed that Ms. Rooney was "right" about the problem. He expressed that he needed "time," and he assured Ms. Rooney that the changes had been an "intermediate maneuver" – an imperfect decision that was right for the firm at the time they made it – and were not the "end state." Ultimately, Mr. Leerink said that they would "chart a new course," he hoped "in short order."

19. In reliance on that promise, Ms. Rooney remained at Leerink and waited for Mr. Leerink to remedy the breach.

20. Yet, Leerink failed to remedy the breach, whether the original agreement or Mr. Leerink's May 2022 promise.

21. Leerink's deferred compensation plan defines "Good Reason" resignation to include, among other things, "(d) a material breach by the Company SVB and any of their Affiliates of any agreement between SVB, the Company (or any Affiliates) and the Participant, including the failure to pay any amounts due under any such agreement ..."

22. On October 23, 2023, Ms. Rooney sent a written notice of her intent to resign for "Good Reason" in accordance with the compensation plan.

6

23. In Ms. Rooney's Good Reason notice, she referenced the failure to pay earned wages, as well as the diminution of authority and seniority as a result of the *en masse* promotion. Ms. Rooney also indicated her intent to resign on March 1, 2024, if the firm did not cure these breaches, as a notice period of "at least" 90 days' notice is required by her offer letter. In closing, Ms. Rooney stated that she looked "forward to hearing from the firm within 45 days as to how it plans to remedy my 'Good Reason.'"

24. Defendant failed to timely cure any of those breaches.

25. Rather, approximately three weeks into the notice period, Defendant terminated Ms. Rooney without warning via an impromptu zoom call with the Head of HR, Maura Polak, and Business Manager, Christine Del Corsano. Ms. Polak and Ms. Del Corsano informed Ms. Rooney that "today [11/13/23] would be [her] last day in the office," that Ms. Rooney was being placed on garden leave and that she must leave her badge on her desk and exit the building. During this meeting, Ms. Polak informed Ms. Rooney that her final date of employment would be cut short from Ms. Rooney's noticed date of March 1, 2024, to January 21, 2024, intentionally setting an end date prior to February 2023 when Ms. Rooney's guaranteed compensation for 2023 and other vesting payments would be due.

26. During that meeting, Ms. Rooney further inquired about transition plans for her ongoing transactions, client meetings and general messaging of her departure to clients. As it appeared that Defendant had no plans in place, an agreement was reached that the parties would work together to align on the appropriate messaging of Ms. Rooney's departure to clients.

27. Before the parties could engage in that messaging discussion, Defendant proactively contacted Ms. Rooney's clients and told them that she had resigned "effective immediately" – a knowingly false statement made to harm Ms. Rooney's reputation and one

7

made in conjunction with shutting off her access to systems, such that she could not correct the record or mitigate the harm caused by the defamatory statement.

28. Per the express terms of the deferred compensation plan, Defendant's failure to cure rendered Ms. Rooney's separation an "Involuntary Termination of Employment." In that event, Defendant is required to pay to Ms. Rooney the full amount of her deferred compensation.

29. Defendant has refused and/or failed to make this payment, in breach of its agreements and the law, and in retaliation for Ms. Rooney's complaints.

30. Upon information and belief, the decisions to refuse payment of Ms. Rooney's wages and to terminate Ms. Rooney's notice period early were made by Mr. Leerink and Mr. Dubin.

31. In addition, on or around February 9, 2024, according to a Memorandum (dated February 20, 2024) that was sent to Ms. Rooney on February 26, 2024, a Committee consisting of Jeffrey Leerink, Daniel Dubin, Steve Heineman (General Counsel), Kevin Leblang (outside counsel), Maura Polak (Head of Human Resources) and Joseph Gentile (Chief Administrative Officer), met and determined that all of Ms. Rooney's "unvested deferred compensation awards are forfeited under the Plan."

32. Ms. Rooney had not requested that the Committee make any such determination, which is what initiates a Committee review under the terms of the deferred compensation plan. What's more, the Committee refused to comply with the mandatory notice protocols required by a Committee determination had such a request been made, hiding Ms. Rooney's right to appeal that decision. For these and several other reasons, this purported Committee action is so deficient as to be itself improper and retaliatory.

33. Defendant had the benefit of Ms. Rooney's employment, work and reputation.

8

34. The early termination, improper actions noted above and refusal to pay all amounts due to Ms. Rooney had the effect of (i) retaliating against Ms. Rooney for her complaints of non-payment of wages, (ii) ensuring that Ms. Rooney would not reach the February 2024 vesting date for payment of her 2023 guaranteed compensation, (iii) depriving her of further payments she would otherwise receive or be due in accordance with her agreement, including without limitation the entirety of her deferred compensation, (iv) depriving her of any further employment from which she could service her clients and earn income, (v) tarnishing her reputation, and (vi) causing her emotional distress.

## CLAIMS FOR RELIEF

### Count I
### Massachusetts Wage Act Claim – Unpaid Wages

35. Defendant failed and/or refused to pay Plaintiff her full guaranteed wages for 2021, 2022 and 2023, in violation of the Massachusetts Wage Act.

36. As the result, Plaintiff has incurred damages in an amount to be determined at trial, along with liquidated damages, attorneys' fees and costs of litigation.

### Count II
### Wage Act Retaliation

37. Plaintiff complained about the non-payment of her wages.

38. In response, among other things, Defendant shortened Plaintiff's notice period, cutting her off from employment, depriving her of the guaranteed pay and the remaining portion of her deferred compensation.

39. Defendant also retaliated against Plaintiff by falsely informing her clients that she had resigned without giving notice and harming her reputation.

9

40. In addition to the monetary damages, Plaintiff also suffered emotional distress as a result of the retaliation.

41. As a result, Plaintiff has incurred harm and loss in an amount to be determined at trial, along with multiple damages, attorneys' fees and costs of litigation.

## Count III
### Breach of Contract

42. Defendant has failed and/or refused to pay Plaintiff her guaranteed wages as set forth in her Offer Letter.

43. Defendant has breached their promises regarding Plaintiff's role as Senior Managing Director.

44. These breaches remained uncured following notice and opportunity to cure.

45. Defendant has breached the terms of the deferred compensation plan by failing and/or refusing to pay Plaintiff her deferred compensation after her Good Reason resignation, as well as her guaranteed compensation.

46. As a result of the Defendant's breach of the agreement set forth above, Plaintiff has incurred damages in an amount to be determined at trial.

## Count IV
### Quantum Meruit/Unjust Enrichment

47. Plaintiff conferred a measurable benefit upon Defendant.

48. Defendant accepted services and expenses from Plaintiff for which a reasonable person would have expected to receive their guaranteed compensation and role.

49. Plaintiff provided her services with the reasonable expectation of receiving her guaranteed compensation and role from Defendant.

50. In accepting these services without compensating Plaintiff fully and without properly providing Plaintiff with her title, Defendant has been unjustly enriched.

51. As the result of the Defendant's violations of Massachusetts law set forth above, Plaintiff has incurred damages in an amount to be determined at trial.

## Count V
### Fraud in the Inducement

52. As set forth above, to induce Plaintiff to leave her job and come to work for Defendant, Defendant made a series of misrepresentations with regard to both her title and her compensation.

53. Defendant's misrepresentations were intentional and knowing.

54. As a result of Plaintiff's reliance on those misrepresentations, Plaintiff has incurred damages in an amount to be determined at trial.

## Count VI
### Breach of Implied Covenant of Good Faith and Fair Dealing

55. Defendant has an obligation to act in good faith in the performance of their contractual duties to Plaintiff.

56. Defendant failed to act with good faith and fair dealing in the performance of its duties to Plaintiff.

57. As a result of Defendant's failures, Plaintiff has incurred damages in an amount to be determined at trial.

## Jury Demand

Plaintiff demands a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that, and moves this Court to:

(A)   Determine the damages sustained by Plaintiff as the result of Defendant's unlawful non-payment of wages and retaliation in violation of the Wage Act, and award those damages, trebled, against Defendant and in favor of Plaintiff, together with such prejudgment interest as may be allowed by law;

(B)   Award Plaintiff her costs and disbursements in this suit, including, without limitation, reasonable attorneys' fees and costs;

(C)   Determine the damages sustained by Plaintiff as the result of Defendant's breach of contract and award those damages against Defendant and in favor of Plaintiff, together with such prejudgment interest as may be allowed by law;

(D)   Enter a permanent injunction ordering Defendant henceforth to refrain from engaging in the unlawful conduct described in this Complaint and to take all necessary measures to ensure that it is at all times in compliance with such injunction; and,

(E)   Grant Plaintiff such other and further relief as the Court may deem just and proper.

        Respectfully submitted,

        MAIRIN ROONEY,

        By her counsel,

        /s/ Benjamin Flam

        _____
        Philip J. Gordon (BBO# 630989)
        Benjamin Flam (BBO# 671853)
        GORDON LAW GROUP, LLP
        585 Boylston Street
        Boston, MA 02116
        Phone: (617) 536-1800
        Fax: (617) 536-1802
        pgordon@gordonllp.com
Dated: March 18, 2024    bflam@gordonllp.com