UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAIRIN ROONEY,<br><br>　Plaintiff,<br><br>　　　v.<br><br>LEERINK PARTNERS, LLC, JEFFREY LEERINK AND DANIEL DUBIN<br><br>　Defendants. | Civil Action No.: 1:24-cv-11165-AK |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

(Filed as a "Matter of Course" under Fed. R. Civ. P. 15)

**INTRODUCTION**

In April 2021, SVB Leerink finally lured Mairin Rooney away from her senior position and career trajectory at Goldman Sachs & Co. LLC, with promises of guaranteed compensation and the position of Senior Managing Director, a distinguished position in the banking industry. The promises were false.

Not only did Leerink fail to pay a substantial portion of that guaranteed compensation, as it turns out, the firm never intended to honor its commitment to the senior role either.

As to the guaranteed compensation, when it came time each year to make the payments set forth in Ms. Rooney's offer letter, Leerink failed, instead delivering promises of deferred cash and worthless unvested RSUs (this past year doing so nine months after they were due).

As to the role, Leerink knew when they were hiring Ms. Rooney that they would have to offer her a role and title reflective of her experience and industry stature stemmed from her tenure and success as an investment banker at one of the most well-known and respected

investment banks – Goldman Sachs – and the need to convey leadership, seniority and elevation within her new firm to her existing clients and relationships.  In fact, Ms. Rooney had expressly told Mr. Dubin that the distinction and seniority in title was a critical factor in her decision to accept the offer to work at Leerink.

As it turns out, on information and belief, there was a pre-existing plan before Ms. Rooney began her employment to elevate virtually every one of Leerink's Managing Directors to the Senior Managing Director role – an *en masse* promotion not based upon merit that literally eliminated the role of Managing Director for the banking group and resulted in a fundamental shift of reporting structure, authority and daily responsibilities.  Mr. Dubin did not notify Ms. Rooney of the imminent seismic shift, which would have allowed her to make an informed decision in accepting her offer.  By February 2022, Ms. Rooney's Senior Managing Director title was essentially meaningless, now shared with those a decade or more her junior in experience, negating the promises Leerink used to lure Ms. Rooney to join and breaching the terms of her offer letter.

Of course, Jeffrey Leerink's titles, Chairman *and* Chief Executive Officer, are publicized and used as marketing tools to win clients.  And Ms. Rooney's supervisor, Dan Dubin, similarly broadcasts his two titles:  Vice Chairman, Global Co-Head of Investment Banking *and* Global Co-Head of Healthcare Investment Banking.  That is why it was no surprise that Ms. Rooney expressed her concern to Mr. Dubin and Mr. Leerink on several occasions about the bait and switch.  In response, Mr. Dubin confirmed it was a problem *he had anticipated* and directed her to speak to Mr. Leerink, who recognized the problem, acknowledged the effect it had on Ms. Rooney, and assured her that with time he would fix it.  He did not, and after the year and a half Ms. Rooney spent giving Mr. Leerink the time, it became obvious he would never do so.

To that end, in October 2023, Ms. Rooney gave the firm written notice of her intent to resign for "Good Reason" for both the pay and title issues, with 45 days to cure. Not only did Leerink management refuse to cure, they retaliated, terminating Ms. Rooney's service early, withholding her earned wages, trashing her reputation by falsely informing her clients that she had resigned without notice, and shutting her out. Ms. Rooney brings this action in response to Defendant's Wage Act violations, breach of contract and retaliation. Through their misconduct, Defendants have derailed Ms. Rooney's career and sullied the stellar reputation she worked more than a decade to establish. What's more, they refuse to pay the millions of dollars of guaranteed compensation they owe her pursuant to her offer letter and their own deferred compensation plan.

## THE PARTIES

1. Plaintiff Mairin Rooney ("Ms. Rooney") is a senior banker who served as a Senior Managing Director at Leerink Partners LLC from August 2, 2021, through January 21, 2024. Ms. Rooney is a New York resident.

2. Defendant, Leerink Partners LLC, ("Defendant L.P.") is an investment bank with its principal place of business located in Boston, Massachusetts. Historically, Silicon Valley Bank owned and operated SVB Leerink LLC (the entity which hired Ms. Rooney, later renamed SVB Securities LLC) as a stand-alone operating entity which provided investment banking services. After Silicon Valley Bank collapsed and went into receivership in March 2023, the management of SVB Securities LLC purchased the entity out of receivership and renamed it "Leerink Partners LLC", assuming all the employee contracts, operating licenses and other contracts of SVB Securities LLC.

3. Defendant Jeffrey Leerink ("Mr. Leerink" or "Defendant Leerink") is the

3

Chairman and Chief Executive Officer of Leerink Partners LLC. As Chairman and Chief Executive Officer, Mr. Leerink controls, directs, and participates to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P.

4. Defendant Daniel Dubin ("Mr. Dubin" or Defendant Dubin; and together with Defendant L.P. and Defendant Leerink, "the Defendants") is the Vice Chairman, Global Co-Head of Investment Banking and Global Co-Head of Healthcare Investment Banking at Leerink Partners LLC. Mr. Dubin was at all relevant times Ms. Rooney's direct supervisor, and controls, directs, and participates to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e) (Civil Enforcement), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

6. Defendant L.P. has consented to the jurisdiction of this Court by removing Ms. Rooney's state court civil action to this Court. Further, this Court has personal jurisdiction over Defendant L.P., because Defendant maintains its principal place of business, regularly transacts business, contracts to supply services and uses real property in Massachusetts.

7. The Court has personal jurisdiction over Defendants Leerink and Dubin as both reside in Massachusetts.

8. Venue is proper in this County because Defendants do business in the Commonwealth of Massachusetts, and it is the location of many of the actions that give rise to Plaintiff's claims.

9. Plaintiff has satisfied all prerequisites and conditions precedent necessary to

entitle her to seek remedy in this case.

## STATEMENT OF FACTS

10. Ms. Rooney was working as a Managing Director in Healthcare Investment Banking in the Investment Banking Division of Goldman Sachs & Co. LLC for approximately four years when she was recruited by SVB Leerink LLC to be a Senior Managing Director. Ms. Rooney was enjoying a successful career at Goldman Sachs, where she was held in high esteem among her colleagues, peers and clients.

11. As part of the recruiting package, and as set forth more fully in her offer letter dated April 30, 2021, Ms. Rooney was promised "a minimum guaranteed bonus" for each of 2021, 2022 and 2023, to be paid in each case in February of the following year.

12. In both February 2022 and 2023, Leerink Partners failed to pay Ms. Rooney the entirety of the guaranteed wages as set forth in her offer letter, electing instead to convey a substantial portion in contingent deferred cash payments and unvested RSUs of its predecessor's stock, instead of cash or its equivalent. By way of example, with respect to the 2022 guaranteed payment, which was due in February 2023, Ms. Rooney was shortchanged by a substantial sum, which Defendants tried, but failed, to cure by finally delivering unvested, worthless RSUs into Ms. Rooney's account on December 21, 2023 – approximately nine months after they were contractually owed.

13. By way of further example, Defendants impermissibly put a substantial sum of Ms. Rooney's minimum guaranteed wages into a contingent deferral program to be paid out over multiple years into the future.

14. As part of the recruiting package, and as set forth more fully in her offer letter dated April 30, 2021, Ms. Rooney was also promised a "special deferred compensation award"

to be paid in five annual installments on the anniversary of her start date.

15. As part of the recruiting package, Ms. Rooney was also promised that she would serve as Senior Managing Director. That title was a relatively exclusive one at Defendant L.P., as only a few individuals held the title at the time, compared to the Managing Directors of which there were dozens. Further, to preserve her role, Ms. Rooney negotiated a clause into her offer letter to ensure a demotion from this title would be a breach of the terms of the agreement.

16. Managing Director, Senior Managing Director and Partner are roles investment banks use to organize their hierarchy of employees, enabling them to present an array of experience and authority to current and prospective clients, while also delineating roles and responsibilities within the firm.

17. Defendants had previously attempted to recruit Ms. Rooney in 2020, to no avail. In 2021, in reliance on the rarity of the Senior Managing Director role at Defendant L.P., as well as the authority, responsibility and management which would come with the role, and the compensation package, Ms. Rooney agreed to resign from Goldman and move to Defendant L.P.

18. On information and belief, prior to Ms. Rooney's start, Defendants had a plan in place to elevate virtually the entire non-administrative staff of Managing Directors to Senior Managing Directors. This plan was known by Mr. Leerink and Mr. Dubin; and Defendant Dubin and others knowingly misled Ms. Rooney during the recruitment process, allowing her to believe that she was accepting an exclusive role at the firm, intentionally refusing to inform her of the pending *en masse* promotion.

19. By February 2022, all Managing Directors in non-administrative roles were elevated to the position of Senior Managing Director ("SMD"), leaving only some administrative functions as Managing Directors – none of which are bankers. Elevating everyone else to SMD

had the effect of making that title and role virtually meaningless for Ms. Rooney – an effective demotion that circumvented the terms of her offer letter.

20. In a discussion with Mr. Leerink on or about May 17, 2022, Ms. Rooney expressed her concern that with all the elevations to SMD, it had made the SMD title "diluted" and of "little value." In that call, which was recorded, Mr. Leerink agreed that Ms. Rooney was "right" about the problem. He expressed that he needed "time," and he assured Ms. Rooney that the changes had been an "intermediate maneuver" – and were not the "end state." Ultimately, Mr. Leerink said that they would "chart a new course," he hoped "in short order."

21. In reliance on that promise, Ms. Rooney remained at Defendant L.P. and waited for Mr. Leerink to remedy the breach, regularly raising the matter to no avail.

22. Defendants failed to remedy the breach, whether the original agreement or Mr. Leerink's May 2022 promise.

23. In September 2023, Defendant L.P. created a new "Partner" title, positioned above SMD, reestablishing a heightened, distinguished leadership level that prior to the *en masse* social promotion, was served by the SMD role. This change was made in connection with the change in control event which occurred on October 2, 2023, pursuant to the Interest and Asset Purchase Agreement by and among SVB Financial Group, SVB Securities Holdings LLC and Leerink Intermediate Holdings LLC (f/k/a Saffron Buyer LLC), dated as of June 17, 2023, as amended.

24. Notably, in December 2023, Defendant L.P. amended its deferred compensation plan months *after* Ms. Rooney's October 2023 notice of Good Reason resignation to exclude this change in control event going forward. Yet, this change cannot and does not apply to Ms. Rooney's notice, even by the amended Plan's own terms. Nor does it excuse Defendant L.P.'s

purposeful refusal to deliver notice and plan documents for the multiple amended deferred compensation plans that were adopted during Ms. Rooney's employment.

25. Defendant L.P. conferred the new Partner title to elevate certain individuals, yet excluded Ms. Rooney, further diminishing her role at the firm. This was despite Defendant Leerink's promise to remedy the title breach.

26. Defendant L.P.'s deferred compensation plan defines "Good Reason" resignation to include, among other things, "(b) a material diminution in the Participant's duties and/or responsibilities with the Company and its Affiliates in effect immediately prior to such reduction,… (d) a material breach by the Company SVB and any of their Affiliates of any agreement between SVB, the Company (or any Affiliates) and the Participant, including the failure to pay any amounts due under any such agreement ..."

27. Notably, the "Good Reason" definition contained in the deferred compensation plan, which governed the terms of Ms. Rooney's employment at the time of her Good Reason resignation, does not require that her resignation be made within any specified period of time following the breach or cause for such resignation. Stated otherwise, Defendant L.P.'s own Plan placed no temporal limitation on Ms. Rooney's ability to raise her Good Reason resignation.

28. On October 23, 2023, Ms. Rooney sent a written notice of her intent to resign for "Good Reason" in accordance with the compensation plan.

29. In Ms. Rooney's Good Reason notice, she referenced the failure to pay earned wages, as well as the diminution of authority and seniority as a result of the *en masse* promotion. Ms. Rooney also indicated her intent to resign on March 1, 2024, if the firm did not cure these breaches, as a notice period of "at least" 90 days' notice is required by her offer letter. In closing, Ms. Rooney stated that she looked "forward to hearing from the firm within 45 days as to how it plans to remedy my 'Good Reason.'"

30. Defendants failed to timely cure any of those breaches.

31. Rather, approximately three weeks into the notice period, Ms. Rooney was terminated without warning via an impromptu meeting with the Head of HR, Maura Polak, and Business Manager, Christine Del Corsano. Ms. Polak and Ms. Del Corsano informed Ms. Rooney that "today [11/13/23] would be [her] last day in the office," that Ms. Rooney was being placed on garden leave and that she must leave her badge on her desk and exit the building. During this meeting, Ms. Polak informed Ms. Rooney that her final date of employment would be cut short from Ms. Rooney's noticed date of March 1, 2024, to January 21, 2024, intentionally setting an end date prior to February 2023 when Ms. Rooney's guaranteed compensation for 2023 and other vesting payments would be due.

32. Defendant L.P.'s own General Counsel confirmed by email that the decision to accelerate Ms. Rooney's last date of employment was made to prevent her from receiving her wages.

33. During the meeting with Ms. Polak and Ms. Del Corsano, Ms. Rooney further inquired about transition plans for her ongoing transactions, client meetings and general messaging of her departure to clients. As it appeared that there was no plan in place, an agreement was reached that the parties would work together to align on the appropriate messaging of Ms. Rooney's departure to clients.

34. Before the parties could engage in that messaging discussion, Defendant L.P.'s agents, including Defendant Dubin, proactively contacted Ms. Rooney's clients and told them that she had resigned "effective immediately" – a knowingly false statement made to harm Ms. Rooney's reputation and one made in conjunction with shutting off her access to systems, such that she could not correct the record or mitigate the harm caused by the defamatory statement.

35. Per the express terms of the deferred compensation plan, Defendant L.P.'s failure to cure rendered Ms. Rooney's separation an "Involuntary Termination of Employment." In that event, Defendant L.P. is required to pay to Ms. Rooney the full amount of her deferred compensation.

36. Defendant L.P. has refused and/or failed to make payment of all deferred compensation, in breach of its agreements and the law, and in retaliation for Ms. Rooney's complaints.

37. Upon information and belief, the decisions to refuse payment of Ms. Rooney's wages and to terminate Ms. Rooney's notice period early were made by Defendants Leerink and Dubin.

38. Defendants Leerink and Dubin both control, direct, and participate to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P.

39. In late 2023, Ms. Rooney notified Defendant L.P. through counsel that she was entitled to payments under the deferred compensation plan (the "Plan").

40. On or around February 9, 2024, according to a Memorandum (dated February 20, 2024) that was sent to Ms. Rooney on February 26, 2024, a Committee comprising Defendant Leerink, Maura Polak (Head of Human Resources) and Joseph Gentile (Chief Administrative Officer), convened a meeting that was also attended by Defendant Dubin, Steve Heineman (General Counsel), Kevin Leblang (outside counsel), and determined that all of Ms. Rooney's "unvested deferred compensation awards are forfeited under the Plan."

41. What's more, the Committee refused to comply with the mandatory notice protocols required by a Committee determination, hiding from Ms. Rooney her right to appeal that decision.

42. The Plan states as follows:

> If the claim is denied, the Committee shall provide the Claimant with a written or electronic notice setting forth the reasons for the denial, references to the provisions of the Plan upon which, the denial was based, a description of any additional information or material necessary for the Claimant to perfect his or her claim, information, as to how the Claimant may submit his or her claim for review, and a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA in the event that his or her claim is denied upon review.

43. The Committee impermissibly failed and/or refused to provide Ms. Rooney with the required information.

44. Worse, instead of interpreting the Plan as it related to Ms. Rooney's right to receive payment, the aforementioned Committee instead invented a new requirement: that Ms. Rooney's resignation must be "a result of" a change in control.

45. However, the Plan's language is plain and clear: Ms. Rooney's "resignation for Good Reason" is one "that becomes effective during the 24-month period following a Change in Control Event."

46. Given the Committee's misconduct, including but not limited to re-writing the Plan under the guise of interpretation and depriving Ms. Rooney of both notice of her internal appeal rights and her right to pursue legal claims, any internal appeal would have been futile.

47. For these and several other reasons, this purported Committee action is so deficient as to be itself improper and retaliatory, in addition to being arbitrary and capricious.

48. Defendants had the benefit of Ms. Rooney's employment, work and reputation.

49. The early termination, improper actions noted above and refusal to pay all amounts due to Ms. Rooney had a detrimental and damaging impact on Ms. Rooney, including but not limited to the following: (i) retaliating against Ms. Rooney for her complaints of non-payment of wages, (ii) ensuring that Ms. Rooney would not reach the February 2024 vesting date

for payment of her 2023 guaranteed compensation, (iii) depriving her of further payments she would otherwise receive or be due in accordance with her agreement, including without limitation the entirety of her deferred compensation, (iv) depriving her of any further employment from which she could service her clients and earn income, (v) tarnishing her reputation, and (vi) causing her emotional distress, and other costs and expenses.

## **CLAIMS FOR RELIEF**

### **Count I**
### **Massachusetts Wage Act – Unpaid Wages**

50. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

51. Defendants failed and/or refused to pay Plaintiff her full guaranteed wages for 2021, 2022 and 2023, in violation of the Massachusetts Wage Act.

52. Defendants Leerink and Dubin both control, direct, and participate to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P., and thus have individual liability for damages under the Wage Act.

53. As the result, Plaintiff has incurred damages in an amount to be determined at trial, along with liquidated damages, attorneys' fees and costs of litigation.

### **Count II**
### **Massachusetts Wage Act Retaliation**

54. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

55. Plaintiff complained about the non-payment of her wages.

56. In response, among other things, Defendants shortened Plaintiff's notice period, cutting her off from employment, depriving her of the guaranteed pay and the remaining portion of her deferred compensation.

57. Defendants also retaliated against Plaintiff by falsely informing her clients that she had resigned without giving notice and harming her reputation.

58. In addition to the monetary damages, Plaintiff also suffered emotional distress as a result of the retaliation.

59. Defendants Leerink and Dubin both control, direct, and participate to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P., and thus have individual liability for damages under the Wage Act.

60. As a result, Plaintiff has incurred harm and loss in an amount to be determined at trial, along with multiple damages, attorneys' fees and costs of litigation.

### Count III
### Civil Enforcement of the Deferred Compensation Plan
### (ERISA)

61. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

62. Plaintiff is a participant in Defendant L.P.'s deferred compensation plan.

63. Upon information and belief, the deferred compensation plan is governed by 29 U.S.C. § 1132.

64. Per the express terms of the deferred compensation plan, Defendant L.P.'s failure to cure rendered Plaintiff's Good Reason resignation an "Involuntary Termination of Employment."

65. Defendant L.P.'s deferred compensation plan requires payment of Ms. Rooney's

deferred compensation in the event of an "Involuntary Termination of Employment."

66. Defendant L.P.'s deferred compensation plan also requires payment of compensation that is subject to the Plan to be made in accordance with the express terms of the agreement providing for such compensation.

67. Defendant L.P. has refused and/or failed to make payment of all deferred compensation, in breach of the terms of the deferred compensation plan.

68. As a result, Plaintiff is entitled to all damages under this cause of action as a consequence of Defendant L.P.'s conduct, including attorneys' fees.

69. Defendants Leerink and Dubin both control, direct, and participate to a substantial degree in formulating and determining the operational and financial policy of Defendant L.P., and thus have individual liability for damages under L.P.'s Deferred Compensation Plan.

## Count IV
### Breach of Contract

70. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

71. Defendant L.P. has failed and/or refused to pay Plaintiff her guaranteed wages as set forth in her Offer Letter.

72. Defendant L.P. has breached their promises regarding Plaintiff's role as Senior Managing Director.

73. These breaches remained uncured following notice and opportunity to cure.

74. Defendant L.P. has breached the terms of the deferred compensation plan by failing and/or refusing to pay Plaintiff her deferred compensation after her Good Reason resignation, as well as her guaranteed compensation.

75. As a result of the Defendant L.P.'s breach of the agreement set forth above, Plaintiff has incurred damages in an amount to be determined at trial.

## Count V
## Quantum Meruit/Unjust Enrichment

76. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

77. Plaintiff conferred a measurable benefit upon Defendant L.P.

78. Defendant L.P. accepted services and expenses from Plaintiff for which a reasonable person would have expected to receive their guaranteed compensation and role.

79. Plaintiff provided her services with the reasonable expectation of receiving her guaranteed compensation and role from Defendant L.P.

80. In accepting these services without compensating Plaintiff fully and without properly providing Plaintiff with her title, Defendant L.P. has been unjustly enriched.

81. As the result of the Defendant L.P.'s violations of Massachusetts law set forth above, Plaintiff has incurred damages in an amount to be determined at trial.

## Count VI
## Fraud in the Inducement

82. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

83. As set forth above, to induce Plaintiff to leave her job and come to work for Defendants, Defendants made a series of omissions with regard to both her title and her compensation.

84. Defendants' omissions were intentional and knowing.

85. As a result of Plaintiff's reliance on those misrepresentations, Plaintiff has incurred damages in an amount to be determined at trial.

## Count VII
## Breach of Implied Covenant of Good Faith and Fair Dealing

86. Plaintiff repeats and incorporates herein the above paragraphs as if each were set out in its entirety.

87. Defendant L.P. has an obligation to act in good faith in the performance of their contractual duties to Plaintiff.

88. Defendant L.P. failed to act with good faith and fair dealing in the performance of its duties to Plaintiff.

89. As a result of Defendant L.P.'s failures, Plaintiff has incurred damages in an amount to be determined at trial.

## Jury Demand

Plaintiff demands a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that, and moves this Court to:

(A) Determine the damages sustained by Plaintiff as the result of Defendant's unlawful non-payment of wages and retaliation in violation of the Wage Act, and award those damages, trebled, against Defendant and in favor of Plaintiff, together with such prejudgment interest as may be allowed by law;

(B) Award Plaintiff her costs and disbursements in this suit, including, without limitation, reasonable attorneys' fees and costs;

(C) Determine the damages sustained by Plaintiff as the result of Defendant's breach of contract, ERISA violations, and her other claims and award those damages against Defendant and in favor of Plaintiff, together with such prejudgment interest as may be allowed by law;

(D) Enter a permanent injunction ordering Defendant henceforth to refrain from engaging in the unlawful conduct described in this Complaint and to take all necessary measures to ensure that it is at all times in compliance with such injunction; and,

(E) Grant Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted,

MAIRIN ROONEY,

By her counsel,

/s/ Benjamin Flam

_____
Philip J. Gordon (BBO# 630989)
Benjamin Flam (BBO# 671853)
GORDON LAW GROUP, LLP
585 Boylston Street
Boston, MA 02116
Phone: (617) 536-1800
Fax: (617) 536-1802
pgordon@gordonllp.com
bflam@gordonllp.com

Dated: May 22, 2024

## RULE 7.1 CERTIFCATION

Counsel for Plaintiff hereby certifies that on May 8, 2024, they conferred by telephone with counsel to Defendant Leerink Partners concerning this Motion.

/s/ Benjamin Flam
Benjamin Flam

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a true and accurate copy of the foregoing document upon counsel for defendants by ECF and via e-mail.

/s/ Benjamin Flam
Benjamin Flam