## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAIRIN ROONEY,

     Plaintiff,

         v.

LEERINK PARTNERS, LLC, JEFFREY
LEERINK AND DANIEL DUBIN

     Defendants.

Civil Action No.:  1:24-cv-11165-AK

## **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## **(REQUEST FOR ORAL ARGUMENT)**

Respectfully submitted,

MAIRIN ROONEY,

By her counsel,

/s/ Benjamin Flam

_____
Philip J. Gordon (BBO# 630989)
Benjamin Flam (BBO# 671853)
GORDON LAW GROUP, LLP
585 Boylston Street
Boston, MA 02116
Phone: (617) 536-1800
Fax: (617) 536-1802
pgordon@gordonllp.com
bflam@gordonllp.com

Fundamentally, the dispute here is quite simple.  Defendants failed to fulfill the promises they made to Ms. Rooney to get her to leave her job and come to work for them – most notably paying the full amount of her guaranteed annual bonuses, and their commitment to her senior role.  Ms. Rooney pushed back, and Defendants retaliated, engaging in substantial misconduct. This suit followed.  As the Court will see, the claims are well pleaded, with counts under the Wage Act, and alternatively under ERISA and common law.

As to the Wage Act claim, Ms. Rooney's guaranteed wages are just that – guaranteed. The terms of her offer letter are clear:  these are not discretionary bonuses.  And, there is no dispute about the amounts Defendants actually paid.  As to the Wage Act retaliation claim, that too is clear.  Ms. Rooney complained to Defendants about their failures, and Defendants retaliated, gerrymandering her termination date simply to deprive Ms. Rooney of her wages. Their own general counsel said so, in writing, and thus her claim for retaliation under the Wage Act must not be dismissed.  In all, Defendants fundamentally misunderstand the applicable law, this Court's pleading standards and preemption, all in support of a motion to dismiss state law claims that must be denied.

Of course, Defendants also wish to dismiss the alternatively pleaded ERISA claims, too. Yet, even a cursory reading of the Amended Complaint shows they are wrong.  The Amended Complaint sets forth that she was due compensation, that she made a complaint for nonpayment, and that Defendants retaliated, leaving her with no shot at an internal appeal.  The Amended Complaint goes even further, plainly demonstrating substantial misconduct by Defendants:  (1) rewriting their compensation plan under the guise of interpretation; (2) denying Ms. Rooney her internal appellate rights; (3) adding new unlawful preconditions to receiving wages; (4) moving her termination date to deprive her of wages; (5) defaming her to clients in connection with her

departure; and (6) fraudulently delivering worthless RSUs to her 10 months after her wages were due. Simply put, arbitrary and capricious is Defendants modus operandi – whatever it takes for them to win, even if it breaks the law and violates Ms. Rooney's rights.

Given the well pleaded claims, Defendants' current attempt to avoid judicial scrutiny falls flat. As this Court knows, Ms. Rooney's allegations must be taken as true. The only question is whether she has stated a plausible theory for relief. She has, on each count, and thus Defendants' Motion to Dismiss must fail.

<u>**Background**</u>

This matter began when Defendants lured Ms. Rooney away from her job at Goldman Sachs with promises of a prestigious title and millions of dollars in guaranteed annual pay – a set of promises they never intended to keep. *See* Dkt. No. 8-1, at p.2-3 (the "Offer Letter"). Once she was aboard, the bait and switch was afoot. Defendants refused to deliver, and still do.

Defendants' promises themselves are clear and undisputed. First, the minimum guaranteed annual bonus. Leerink's Offer Letter set out a precise guaranteed minimum annual bonus amount Ms. Rooney would earn each year for her first three years of work from 2021-2023, with each guarantee in its own paragraph – all of which were identical except for the amount of that year's pay and the date of payment. *Id*.; Am. Comp. at ¶11. For example, the paragraph governing the 2021 minimum annual bonus sets forth as follows in relevant part:

> You will receive a **minimum guaranteed bonus for 2021 in the amount of $2,812,500**, less applicable withholdings and deductions. **This bonus will be paid according to the Company's 2021 bonus cycle schedule (expected to be February 2022)** and will be subject to the Company's deferred compensation plan. In order to receive the guaranteed minimum bonus outlined above, you must either (a) be an active, full-time employee in good standing at the time this payment is made, or (b) have had your employment terminated by the Company without Cause (as defined below) prior to such payment. *See* Dkt. No. 8-1 at p.2 (emphasis added).

The paragraphs setting out the remaining minimum guaranteed annual bonuses for 2022 and 2023 are the same, except that guaranteed bonus for 2022 was set at $4,550,000 (to be paid in the 2022 bonus cycle in February 2023), and the guaranteed bonus for 2023 was set at $2,550,000 (to be paid in the 2023 bonus cycle in February 2024). *Id*. at p. 2-3. Yet, Leerink failed to pay Ms. Rooney the full amount of those minimum guaranteed payments when due. Instead, Leerink impermissibly deferred payment of the guaranteed minimum bonuses, dividing the amounts up and placing some in a contingent deferred cash program to be paid out over multiple years into the future and the rest in contingent, unvested RSUs of Leerink's predecessor's stock. Am. Comp. at ¶¶ 12 and 13. Stated otherwise, Leerink unlawfully changed Ms. Rooney's compensation from "guaranteed" to "contingent."

Second, the Special Deferred Grant (Am. Comp. at ¶ 14), which was set forth as follows:

> You have advised us that as of your date of employment with us you will have forfeited unvested deferred compensation awards totaling approximately [$5,466,249.80] as a result of your separation from your prior firm and subsequent employment by the Company…**The award will vest and be paid to you in accordance with the payment schedule attached hereto as Exhibit B, but otherwise shall be subject to the terms and conditions of the Company's deferred compensation plan including those relating to vesting, payment and forfeiture…** *See* Dkt. No. 8-1 at p.4 (emphasis added).

This second form of compensation was due in five annual installments set forth in the Offer Letter, which would be accelerated or forfeited in accordance with the deferred compensation plan. *Id*. That plan included payout in full in the event that Ms. Rooney terminated her employment for Good Reason and satisfied the conditions of an "Involuntary Termination of Employment." Am. Comp. at ¶¶ 26 and 35. In October 2023, Ms. Rooney was forced to do just that, and she sent a written notice of her intent to resign for Good Reason in accordance with the plan, citing both the failure to pay earned wages as well as the diminution of authority and seniority she was promised, with time to cure. *Id.* at ¶¶ 28, 29 and 39. Defendants

failed to cure, and instead chose to retaliate, terminating her employment early (Ex. A), selecting a new date designed to avoid paying her earned wages (*id.* at ¶¶ 31 and 32), and then telling the firm's clients she resigned "effective immediately," a knowing lie. *Id.* at ¶34.

Defendants then responded to Ms. Rooney's claim for payment under the plan with a decision that failed to inform Ms. Rooney of her substantive rights and invented reasons for denying compensation – all of which made any further internal appeal futile. *Id.* at ¶¶ 40-46.

## ARGUMENT

### I.    Standard for Motion to Dismiss.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), with all well pleaded factual allegations in the complaint taken as true and all reasonable inferences must be drawn in the plaintiff's favor.  *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).  Evaluating the plausibility of a complaint is a clear-cut inquiry. The court must determine whether the facts alleged allow it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.  In carrying out this evaluation, the court must view the claims as a whole, instead of demanding "a one-to-one relationship between any single allegation and a necessary element of the cause of action." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 55 (1st Cir. 2013).

### II.    Ms. Rooney has a well pleaded Wage Act claim.

Ms. Rooney has properly pleaded a Wage Act claim.  She alleges that she was an employee of Leerink (Am. Comp. at ¶10), that the unpaid compensation constitutes a wage under the Wage Act (Am. Comp. at ¶¶11-14, and ¶51), and that Defendants failed to pay those wages in a timely manner (Am. Comp. at ¶¶11-14, and 51).  *See Klauber v. VMWare, Inc.*, 599 F.Supp.3d

34, 46 (D. Mass. 2022), *aff'd*, 80 F.4th 1 (1st Cir. 2023) (citing Mass. Gen. Laws ch. 149, §148).

### A.  <u>The non-discretionary bonuses are wages under the Wage Act</u>.

At issue are non-discretionary bonuses which are wages protected by the Wage Act.  *See, e.g., George Serebrennikov v. Proxet Grp.*, 2024 US. Dist. LEXIS 59363, *12 (D. Mass. 2024) (denying motion to dismiss Wage Act claim for oral agreement to pay non-discretionary bonus); *Brennan v. Arthur D. Little, Inc.*, 2020 Mass. Super. LEXIS 180, *2-3 (Oct. 8, 2020) (finding non-discretionary bonus is a wage covered by the Wage Act)  It is axiomatic that wages cannot be deferred under the Wage Act's special contract prohibition.  *See* G.L. c. 149, §148; *Stanton v. Lighthouse Fin. Servs.*, 621 F. Supp. 2d 5, 7 (D. Mass. 2009); *Parker v. EnerNOC, Inc.*, 484 Mass. 128, 135 (2020).  The half-baked reference in the Offer Letter that Defendants argue places the wages under the plan is thus void as a matter of law and public policy.  *See id*.

Indeed, as the Offer Letter confirms:

> **In addition to the compensation outlined above for 2021, 2022, 2023** and subsequent to 2023, you shall be eligible to receive a discretionary annual bonus provided that you are an active, full-time employee in good standing at the time these payments are scheduled to be made. Dkt. No. 8-1 at p.3 (emphasis added).

In other words, the only discretionary payments are those above the guaranteed ones.  *Id*. To this end, Defendants' citation to *Weems v Citigroup, Inc.*, proves inapposite, as the compensation owed to Weems was wholly "discretionary," because his bonuses were "*potentially* awarded as part of an award of restricted stock."  453 Mass. 147, 153 (2009).  As the *Weems* court held, "The operative fact here is that bonus awards under these programs are discretionary, not because they are labeled bonuses, but because the employers are, apparently, under no obligation to award them."  *Id*.  However, the amounts due in this case are not discretionary, but rather a guaranteed minimum.  Stated otherwise, unlike *Weems*, there exists an obligation to pay

the bonuses here.[1]  Further, the SJC has "consistently held that the legislative purpose behind the Wage Act…is to provide strong statutory protection for employees and their right to "wages." *Crocker v. Townsend*, 464 Mass. 1, 13 (2012); *Reuter v. City of Methuen*, 489 Mass. 465, 471 (2022) ("stick rather than carrot").  The Legislature has repeatedly "broadened the scope of employees covered, the type of eligible compensation, and the remedies available to employees whose rights have been violated."  *Melia v. Zenhire*, 462 Mass. 164, 170-71 (2012).  Despite Defendants' efforts to cast Ms. Rooney's earned incentive pay as discretionary, in the light most favorable to Ms. Rooney, this cannot be the case. Defendants' motion to dismiss must be denied.

### 1.  <u>The minimum guaranteed annual bonus remains unpaid.</u>

Ms. Rooney's Offer Letter clearly states that she "will receive a minimum guaranteed bonus" in the amount of $2,812,500 for 2021, $4,550,000 for 2022, and $2,550,000 for 2023. Dkt. No. 8-1 at p.2-3.  These amounts were to be paid in February 2022, 2023 and 2024, respectively. In order to receive the guaranteed bonuses Ms. Rooney must have either been "an active, full-time employee in good standing" when the payments were made or have been terminated without Cause prior to the payments.  *Id.*  That is what the guarantee made by Defendants says – as important is what it does not say.

The guarantee does <u>not</u> say that the amounts will be "a deferred or partially deferred

---

[1]     Defendants' citations to *Sheedy* and *Prozinski* are similarly inapposite and intentionally misleading. *See* Memo at p.11-12.  *Sheedy* involved a claim for money due under a promissory note, where the plaintiff never completed the labor required to earn the amounts in question.  *See Sheedy v. Lehman Bros. Holdings Inc.*, 2011 U.S. Dist. *2 (D. Mass. 2011) (finding that Sheedy's work ended in 2008 as a result of Lehman's bankruptcy, and thus she could not have earned amounts that would be due in the next three years).  Here, Ms. Rooney worked from August 2021 through her termination on January 21, 2024 (Am. Comp. at ¶1) – completing the labor for the period in which the bonuses were earned. *Prozinski* involved a claim for severance, which Defendants misrepresent in their brief.  *Prozinski v. Northeast Real Estate Servs.,* 797 N.E.2d 415, 420 (Mass. App. Ct. 2003).  Ms. Rooney's guaranteed bonuses are non-discretionary.  *See* Ex. A at p.2 (confirming that "but for her notice of resignation," Ms. Rooney's guaranteed bonus "would be paid on February 28, 2024.").

bonus or compensation." It does <u>not</u> say the amounts will be subject to a vesting and/or payment

schedule set out over a number of years. And, it does <u>not</u> say the money instead will be paid <u>into</u>

a deferred compensation plan, to be paid out over multiple years in accordance with the terms of

a vesting schedule. Had Leerink wanted to impose such limitations, they would have – one need

only look to the language used in setting forth the terms of the Special Deferred Grant to see they

did so there. *Id*. at p.4. In fact, the bonuses are written individually, for each year – not even

lumped together, each with a fixed payment date. Thus, with respect to Ms. Rooney's minimum

guaranteed bonus, the reference to the "and will be subject to the deferred compensation plan"

does nothing to change the terms of the bonus in the Offer Letter. *See* Dkt. No. 8-1 at p.2-3; Dkt.

No. 8-3 at p.16 (Section 7.16 incorporates all legally binding agreements, "[n]otwithstanding

anything to the contrary in the plan"). Defendants then mislead this Court, stating in their Memo

at p.11 that, "Indeed, Rooney acknowledges the 'contingent' nature of these payments in the

Amended complaint," with a citation to Am. Compl. at ¶12. Yet, the Amended Complaint does

no such thing. To the contrary, Am. Compl. ¶12 states:

> Leerink Partners failed to pay Ms. Rooney the entirety of the guaranteed wages
> set forth in her offer letter, electing instead to convey a substantial portion in
> contingent deferred cash payments and unvested RSUs of its predecessor stock,
> instead of cash or its equivalent. By way of example, with respect to the 2022
> guaranteed payment, which was due February 2023, Ms. Rooney was
> shortchanged by a substantial sum…

What in that paragraph indicates any such acknowledgement that the payments were to

be contingent? Nothing. As with its other arguments, Defendants invent their own false facts.

More troublingly, Defendants even failed to pay the amounts they admit were due. In

their Memo at p.6, Defendants falsely allege that ~$450,000 of RSUs were delivered on

February 28, 2023, in satisfaction of their obligations. While Ms. Rooney disputes that the RSUs

constituted proper payment, Defendants cannot dispute that those RSUs were instead

electronically delivered to Ms. Rooney on December 21, 2023 – a full 10 months late. *See* Ex. B at p.2 (Dec. 21, 2023 email to Heineman). While Defendants will argue some sort of clerical snafu caused the 10-month delay, that argument cannot reconcile the fact that the RSUs they delinquently delivered as compensation in late December 2023 had already been cancelled as a result of Leerink's management buyout, which closed in October of 2023, ***over two months before*** Defendants delivered the shares to Ms. Rooney. *See* Am. Compl. ¶ 23. This was confirmed by Leerink's own general counsel:

> all unvested RSUs that were awarded to Leerink employees (not just Mairin) **were forfeited when Leerink Partners closed its MBO and was no longer affiliated with SVBFG**… *See* Ex. B at 1 (emphasis added).

Moreover, the worthless RSUs were delivered to Ms. Rooney 15 days *after* the expiry of the 45-day cure period for her Good Reason resignation (December 6, 2023). In their haste to retaliate against Ms. Rooney for opposing the non-payment of her wages, Defendants tried to slip a transparent lie past her, and now try to slip that same lie past this Court.

**2.  <u>The Wage Act compels payment of Ms. Rooney's wages in full</u>.**

The annual guaranteed bonus amounts were determined, due and unpaid. Thus, reference to a plan that would later serve to change the terms of the Offer Letter cannot work to undo the earned bonus. *See Stanton*, 621 F. Supp. 2d at 7; *EnerNOC,* 484 Mass. at 135. Indeed, the Wage Act requires timely payment of wages, including bonuses. G.L. c. 149, § 148. The SJC has confirmed employers' responsibility to pay wages earned prior to termination, even if payment would otherwise not become due until a later date.[2] Thus, Defendants' argument now that Ms.

---

[2]     *See EnerNOC,* 484 Mass. at 135 (2020); *Perry v. Hampden Eng'g Corp.*, 2016 Mass. App. Unpub. LEXIS 951 *4 (2016) (special contracts provision of Wage Act prohibits employer from denying commissions earned during employment even if payment due later); *see also, Sutton v. Jordan's Furniture, Inc.*, 493 Mass. 728, n. 15 (2024) (finding that "an employer's [compensation] formula cannot violate the Wage Act or be used to circumvent other obligations under the Wage Act"); *Elec. Data Sys.*

Rooney had to be employed on a future date to earn her annual guaranteed bonus is unenforceable as a matter of law. *See* fn. 2 (*supra*).

Here, the bonus was guaranteed – to be paid in the next bonus cycle, so long as Ms. Rooney was employed or at least not terminated for Cause (as defined in the Offer Letter). No other conditions are applicable, despite Defendants' disingenuous attempt to create them now. Further, Defendants' retaliatory decision to gerrymander her separation date does not impact the requirement to pay Ms. Rooney her guaranteed 2023 wages. *McAleer*, 928 F.Supp.2d at 289-90; *Israel v. Voya*, 2017 U.S. Dist. LEXIS 37961, *19-20 (D. Mass. 2017). And, as noted above, there was no language in the Offer Letter indicating any type of deferral treatment for the bonuses. Dkt. No. 8-1 at p.2-3. The reference to the deferred compensation plan cannot suddenly revise all of the other clear terms and turn this into deferred compensation. G.L. c. 149, §148 ("No person shall by a special contract with an employee or by any other means exempt himself from this section…"). As a result, Defendants cannot escape their obligation to pay Ms. Rooney's earned compensation. *See McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 288 (D. Mass. 2013) (employer's attempt to use discretion to evade required payment obligations must be rejected because it would render meaningless the obligation to pay wages). The clear terms of Ms. Rooney's Offer Letter make the guaranteed bonuses due and payable, as wages. Those clear terms are further incorporated into the plan. *See* No. 8-3 at p.16 at Section 7.16.

### III.    Ms. Rooney's Wage Act retaliation Claim is well pleaded.

The following cannot be disputed:

- Ms. Rooney gave her Good Reason Resignation notice on October 23, 2023. Dkt. 8-6.

- In her notice, Ms. Rooney opposed the non-payment of her wages, stating: "the firm has failed to deliver approximately $450,000 of my 2022 compensation to which I am

---

*Corp. v. AG*, 440 Mass. 1020 (2003) ("[N]o person shall by a special contract with an employee or by any other means exempt himself from this section").

entitled pursuant to my offer letter."  Dkt. No. 8-6 (Good Reason resignation letter).

- In accordance with her Offer Letter, she gave "at least" 90 days' notice, with a separation date of March 1, 2024 – if the company did not cure her concerns. *Id*.; Dkt. 8-1 at p.5.

- On November 13, 2023, Leerink accelerated Ms. Rooney's employment end date to January 21, 2024. *See* Ex. A at p.1.

- As Leerink's own General Counsel confirmed in writing, the motivating factor for gerrymandering Ms. Rooney's separation date was to deprive her of her wages:

  > It is obvious that Mairin selected March 1, 2024, as her last day of employment in an unsuccessful attempt to preserve her 2023 guaranteed bonus, which, but for her notice of resignation (or termination for Cause), would be paid on February 28, 2024, as well as vesting of a portion of prior deferred compensation awards on the same date… Accordingly, the firm is accepting Mairin's notice of resignation, and her last day of employment will be January 21, 2024 (90 days from the date of her letter).  *See* Ex. A at p.1.

- Defendants told Ms. Rooney's clients she resigned "effective immediately," knowing this was not the case, as her Good Reason resignation letter gave more than 90 days' notice.  *See* Am. Compl. ¶34; *see also*, Dkt. No. 8-6.

### A. <u>Defendants' inability to comply with their own written documents demonstrates retaliatory motive.</u>

Defendants argue that Ms. Rooney could not have given notice and been eligible for her

guaranteed bonus.  Memo at p.13.  Yet, the Offer Letter does not contain that restriction.  Dkt.

No. 8-1. Defendants have falsified this fact.  Defendants' attempt to add new restrictions *after* the

Offer Letter is a blatant violation of the Wage Act's "special contract" prohibition.  G.L. c. 149,

§148.  A deeper dive into Heineman's email (Ex. A) further demonstrates Defendants' pattern

and practice of ignoring and then reinventing contract terms, and their retaliatory motivation:

  > While Mairin's offer letter states that she must give "at least" 90 days prior written notice of the effective date of her resignation, there is nothing in the offer letter that gives her the unilateral right to give substantially more notice than the required 90 days…  *See* Ex. A at p.1.

So, Heineman argued that while Ms. Rooney was required to give "at least" 90 days'

notice, she had no right to give notice in excess of 90 days.  Except that is exactly what the Offer

Letter requires.  Dkt. No. 8-1 at p.5.  Setting his falsehood aside, it is crystal clear why they

invented a new notice requirement and changed Ms. Rooney's termination date.  By Heineman's

own hand, the motivating factor was to deprive Ms. Rooney of her wages, in retaliation for her

complaint of non-payment, which Heineman admits were going to have been paid.  *See* Ex. A at

p.2 (confirming that "but for her notice of resignation," Ms. Rooney's guaranteed bonus "would

be paid on February 28, 2024.").  Ms. Rooney thus has a well pleaded Wage Act retaliation

claim.  *See* G.L. c. 149, §148A; *Voya*, 2017 U.S. Dist. LEXIS 37961 (motivating factor was

deprivation of wages).  "If, indeed, [Ms. Rooney's] termination was the result of unlawful

[retaliation]…Defendants "may not avoid liability under the Wage Act merely by asserting

retention of discretion…."  *McAleer,* 928 F.Supp.2d at 288.  That is exactly what Defendants

have tried to do – abuse their discretion to cut short Ms. Rooney's notice period to deprive her of

wages to punish her for opposing a Wage Act violation.  *See id*.

### B.  The Special Deferred Grant is a compensable damage for retaliation under the Wage Act.

The Special Deferred Grant deserves treatment as a damage under the Wage Act, because

Defendants have refused to pay it in retaliation for Ms. Rooney's opposing the non-payment of

her wages.  *See* Am. Compl. ¶¶54-56; *Travers v. Flight Servs. & Sys.*, 808 F.3d 525, 543-52 (1st

Cir. 2015).  Notably, Defendants do not dispute this in their motion, and thus concede the point.

### C.  Leerink and Dubin can be individually liable for Wage Act retaliation.

Courts have consistently and routinely found and upheld liability under the anti-

retaliation provisions of the Wage Act for those individuals having management of the employer,

often citing the fundamental and broad protective purposes of the Act.[3]  Defendants argue the opposite by citation to *St. Fleur v. Kurtin*, 2022 Mass. Super. LEXIS 15, at *7 (Gordon, J., May 18, 2022) (interpreting Wage Act to dismiss anti-retaliation count against individuals).  In *St. Fleur*, the Superior Court interpreted the word "employer" to exclude the individual agents, because it found "no language in Section 148A that provides for personal liability" to the individual agents.  *Id*. at *7.  *St. Fleur* is not only alone, it is also incorrect, because the superior court there failed to consider the full text of the Wage Act's anti-retaliation provision, along with the weight of appellate authority.  *See* fn. 3 (*supra*); *see also*, *Cook* v. *Patient Edu, LLC.*, 465 Mass. 548, 551-52 (2013) ("If a liberal, even if not literally exact, interpretation of certain words [in the Wage Act] is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat that purpose").

As the anti-retaliation provision states, "**Any** employer who discharges or in any other manner discriminates against any employee…shall have violated this section..."  G.L. c. 149, §148A (emphasis added).  The key words in the anti-retaliation statute are "**Any** employer."  The Legislature used the broadest word possible here.  The Legislature could have used the term "**An** employer" if it wished to be restrictive.  It did not.  Thus, §148A's reference to "any employer" under this Chapter 149 would include the "employer" set forth in §148.  "Employer" under §148 includes those having management of an LLC.  *See Cook*, 465 Mass. at 555 (vacating decision to dismiss managers of an LLC, and finding that, "The legislative intent of the Wage Act, to hold individual mangers liable for violations, is clear…").  §148A therefore must include Dubin and

---

[3]    *See, e.g., EnerNOC*, 484 Mass. at 136 (upholding liability against the corporation and its officer under the Wage Act); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App, Ct. 698, 706 (2013) (reversing dismissal of complaint including retaliation under Wage Act against individual defendant, citing clear legislative policy "to encourage enforcement of the wage laws by protecting employees who complain about violations of same."); *Joyce v. The Upper Crust, LLC*, 2015 U.S. Dist. LEXIS 95542, *19 (Casper, J., D. Mass. 2015) (denying summary judgment to the LLC manager under §148A of the Wage Act).

Leerink, who are senior most officials of the defendant LLC (Am. Compl. ¶¶3-4), and the motion to dismiss them as individuals must fail.

**IV.** **The alternative ERISA count either does not apply here, as the amounts due are all governed by the Wage Act, or it is limited to the special deferred grant, and thus the state law claims are not preempted.**

While ERISA might apply to the Special Deferred Grant, in which case the Amended Complaint states a well pleaded claim under ERISA, ERISA certainly does not apply to the guaranteed bonuses. Thus, preemption, if it applies at all, is limited. We'll take each in turn.

**A.** **First, the minimum guaranteed annual bonus – a form of compensation not covered by the ERISA.**

First, the language of the minimum guaranteed bonus shows it is not a "deferred" grant, and the words of the bonus do not make it an ERISA plan. Why? Unlike the Special Deferred Grant (Dkt. No. 8-1 at p.4), there is no language in the Offer Letter that indicates the bonuses are any type of deferred compensation or deferred grant at all. Rather, the Offer Letter describes a very simple minimum guaranteed annual bonus, and sets forth the exact amount of payment, along with the date it would be paid. *Id.* at p.2-3. Yes, the Offer Letter notes the payment is also subject to the Company's deferred compensation plan, but that reference alone is insufficient to subject it to coverage under ERISA. *See, Keefe v. LendUS, LLC*, 2020 U.S. Dist. LEXIS 99924 (D.N.H., DiClerico, J., 2020) (finding annual bonus not covered by ERISA and allowing claim to proceed under state law, while a deferred settlement amount was properly governed by ERISA as a top hat plan and thus ERISA claims for those amounts could also proceed)[4]; *Vrana v. Atkins N. Am. Holdings Corp.*, 2013 U.S. Dist. LEXIS 19941, *11 (M.D. Fl. 2013) (finding certain benefits provided by agreement, such as target annual bonus to be benefits not covered by ERISA, and other benefits, such as dental, to be covered by ERISA).

---

[4]     For the Court's convenience, the *Keefe* motion to dismiss decision is appended to this Opposition.

Second, unfunded executive bonuses are not within the class of benefits Congress sought to protect in enacting ERISA. *See Faris v. Southern Ute Indian Tribe*, 2023 U.S. Dist. LEXIS 200975, *17 (D. Colo. 2023) (finding a bonus plan to be outside the scope of ERISA because the Court could not conclude that the "LTIP 'systematically defers payments to the termination of covered employment and beyond,' as required for ERISA under 29 C.F.R. § 2510,3-2(c)."). This Court can also look to the Department of Labor for guidance on bonus plans, which further supports Ms. Rooney's position. Specifically, the DOL has interpreted whether employee bonus compensation plans are covered by ERISA. *See* 29 C.F.R. § 2510.3-2(a) (1990). Where bonuses are paid during employment, and are not reserved as retirement income for employees, the DOL considers such programs outside of ERISA's reach.[5] That is just the case here, where the guaranteed annual bonus offered Ms. Rooney an incentive to remain working with Defendants. *See Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 455 (1995) (denying ERISA coverage in the absence of company's ongoing administrative or financial obligation to employees post-employment). As the plan clearly states: "*The plan is established in order to encourage key executives of the company to achieve higher levels of performance and to remain in the service of the company.*" Dkt. No. 8-3 at p.2 (emphasis added).

Of course, payment of bonuses could be made after Ms. Rooney's employment ended, or to her beneficiaries, but those possibilities do not convert the bonus program into an ERISA plan. Indeed, "[t]he statute does not embrace all plans that may incidentally result in the payment of benefits after death or disability but only plans established for the purpose of

---

[5] Payments made post-employment do not serve to change the analysis, especially here, where they were "'merely incidental to the goal of providing current compensation,' *International Paper Co.*, 978 F. Supp. 506, 511 (S.D.N.Y. 1997), and thus did not amount to a systematic deferral of income 'to the termination of employment or beyond' sufficient to take the Agreement out of the exemption established by 29 C.F.R. § 2510.3-2(c)." *See Albers v. Guardian Life Ins. Co.*, 1999 U.S. Dist. LEXIS 5410, *11 (S.D.N.Y. 1999).

providing those benefits." *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 574 (5th Cir. 1980). Using the *Murphy* analysis, courts look to whether a plan was "designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of ERISA." *See id.*; *Goodrich v. CML Fiberoptics,* 990 F. Supp. 48 (D. Mass. 1998). Leerink's plan fails the *Murphy* analysis. Ms. Rooney's guaranteed annual bonuses are outside the scope of ERISA.

Thus, ERISA does not preempt the state law causes of action pled in Counts I, II, IV and VII, and those counts must not be dismissed.

### B. It's simple arithmetic, and thus, even if there is coverage under ERISA, there is no ERISA preemption for the guaranteed annual bonus.

The First Circuit also has held that where simple arithmetic can be used to determine payments, without need to reference any plan, ERISA does not govern. *See O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262, 267-68 (1st Cir. 2001) (finding no ERISA claim where "[s]imple arithmetic thus dictated the amount of the bonus"); *Rodowicz v. Mass. Mut. Life Ins. Co.,* 192 F.3d 162 (1st Cir. 1999) (severance bonus, based on tenure and calculated based on years of service, was not an ERISA plan). Similarly, in *Belanger*, the First Circuit analyzed whether a series of four early retirement offers was subject to ERISA. The court concluded they were not and analyzed each offer singly, rather than as a group. "Taken singly, the early retirement offers involve precisely the kind of one-time, lumpsum payment" that is "clearly excluded from the pantheon of ERISA plans." *Belanger*, 71 F.3d at 13. Here, Ms. Rooney's annual bonuses are precisely the type of "lumpsum payment," paid once annually, that the First Circuit commands as outside the scope of ERISA. *Id*. Thus, ERISA does not preempt the state law causes of action pled in Counts I, II, IV and VII, and those counts must not be dismissed.

### V. If ERISA does apply, Ms. Rooney has sufficiently pleaded her compliance

**with the plan to support such a claim.**

Ms. Rooney has pleaded facts sufficient to demonstrate she complied with her obligations under the compensation plan, and that Defendants have violated both the law and the plan itself in refusing to pay under its terms.

### A. Ms. Rooney properly pleaded resignation for Good Reason.

Under Defendants' plan, where a participant resigns for Good Reason, within two years of a change in control event, the participant must be paid out in full. Dkt. No. 8-3. The Plan defines Good Reason in relevant part, as: "the material breach by the Company" of "**any agreement**" between the Company and Ms. Rooney, which was not cured within 45 days of Ms. Rooney's October 23, 2023 notice. *Id*. at p.4 (Section 1.11). More than one agreement between the parties was materially breached by the Defendants. *See* Am. Compl. at ¶29. It is undisputed that Defendants failed to cure. *See id*. at ¶¶30-31; Ex. A.

In accordance with Section 1.12 of the deferred compensation plan, because these events took place within 24 months of a change in control event, Ms. Rooney's separation was an "Involuntary Termination of Employment." Dkt. No. 8-3 at p.4. In the event of an "Involuntary Termination of Employment," all deferred compensation vests fully (*see id*. at p.8, Section 4.4) and "shall [be] paid out in a lump sum" "no later than 90 days following the vesting date." *See id*. at p.9, Section 5.1). It is undisputed that Defendants have refused to pay. Ms. Rooney expressed through counsel that she had a claim. Am. Compl. at ¶39. Defendants responded. *See* Dkt. No. 8-7. Of particular note, here, as set forth below, they *refused* to follow the *explicit requirement* to notify her of her internal appeal rights – demonstrating their retaliatory animus. *See id*. (devoid of any notice of appeal rights). The plan clearly states:

> If the claim is denied, the Committee **shall** provide the Claimant with…a description of any additional information or material necessary for the Claimant

to perfect his or her claim, information, as to how the Claimant may submit his or her claim for review, and a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA in the event that his or her claim is denied upon review.  *See* Dkt. No. 8-3 at p.12.

Defendants' refusal to provide Ms. Rooney with her appellate rights as required by the plan they claim to be administering is shocking, especially where Defendants now have the audacity to claim that Ms. Rooney failed to exhaust her internal appeal after hiding those rights from her.  *See* Memo at p.22.  This demonstrates bad faith and the arbitrary and capricious nature of the decision to deny Ms. Rooney's claim for payment, and it establishes the futility of any internal complaint or appeal.  *See Barthelmes v. Kimberly-Clark Corp.*, 2015 U.S. Dist. LEXIS 39421, *16-17 (D. Mass. March 27, 2015).  Simply citing futility in this opposition is sufficient. *Id*.  Yet, Ms. Rooney does much more.  Am. Compl. at ¶¶ 39-46.  Ms. Rooney met her obligations under the plan and for proper pleading of a claim under ERISA.

## B.  <u>Defendants' challenge to Ms. Rooney's eligibility for plan benefits is wrong, and supported only by their unlawful acts and misconduct.</u>

Defendants' conduct in administering the plan is deficient and reeks of retaliatory animus. As to Defendants' argument that the Good Reason resignation must be causally tied to, and have a "nexus" with, the change in control, that required link is not written into the deferred compensation plan.  As Section 1.12 of the plan states:

> "Involuntary Termination of Employment" means…(b) a Participant's resignation for Good Reason that becomes effective during the 24-month period following a Change in Control Event.  *See* Dkt. No. 8-3 at p.4.

The provision is crystal clear:  so long as the Good Reason resignation occurs within 24 months of a Change in Control (which the parties agree took place), the "why" is irrelevant.  Were this not the case, the plan would state otherwise.[6]  Yet another falsehood conjured by Defendants.

---

[6]    As to the double trigger causation argument Defendants have conjured, one need look no further than their own General Counsel's November 2023 email to see that at the time they responded to Ms.

Indeed, Massachusetts courts will not read further than the agreement is written, despite

Defendants' new contortion of the text.  *See Stanton*, 621 F. Supp. 2d at 7 ("I cannot read textual

exceptions that are not there.").  Because "[a] primary purpose of ERISA is to ensure the

integrity and primacy of the written plans…the plain language of an ERISA plan should be given

its literal and natural meaning." *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir.

1997).  Indeed, where a contract is clear and unambiguous, Massachusetts courts require that the

words be given their "plain and ordinary" meaning. *See Balles* v. *Babcock Power, Inc.,* 476

Mass. 565, 571-572 (2017).  In ERISA cases, the First Circuit applies federal common law rules

to "'interpret the terms of the policy in an ordinary and popular sense, as would a person of

average intelligence and experience,' and 'construe all plan ambiguities in favor of the

insured…'" *Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 98 (1st Cir. 2008) (emphasis added).

To be sure, Leerink's plan administrator **"must not rewrite, under the guise of
interpretation,"** a term of the plan.  *See, e.g., Neuroaxis Neurosurgical Assocs., PC v. Costco
Wholesale Co.*, 919 F.Supp.2d 345 (S.D.N.Y. 2013) (emphasis added). Yet, an impermissible re-
writing is the only way to interpret their actions here.  This, juxtaposed with the denial of Ms.
Rooney's appeal rights notice and the retaliatory gerrymandering of her termination date to
deprive her of wages, yields only one conclusion.  Defendants can no longer be permitted to act
with impunity.  They must face judicial scrutiny into their misconduct.

### VI.    The breach of contract/good faith and fair dealing claims are well pleaded.

To meet her burden of production, Ms. Rooney must demonstrate that there exists a
dispute as to whether Defendants deprived her of an expected benefit. *See Wong v. Resolve*

---

Rooney's Good Reason resignation, they had not yet engaged in the prohibited re-writing of the plan.  His
email contained zero mention of the fictional "nexus" to a Change of Control they now invent.  *See* Ex. A.
They may not now recreate history.

*Tech.,* 2011 U.S. Dist. LEXIS 80733, *20 (D. Mass. 2011). Ms. Rooney's wages and other contractually guaranteed compensation were legitimate expected benefits. *See id.* Defendants deprived her of both. "The implied covenant…provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Owen v. Kessler*, 56 Mass. App. Ct. 466, 471 (2002). Thus, the question of whether Defendants "deprived [Ms. Rooney] of money that [she] had fairly earned and legitimately expected" must be litigated. *See Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 874 (1982); *see also*, *Krause v. UPS Supply Chain Solutions, Inc.*, 2009 U.S. Dist. LEXIS 101526 (D. Mass. 2009) (plaintiff could recover incentive pay under the implied covenant of good faith and fair dealing, even if were not yet contractually due). As a result, Ms. Rooney has met her burden on the breach of contract/good faith and fair dealing claims.

## VII.   The Quantum Meruit/Unjust Enrichment claim is properly pleaded.

Ms. Rooney's *quantum meruit/unjust enrichment* claims are properly pleaded, as she conferred a benefit upon Defendants by working for them, which they recognized, and Defendants have impermissibly retained her compensation. *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012). This claim is not governed by ERISA and must not be dismissed.

## VIII.   The fraud in the inducement count is properly pleaded.

Fraud in the inducement here, rests on Defendants' failures to disclose their known intentions with respect to both compensation and title. Am. Compl. at ¶83. As the SJC has made clear in complaints of fraud, "[f]ragmentary information may be as misleading as active misrepresentation, and half-truths may be as actionable as whole lies." *Kannavos v. Annino*, 356 Mass. 42, 48 (1969). When assessing whether the related factual allegations might generate a plausible inference of liability on that basis, a court may "draw on its judicial experience and

common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, (2009).  Defendants' failures were just

that, half-truths, and thus Count VI must not be dismissed.

    **IX.**    **<u>Ms. Rooney is entitled to the protections of the Massachusetts Wage Act</u>.**

    Hidden in a footnote, Defendants argue that Ms. Rooney cannot invoke the Wage Act

because she is a New York resident working in Leerink's New York office.  Memo at p.11, fn. 9.

*Wilson v. Recorded Future, Inc.*, 669 F. Supp. 3d 53, 59 (D. Mass. 2023), proves their argument

wrong, as "there is no requirement that [plaintiff] reside or work in Massachusetts to be afforded

the Wage Act's protections—only that Massachusetts has the most significant relationship with

[her] employment." Ms. Rooney satisfies the *Wilson* factors.  Her Offer Letter (Dkt. No. 8-1 at

p.6) and the deferred compensation plan (Dkt. No. 8-1 at p.14) are governed by Massachusetts

law.  The Boston office was the company's principal place of business.  Am. Compl. at ¶ 2.  Her

direct supervisor (Dubin) worked out of the Boston office where he oversaw the Biopharma

Investment Banking team, of which Ms. Rooney was a member, and Leerink's CEO (Leerink)

worked out of the Boston office where he oversaw all Leerink activities.  *Id*. at ¶ 7.  Ms. Rooney

interacted with company officials in Massachusetts and is entitled to the inference that she and

the Biopharma Investment Banking team transacted significant amounts of its business in

Massachusetts.  Just as in *Wilson*, the motion to dismiss must fail at this stage.  *Wilson*, 669 F.

Supp. 3d at 59 ("taking all inferences in favor of [plaintiff] at this stage…Massachusetts may

have the most significant connection to the employment relationship between [plaintiff] and

[employer] and the Massachusetts Wage Act may apply").

<u>**Conclusion**</u>

    Defendants' effort to evade judicial scrutiny into their misconduct is revealing.  A delay

tactic, fueled by false facts.  This Court should <u>deny</u> Defendants' motion in its entirety.

Respectfully submitted,

MAIRIN ROONEY,

By her counsel,

/s/ Benjamin Flam

_____
Philip J. Gordon (BBO# 630989)
Benjamin Flam (BBO# 671853)
GORDON LAW GROUP, LLP
585 Boylston Street
Boston, MA 02116
Phone: (617) 536-1800
Fax: (617) 536-1802
pgordon@gordonllp.com
Dated:  June 20, 2024        bflam@gordonllp.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a true and accurate copy of the foregoing document upon counsel for defendants by ECF and via e-mail.

/s/ Benjamin Flam

_____
Benjamin Flam

21

# APPENDIX

# Keefe v. LendUs, LLC

United States District Court for the District of New Hampshire

June 8, 2020, Decided

Civil No. 20-cv-195-JD

**Reporter**

2020 U.S. Dist. LEXIS 99924 *; 2020 DNH 099; 2020 WL 3051779

Quentin Keefe v. LendUs, LLC

**Subsequent History:** Motion granted by, Motion denied by Keefe v. Lendus, LLC, 2021 U.S. Dist. LEXIS 253919, 2021 WL 6932196 (D.N.H., May 12, 2021)

Motion granted by Keefe v. LendUS, LLC, 2021 U.S. Dist. LEXIS 150415, 2021 WL 3550036 (D.N.H., Aug. 11, 2021)

Motion granted by Keefe v. Lendus, LLC, 2022 U.S. Dist. LEXIS 185007, 2022 WL 4985658 (D.N.H., Jan. 13, 2022)

Partial summary judgment denied by, Summary judgment granted by Keefe v. Lendus, LLC, 2022 U.S. Dist. LEXIS 233466, 2022 WL 17976795 (D.N.H., Oct. 13, 2022)

Motion granted by, in part Keefe v. Lendus, LLC, 2023 U.S. Dist. LEXIS 41368, 2023 WL 2430195 (D.N.H., Feb. 22, 2023)

Motion denied by, Without prejudice, Motion granted by, in part, Motion denied by, in part, Motion granted by Keefe v. Lendus, LLC, 2023 U.S. Dist. LEXIS 35190, 2023 WL 2326451 (D.N.H., Mar. 2, 2023)

**Counsel:** **[\*1]** For Quentin Keefe, Plaintiff: James Joseph Armillay, Jr., Timothy John McLaughlin, Shaheen & Gordon, Concord, NH.

For LendUs, LLC, successor of Regency Mortgage Corp., Successor, Regency Mortgage Corp., Defendant: Tara E. Lynch, LEAD ATTORNEY, Gordon Rees Scully Mansukhani LLP, Boston, MA.

**Judges:** Joseph A. DiClerico, Jr., United States District Judge.

**Opinion by:** Joseph A. DiClerico, Jr.

# Opinion

ORDER

Quentin Keefe brought suit against his former employer, LendUs, LLC, seeking in part to enforce the terms of the Executive Incentive Bonus Program under the Employee Retirement and Income Security Act ("ERISA"). He contends that after his employment terminated, LendUs failed to pay him the benefits that were owed to him. LendUs moves to dismiss Counts I, II, and V on the ground that Keefe has not alleged ERISA claims.

## Standard of Review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts the well-pleaded factual allegations in the complaint as true and construes reasonable inferences in the plaintiff's favor. Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019). "To withstand a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." Rios-Campbell v. United States DOC, 927 F.3d 21, 24 (1st Cir. 2019) (internal quotation marks omitted). The purpose of the plausibility **[\*2]** standard is to "weed out cases that do not warrant either discovery or trial." Id. (internal quotation marks omitted).

## Background

Keefe was a co-founder and chief executive officer of Regency Mortgage Corp. In December of 2014, Keefe sold Regency to RPM Holdings I, LLC. Keefe was employed by RPM as president and chief executive officer of Regency. On January 12, 2017, LendUs became the successor in interest to Regency when Regency was reincorporated.

Keefe received salary and benefits provided by the Executive Incentive Bonus Program ("Program"). The Program states that its purpose is to retain Keefe as an executive employee of Regency by providing him "with an opportunity to receive annual bonuses and a long-term interest in the profits of Regency." Doc. 11-1, at *2. The Program also was "intended to be exempt from the reporting and disclosure requirements of Title I of ERISA because it is an unfunded plan maintained

by an employer for the purpose of providing benefits for a select group of management or highly compensated employees." Id. Article II provides the terms for annual bonuses, and Article III provides for the settlement of interest in net profits.

Keefe contends that his annual [*3] bonus for 2018 was at least $1,027,116 and that he was not paid that amount. He contends that his interest in net profits, the settlement amount, was 20% of the net profits of the business, which was payable within sixty days after the termination of his employment. He states that the settlement amount is $3,592,471 and has not been paid.

Keefe was an employee of LendUs after Regency was reincorporated. He attempted to negotiate with the chief executive officer of LendUs for early retirement but that was unsuccessful. LendUs terminated Keefe's employment on December 31, 2018.

When he was unable to obtain the benefits that he believed he was due, Keefe brought suit. Keefe alleges three claims under ERISA and also alleges claims for breach of contract and breach of the covenant of good faith and fair dealing. In the ERISA claims, he seeks enforcement of the 2018 annual bonus provision of the Program, Count I; enforcement of the bonus settlement amount, Count II; and attorneys' fees, Count V.

## Discussion

LendUs moves to dismiss the ERISA claims, Counts I, II, and V, on the ground that the Program is not an ERISA plan and is not subject to enforcement under ERISA. Keefe contends that the Program [*4] is a "top hat" plan that is enforceable under ERISA. In reply, LendUs contends that Keefe has not alleged facts to show that the Program is a top hat plan, and Keefe argues in his surreply that the bonus settlement amount was a top hat plan that provided deferred compensation.

## A. Legal Framework

Employee benefit plans under ERISA may provide welfare or pension benefits. 29 U.S.C. §§ 1002(1) & 1002(2)(A); M&G Polymers USA, LLC v. Tackett, 574 US 427, 434, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015). Pension benefit plans provide retirement income or benefits that result from a deferral of income. § 1002(2)(A). A top hat plan is an ERISA plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2); Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 42 (1st Cir.

2008). Top hat plans are not subject to the substantive ERISA requirements that are intended to safeguard employee benefit funds. Id. Top hat plans, however, are subject to ERISA enforcement provisions. Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 46 n.3 (1st Cir. 2000).

"The fact that a plan is 'established as a means to retain valuable employees' does not disqualify it from top hat status it otherwise deserves." Alexander v. Brigham and Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006) (quoting Demery v. Extebank Deferred Compensation Plan (B), 216 F. 3d 283, 287 (2d Cir. 2000)); accord Tolbert v. RBC Capital Mkts. Corp., 2015 U.S. Dist. LEXIS 55196, 2015 WL 2138200, at *4 (S.D. Tex. Apr. 28, 2015). The use of the term "primarily" in the statute means the primary benefit of the plan, not the primary use of the plan. 2015 U.S. Dist. LEXIS 55196, [WL] at *5 (citing U.S. Dept. of [*5] Labor ERISA Opinion 90-14A, at 2). For that reason, a plan that states a primary purpose of retaining valuable employees may nevertheless be a top hat plan if the primary benefit is deferred compensation. Id.

On the other hand, an ERISA plan does not include plans for payments made as bonuses for work performed, "unless such payments are systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c). An annual bonus plan, when no annual bonuses have been deferred by the employer, is not an ERISA top hat plan. Baumgardner v. Cannon, 2018 U.S. Dist. LEXIS 95160, 2018 WL 2722453, at *4 (D. Colo. June 6, 2018). A plan whose primary purpose is to provide bonuses rather than deferred compensation is not an ERISA top hat plan. Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 (8th Cir. 1999).

## B. ERISA Plan

The parties do not dispute that the Program was unfunded and was intended for a select employee, Keefe, as required for an ERISA top hat plan. LendUs argues that the Program was a bonus plan intended to retain Keefe as an employee and did not have as its primary purpose providing deferred compensation. Keefe contends that the Program was a top hat plan and focuses on the settlement amount provided in Article III of the Program. In response, LendUs argues that the settlement amount provided in Article III, taken by itself, is not an ERISA [*6] plan and is instead a single lump sum payment.

## 1. Employee Benefit Plan Requirements

To qualify as an ERISA plan, employee benefits must meet certain criteria. "[A]n employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations by the

employer to the behoof of employees or their beneficiaries." Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995). A one-time lump-sum payment, such as a severance payment, does not require ongoing administration and, therefore, is not an ERISA plan. Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 12, 107 S. Ct. 2211, 96 L. Ed. 2d 1 (1987). In one test for an ERISA plan, the court must determine whether "(1) the employer has manifested its intention to provide benefits on a regular and long-term basis; (2) a reasonable person would be able to ascertain the plan's intended benefits, the class of beneficiaries, the source of financing, and the procedures for recovering benefits, and (3) the benefits are to be provided pursuant to an on-going administrative scheme." Simmons v. Serv. Credit Union, No. 17-CV-159-PB, 2018 U.S. Dist. LEXIS 39693, 2018 WL 1251628, at *2 (D.N.H. Mar. 12, 2018).

## 2. Bonus Plan

Article II of the Program provides for the annual bonuses. Although the annual bonuses were not paid immediately, they were not deferred compensation for purposes of providing an employee [*7] pension benefits. The fact that the 2018 bonus has not been paid does not make the annual bonus provision a deferred income plan. The purpose of a top hat plan must be to provide deferred income, and that is not the purpose of the annual bonuses.

## 3. Settlement Amount

On the other hand, under Article III, the settlement amount was deferred until the five-year anniversary of the effective date of the Program (December 1, 2019) or Keefe's termination, whichever was later. Therefore, Keefe could not receive the settlement amount until the termination of his employment. That arrangement suggests deferred compensation.

A pension or severance plan is an ERISA plan, however, only if it requires an ongoing administration after employment ends. Fort Halifax, 482 U.S. at 12. "Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employers' need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria." Miller v. Starkey Labs., Inc., 299 F. Supp. 3d 1046, 1053 (D. Minn. 2018). Whether a plan is an ERISA plan depends on the employer's obligations in administering [*8] the benefits so that a "one-shot, take-it-or-leave-it incentive" without an ongoing administrative scheme is less likely to be an ERISA plan. O'Connor v. Commonwealth Gas. Co., 251 F.3d 262, 267 (1st Cir. 2001).

LendUs argues that the settlement amount part of the Program is not an ERISA plan because it is simply a one-time bonus, in the nature of a severance bonus. LendUs further argues that the settlement amount does not require any administration for the payment to be made. Keefe argues that the settlement amount does require administration, making it an ERISA plan.

Keefe points to the provisions of the Program for claiming benefits. Article 3.1 of the Program provides the means for determining the settlement amount. That process occurs within sixty days after termination of employment and requires liquidation of Keefe's interest in profits based on specified calculation. The present value of Keefe's interest is to be determined by an independent accounting firm, which is acceptable to both Keefe and LendUs. The method of the appraisal is also provided.

Article VII addresses the administration of the Program. The Program is to be administered by a designated person. Disputes may be subject to arbitration. The administrator is required to keep all necessary [*9] records and to furnish information to Keefe, as the administrator determines is necessary.

Claims for benefits under the Program are to be submitted to the administrator. Art. 7.2. Claims must be decided within 90 days of submission unless extended to 120 days. A denied claim is subject to a review process.

The process provided by the Program for paying the settlement amount appears to extend beyond a simple one-time severance payment. Instead, that process requires administration of the Program to continue after termination. Based on the motion to dismiss standard, the court cannot determine as a matter of law that the settlement amount part of the Program is not an ERISA top hat plan.

## Conclusion

For the foregoing reasons, the defendant's motion to dismiss (document no. 13) is granted as to Count I and denied as to Counts II and V.

SO ORDERED.

/s/ Joseph A. DiClerico, Jr.

Joseph A. DiClerico, Jr.

United States District Judge

June 8, 2020

2020 U.S. Dist. LEXIS 99924, *9

**End of Document**