# Exhibit 74

**Final Form**

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

OF

LEERINK HOLDINGS LLC,

a Delaware Limited Liability Company

---

Dated as of October 2, 2023

# TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS


1.1 Definitions....2
1.2 Interpretive Provisions....20


ARTICLE II
THE LIMITED LIABILITY COMPANY


2.1 Formation....21
2.2 Name....22
2.3 Business Purpose....22
2.4 Registered Office and Agent....22
2.5 Term....22
2.6 Company Powers....22
2.7 Business Transactions of a Member or Director with the Company....23
2.8 Principal Place of Business....23
2.9 Title to Company Property....23


ARTICLE III
THE MEMBERS


3.1 The Members....23
3.2 No Participation in Management....23
3.3 Member Meetings....23
3.4 Liability of Members....24
3.5 Pass-Through Rights and Obligations....24
3.6 Corresponding Management Holdco Units....25


ARTICLE IV
THE BOARD AND OFFICERS


4.1 Management by the Board of Directors....26
4.2 Meetings of the Board....27
4.3 Authority of the Board; Power to Bind Company....28
4.4 Major Decisions....29
4.5 Officers and Related Persons....31
4.6 Committees....32
4.7 Reliance by Third Parties....32
4.8 No Fiduciary Duties....32
4.9 Corporate Opportunities....33
4.10 Insurance....34
4.11 Affiliate Transactions....35

4.12 Investment Opportunity ....35

ARTICLE V
CAPITAL STRUCTURE AND CONTRIBUTIONS

5.1 Capital Structure ....36
5.2 Unit Schedule ....38
5.3 Preemptive Rights ....38
5.4 No Withdrawal of Capital Contributions ....40
5.5 No Other Capital Contributions ....40
5.6 Capital Accounts ....40

ARTICLE VI
ALLOCATIONS AND DISTRIBUTIONS.

6.1 Allocations ....41
6.2 Tax Allocations ....43
6.3 No Right to Distributions ....44
6.4 Distributions ....44
6.5 Distributions to Holders of Class B-2 Units ....45
6.6 Tax Distributions ....46
6.7 Withholding ....46
6.8 Restrictions on Distributions ....47
6.9 Determinations by the Board ....47

ARTICLE VII
ACCOUNTS

7.1 Books ....47
7.2 Reports ....48
7.3 Tax Matters ....48
7.4 Fiscal Year ....51

ARTICLE VIII
TRANSFER OF UNITS IN THE COMPANY

8.1 Prohibition ....52
8.2 Conditions to Permitted Transfers ....53
8.3 Effect of Transfers ....54
8.4 Admission of Additional Members ....54
8.5 Admission of Assignees as Substitute Members ....55
8.6 Cessation of Member ....55
8.7 Withdrawal of Members Upon Transfer ....55
8.8 Call Rights. ....56
8.9 Company Call Option; Qualified Sale ....57
8.10 Right of First Offer. ....60
8.11 Tag-Along Rights ....61
8.12 Drag-Along Rights ....63

8.13 Effect of Notices ....65
8.14 After-Acquired Securities ....65
8.15 Management Holdco Purchase Rights ....65
8.16 Certain Terms and Conditions applicable to Drag-Along Sales, Tag-Along Sales and Qualified Sales ....65
8.17 Change of Control ....67

ARTICLE IX
INITIAL PUBLIC OFFERING; REGISTRATION RIGHTS

9.1 Public Offering Mechanics ....69
9.2 Treatment of Units in Conversion Transaction ....71
9.3 Registration Rights ....71

ARTICLE X
EVENTS OF DISSOLUTION

10.1 Dissolution ....72

ARTICLE XI
TERMINATION

11.1 Liquidation ....73
11.2 Final Accounting ....73
11.3 Distribution in Kind ....73
11.4 Certificate of Cancellation ....73

ARTICLE XII
EXCULPATION AND INDEMNIFICATION

12.1 Exculpation ....73
12.2 Indemnification ....74
12.3 Effect of Modification ....74
12.4 Non-exclusivity of Rights ....75

ARTICLE XIII
AMENDMENT TO AGREEMENT

13.1 Amendments ....75

ARTICLE XIV
[RESERVED.]

ARTICLE XV
GENERAL PROVISIONS

15.1 Expenses ....76
15.2 Notices ....76

| | | |
|---|---|---|
| 15.3 | Publicity; Confidentiality | 77 |
| 15.4 | Entire Agreement and Waiver | 78 |
| 15.5 | Counterparts | 78 |
| 15.6 | Severability | 78 |
| 15.7 | Governing Law | 78 |
| 15.8 | WAIVER OF JURY TRIAL | 78 |
| 15.9 | Binding Effect | 79 |
| 15.10 | Additional Documents and Acts | 79 |
| 15.11 | No Third-Party Beneficiary | 79 |
| 15.12 | Non-Recourse | 79 |
| 15.13 | Successors and Assigns | 79 |
| 15.14 | Jurisdiction; Service of Process | 80 |
| 15.15 | Specific Performance | 80 |
| 15.16 | Representations and Warranties | 80 |
| 15.17 | Survival of Representations and Warranties; Termination of Covenants | 80 |

**Schedules**

| | |
|---|---|
| Schedule A | Membership Interests; Capital Contributions |
| Schedule B | Certain Management Holders |
| Schedule C | Directors |
| Schedule D | Officers |
| Schedule E | Representations and Warranties |
| Schedule I | Class A Units Annual Amortization |
| Schedule II | Comparable Companies for Adjusting Multiple |

**Exhibits**

| | |
|---|---|
| Exhibit A | Joinder Agreement |
| Exhibit B | Spousal Consent |
| Exhibit C | Form of Applicable Class B-2 Award Agreement |

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") of Leerink Holdings LLC (f/k/a Saffron HoldCo LLC), a Delaware limited liability company (the "Company"), is made and entered into as of October 2, 2023, by and between each of the Persons set forth on Schedule A.

**RECITALS**

WHEREAS, on May 25, 2023, the Company was formed by filing a Certificate of Formation with the Secretary of State of the State of Delaware in accordance with the provisions of the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) (the "Act"), and on 25, 2023, Leerink Aggregator LP (f/k/a Saffron Management Aggregator LP), a Delaware limited partnership ("Management Holdco") entered into a written agreement pursuant to the Act governing the affairs of the Company and the conduct of its business (the "Existing LLC Agreement");

WHEREAS, pursuant to the Purchase Agreement, dated as of June 17, 2023 (the "Purchase Agreement"), by and among the Company, Leerink Intermediate Holdings LLC (f/k/a Saffron Buyer LLC), a Delaware limited liability company ("Purchaser"), SVB Financial Group, a Delaware limited liability company ("SVBFG"), and SVB Holdings LLC, a Delaware limited liability company ("Seller"), Purchaser agreed to acquire all of the equity interests of Leerink Partners LLC (f/k/a SVB Securities LLC), a Delaware limited liability company ("SVBS") and MEDACorp LLC (f/k/a SVB MEDACorp LLC), a Delaware limited liability company ("SVB Medacorp"), from Seller and certain other assets from Seller and SVBFG on the terms and conditions set forth therein (the "SVBS Acquisition");

WHEREAS, pursuant to the Subscription Agreements, dated as of September 11, 2023, by and between Management Holdco and certain Management Holders listed on Schedule A hereto (such agreements, the "Subscription Agreements"), the Management Holders purchased the number of Management Holdco Class A Units and Management Holdco Class B-1 Units set forth in such Subscription Agreements (the "Subscription") immediately prior to the consummation of the SVBS Acquisition for an aggregate amount equal to $50 million (the "Management Initial Capital Contribution");

WHEREAS, pursuant to the Applicable Class B-2 Award Agreements, dated as of October 2, 2023, by and between Management Holdco and certain Management Holders listed on Schedule B hereto, such Management Holders will be issued the number of Management Holdco Class B-2 Units set forth in such Applicable Class B-2 Award Agreements upon the consummation of the SVBS Acquisition;

WHEREAS, pursuant to the Subscription and Contribution Agreement, dated as of the date hereof, by and between Management Holdco and the Company (the "Subscription and Contribution Agreement"), immediately following consummation of the Subscription and prior to consummation of the SVBS Acquisition, Management Holdco contributed the Management Initial Capital Contribution to the Company in exchange for Class A Units and Class B-1 Units of the Company set forth in the Subscription and Contribution Agreement, which Management Holdco

will hold on behalf of the Management Holders immediately following the consummation of the Subscription;

WHEREAS, pursuant to the Subscription and Contribution Agreement, dated as of the date hereof, by and between the Baupost Investors and the Company (the "Baupost Subscription and Contribution Agreement"), immediately following the consummation of the Subscription and immediately prior to consummation of the SVBS Acquisition, the Baupost Investors contributed $50 million to the Company in exchange for Class A and Class B-1 units of the Company set forth in the Baupost Subscription and Contribution Agreement; and

WHEREAS, the SVBS Acquisition has been consummated on the date hereof, and in connection and substantially concurrently therewith, pursuant to and in accordance with Section 9.2 of the Existing LLC Agreement, the Investors wish to amend and restate the Existing LLC Agreement in its entirety upon the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 Definitions. As used herein, the following terms have the meanings set forth below:

"Accounting Firm" means such accounting firm as the Board shall from time to time determine.

"Act" shall have the meaning set forth in the recitals hereto.

"Additional Member" shall mean a Person who has acquired newly issued Units directly from the Company after the date hereof and has been admitted as a Member of the Company pursuant to Section 8.4.

"Additional Securities" shall have the meaning set forth in Section 5.3(a).

"Adjusted Capital Account Deficit" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year after giving effect to the following adjustments: (a) credit to such Capital Account any amounts that such Member is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) debit to such Capital Account such Member's share of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusting Multiple" shall mean the prevailing median multiple derived from the Comparable Multiples (as defined herein) calculated for each of the publicly traded companies set forth on Schedule II ("Comparable Companies"), in each case based on such company's most

recent publicly available financial information at such time of calculation, which list of companies shall be amended by the Board (with the consent of at least one Baupost Director) on an annual basis to remove any companies that cease to be publicly traded or are delisted from primary exchanges and to make any other mutually agreed modifications. Any such amendments made by the Board (with the consent of at least one Baupost Director) to Schedule II shall be automatically effective and reflected in the calculations of the Adjusting Multiple, Hurdle and Qualified Change of Control, as applicable, in accordance with this Agreement.]

"Affiliate" shall mean, with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise. "Affiliate" also includes any Person who is (or is directly, or indirectly through one or more intermediaries, controlled by) a spouse, ancestor, descendant or sibling of the Person to whom reference is made, a spouse of such ancestor, descendant or sibling, or a trust created for the primary benefit of such spouse, ancestor, descendant or sibling. Notwithstanding anything to the contrary set forth in this Agreement, (a) no portfolio company of the Baupost Investors or their Affiliates shall be deemed or treated as an Affiliate, and (b) Management Holdco shall not be deemed or treated as an Affiliate of the Baupost Investors.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Applicable Class B-2 Award Agreement" shall mean, with respect to any Class B-2 Unit, an agreement, substantially in the form set forth on Exhibit C, between a limited partner of Management Holdco and Management Holdco evidencing an award of the Management Holdco Class B-2 Unit that corresponds to such Class B-2 Unit.

"Applicable Holders" shall have the meaning set forth in Section 5.3(a).

"Applicable Persons" shall have the meaning set forth in Section 4.9(a).

"Article 8 Investor" shall have the meaning set forth in Section 8.16(a).

"Article 8 Seller" shall have the meaning set forth in Section 8.16(a).

"Article 8 Transaction" shall have the meaning set forth in Section 8.16.

"Assignee" shall mean a transferee of Units who has not been admitted as a Substitute Member.

"Baupost Called Units" shall have the meaning set forth in Section 8.9(a).

"Baupost Change of Control Sale Proceeds" shall have the meaning set forth in Section 8.9(b)(iii).

"Baupost Directors" shall have the meaning set forth in Section 4.1(b)(i)(B).

"Baupost Investors" shall mean (i) Baupost Limited Partnership 1983 A-1, (ii) Baupost Limited Partnership 1983 B-1, (iii) Baupost Limited Partnership 1983 C-1, (iv) PB Institutional Limited Partnership, (v) Baupost Value Partners, L.P.-I, (vi) Baupost Value Partners, L.P.-II, (vii) Baupost Value Partners, L.P.-III and (viii) Baupost Value Partners, L.P.-IV.

"Baupost Per Unit Call Price" shall have the meaning set forth in Section 8.9(b)(i).

"Baupost Request for Sale Notice" shall have the meaning set forth in Section 8.9(a).

"Baupost Subscription and Contribution Agreement" shall have the meaning set forth in the recitals hereto.

"Blocker" shall mean any entity that is classified as a domestic corporation within the meaning of Section 7701(a) of the Code provided that such entity's assets have, since its date of formation, consisted exclusively of (a) equity interests in the Company or any entity classified as a partnership or disregarded entity for U.S. federal income tax purposes whose assets have consisted exclusively of direct or indirect (solely through other entities classified as partnerships or disregarded entities) equity interests in the Company, and (b) cash and any other assets that are incidental to the ownership of direct or indirect interests in the Company.

"Blocker Sale" shall have the meaning set forth in Section 7.3(f).

"Blocker Securities" shall have the meaning set forth in Section 7.3(f).

"Board" shall have the meaning set forth in Section 4.1(a).

"Book Value" shall mean, with respect to any Company asset, the adjusted tax basis of the asset for United States federal income tax purposes, except that (a) the initial Book Value of any property contributed by a Member to the Company (other than cash) shall be the gross Fair Market Value of such property, and (b) the Book Values of all Company assets shall be adjusted to equal their respective gross Fair Market Values, in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Regulations, except as otherwise provided herein, immediately prior to: (i) the date of the acquisition of any additional Units by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the date of the Distribution of more than a de minimis amount of Company property (other than a pro rata Distribution) to a Member; (iii) the date of the actual liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the date of the acquisition of any additional Units (other than a de minimis Unit) by any new or existing Member as consideration for the performance of services to or for the benefit of the Company; or (v) any other time at which revaluations of property are permitted to be made under Regulations Section 1.704-1(b)(2)(iv); *provided* that adjustments pursuant to clauses (i) through (v) above shall be made only if the Company determines in good faith that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.

"Business" shall mean the business of SVBS, SVB Medacorp and their respective Subsidiaries (if any) as conducted in each state and other jurisdiction in North America in which

SVBS or SVB Medacorp has offices or customers or otherwise conducts business operations as of a given date.

"Business Day" shall mean a day other than any day on which banks are authorized or obligated by Law or executive order to close in New York, New York.

"Capital Account" shall have the meaning set forth in Section 5.6(a).

"Capital Contribution" shall mean any contribution or deemed contribution of cash or property to the Company made by or on behalf of a Member, as set forth from time to time in the books and records of the Company and as set forth on Schedule A hereto. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution of its predecessor(s) in interest.

"Cause" shall mean, with respect to any Management Holder: (a) conviction of (or pleading nolo contendere to) theft, fraud, deceit, embezzlement or willful misappropriation of funds or property of the Company or any of its Affiliates; (b) any dishonesty, moral turpitude or willful misconduct relating to the Company or any of its Affiliates, or shareholders, or any of their businesses or any action or omission that the Management Holder knows or should know will have a material adverse effect on the Company or any of its Affiliates, or their businesses, including, without limitation, gross negligence or continuous nonfeasance with regard to the Management Holder's duties; (c) conviction of (or pleading nolo contendere to) a felony that reasonably could be deemed to affect the fitness of the participant for his or her position or is likely to adversely affect the Company's or any of its Affiliates' reputation or business; or (d) becoming permanently enjoined by any bank regulatory authority, the Securities and Exchange Commission, FINRA, or any other governmental, self-regulatory organization, or industry regulatory authority from working in the investment advisory, securities, broker-dealer, or distribution industry or other industry in which the Company or any of its Affiliates engages, after any and all appeal periods have expired.

"Certificate of Cancellation" shall mean the certificate required to be filed with the Secretary of State of the State of Delaware pursuant to Section 18-203 of the Act in connection with a dissolution of the Company.

"Certificate of Formation" shall have the meaning set forth in Section 2.1.

"Change of Control" shall mean (a) any transaction or series of transactions immediately following which a Person or Persons acting as a group (other than Management Holdco) becomes the beneficial owner of more than fifty percent (50%) of the outstanding Voting Units of the Company, (b) any transaction or series of transactions, immediately following which Management Holdco, directly or indirectly, beneficially own less than fifty percent (50%) of the outstanding voting equity interests of (i) the Company, (ii) Purchaser, (iii) any direct or indirect holding company or parent of the Company or Purchaser or (iv) a successor to any entity described in clauses (i) and (iii), (c) a sale, lease, license or other disposition of all or substantially all of the Company's assets (including the capital stock or assets of the Company's Subsidiaries) or (d) a Qualified Offering.

"Chosen Courts" shall have the meaning set forth in Section 15.14.

"Claim" shall have the meaning set forth in Section 12.2(a).

"Class A Holders" shall mean the Class A Holders as listed on Schedule A at the time of reference.

"Class A Units" shall mean the Class A Units of the Company, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in Sections 5.1(a) and 5.1(b).

"Class B Holders" shall mean the Class B-1 Holders and the Class B-2 Holders.

"Class B Units" shall mean, collectively, the Class B-1 Units and the Class B-2 Units.

"Class B-1 Holder" shall mean a Member owning Class B-1 Units, in such Member's capacity as such.

"Class B-1 Units" shall mean the Class B-1 Units of the Company, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in Sections 5.1(a) and 5.1(b).

"Class B-2 Holder" shall mean a Member owning Class B-2 Units, in such Member's capacity as such.

"Class B-2 Units" shall mean the Class B-2 Units of the Company, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in Sections 5.1(a) and 5.1(b).

"Code" shall mean the United States Internal Revenue Code of 1986.

"Company" shall have the meaning set forth in the preamble hereto.

"Company Call Determination Date" shall have the meaning set forth in Section 8.9(b)(i).

"Company Call Equity Value" means an aggregate equity valuation of the Company and its Subsidiaries, collectively, equal to (i) 150% multiplied by (ii) the trailing twelve (12) months revenue of the Company and its Subsidiaries based on the most recent available financial information of the Company and its Subsidiaries (calculated as of the Company Call Notice Date).

"Company Call Notice" shall have the meaning set forth in Section 8.9(a).

"Company Call Notice Date" shall have the meaning set forth in Section 8.9(a).

"Company Call Option" shall have the meaning set forth in Section 8.9(a).

"Company Call Option Consideration" shall have the meaning set forth in Section 8.9(b)(i).

"Company Call Period" shall have the meaning set forth in Section 8.9(a).

"Company Call Prohibition Event" shall have the meaning set forth in Section 8.9(b)(iii).

"Company Industry Segment" shall have the meaning set forth in Section 4.9(b).

"Company Intent to Redeem Notice" shall have the meaning set forth in Section 8.9(a).

"Company Minimum Gain" shall mean "partnership minimum gain" as set forth in Regulations Section 1.704-2(b)(2).

"Company Offeror" shall mean (a) the Company (including any entity formed in a Conversion Transaction pursuant to Section 9.1), (b) any successor to the Company or any surviving entity resulting from a merger, consolidation or other business combination involving the Company or any wholly owned Subsidiary of the Company, (c) any Subsidiary of the Company that is a holding company for all or substantially all of the operating assets of the Company's Subsidiaries, or (d) any other entity the securities of which are exchanged for Units pursuant to Article IX in anticipation of an IPO.

"Company Per Unit Call Price" shall have the meaning set forth in Section 8.9(b)(i).

"Comparable Multiple" shall mean the average market capitalization to last twelve month revenue multiple ("Market Capitalization to LTM Revenue Multiple") calculated by taking the average of the Market Capitalization to LTM Revenue Multiple of each applicable Comparable Company, calculated as of the Hurdle Measurement Date and as of each of the six months preceding the Hurdle Measurement Date (each such measurement date, the "Multiple Measurement Date"); *provided* that, if the Hurdle Measurement Date is the last day of the month, each of the other Multiple Measurement Dates shall be on the last day of each of the five (5) preceding months. The Market Capitalization to LTM Revenue Multiple is calculated by dividing the fully diluted market capitalization of the applicable Comparable Company by the last twelve (12)-month revenue of such Comparable Company, based on the most recent publicly available financial information of such Comparable Company at the time of the applicable Multiple Measurement Date. By way of illustration, (A) if the Hurdle Measurement Date is June 2, then the six (6)-month average Market Capitalization to LTM Revenue multiple is calculated by taking the average of the market capitalization to LTM revenue multiple on each of (1) June 2, (2) May 2, (3) April 2, (4) March 2, (5) February 2 and (6) January 2; (B) if the Hurdle Measurement Date is June 30, then the six (6)-month average Market Capitalization to LTM Revenue multiple is calculated by taking the average of the market capitalization to LTM revenue multiple on each of (1) June 30, (2) May 31, (3) April 30, (4) March 31, (5) February 28 and (6) January 31; and (C) if the Hurdle Measurement Date is February 28, then the six (6)-month average Market Capitalization to LTM Revenue multiple is calculated by taking the average of the market capitalization to LTM revenue multiple on each of (1) February 28, (2) January 31, (3) December 31, (4) November 30, (5) October 31 and (6) September 30.

"Competitor" shall mean any Person engaging in the Business.

"Conversion Transaction" shall have the meaning set forth in Section 9.1(a).

"Corporate Opportunities" shall have the meaning set forth in Section 4.9(a).

"Corresponding Direct Management Units" shall have the meaning set forth in Section 8.15.

"Corresponding Management Holdco Unit" shall have the meaning set forth in Section 3.6.

"Court of Chancery" shall have the meaning set forth in Section 15.14.

"Covered Persons" shall have the meaning set forth in Section 4.8(b).

"Deal Counsel" shall have the meaning set forth in Section 8.9(b)(iii).

"Delaware Federal Court" shall have the meaning set forth in Section 15.14.

"Delayed Company Call Closing Date" shall have the meaning set forth in Section 8.9(b)(iii).

"Director" shall have the meaning set forth in Section 4.1(a).

"Disability" shall mean, with respect to any Management Holder, the Termination of such Management Holder as a result of such Management Holder's incapacity due to physical or mental illness that shall have prevented such Management Holder from performing his or her duties for the Company or its Affiliates on a full-time basis for more than six (6) months. Any question as to the existence, extent, or potentiality of Management Holder's Disability upon which Management Holder and the Company cannot agree shall be determined by a qualified, independent physician selected by the Company and approved by the Management Holder (which approval shall not be unreasonably withheld). The determination of any such physician shall be final and conclusive for all purposes of this Agreement.

"Disclosure Law" shall mean, as to any Person, any law, statute, treaty, rule, regulation, right, privilege, qualification, license or franchise or determination of any Governmental Authority or stock exchange, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

"Discount" shall have the meaning set forth in Section 7.3(f).

"Discount Valuation Firm" shall have the meaning set forth in Section 7.3(f).

"Disinterested Party Approval" shall have the meaning set forth in Section 4.11.

"Distribution" shall mean a transfer of cash, securities or other property by the Company to a Member on account of Units as described in Article VI (including Tax Distributions).

"Drag-Along Notice" shall have the meaning set forth in Section 8.12(b).

"Drag-Along Portion" shall mean, with respect to any Dragged Member, the product of (a) a fraction, the numerator of which is the number of Units proposed to be sold by the

Dragging Member in a Drag-Along Sale and the denominator of which is the total number of Units then owned by the Dragging Member and (b) the total number of Units (including Class B-2 Units that are vested or that will vest in connection with the Drag-Along Sale based upon the price per unit to be received in such Drag-Along Sale or the Dragging Member's reasonable good faith estimate thereof) held by such Dragged Member.

"Drag-Along Purchaser(s)" shall have the meaning set forth in Section 8.12(a).

"Drag-Along Sale" shall have the meaning set forth in Section 8.12(a).

"Drag-Along Units" shall have the meaning set forth in Section 8.12(b).

"Dragged Member" shall have the meaning set forth in Section 8.12(a).

"Dragging Member" shall have the meaning set forth in Section 8.12(a).'

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Event of Dissolution" shall have the meaning set forth in Section 10.1.

"Exchange Act" shall mean the Securities Exchange Act of 1934.

"Excluded Issuances" shall mean issuances of equity or debt securities of the Company (a) to employees, directors, consultants and/or advisors of the Company or its Subsidiaries who are natural persons directly pursuant to employee incentive plans, similar benefits programs or other arrangements, including grants to new hires, in connection with promotions or otherwise, in each case approved by the Board in accordance with the terms of this Agreement, including the issuance by the Company of any Class B-2 Units or other profits interests or other compensatory grants of Company securities, directly or indirectly through the issuance of Corresponding Management Holdco Units and a related issuance to Management Holdco; (b) in connection with permitted borrowings; (c) upon the exercise, conversion or exchange of securities previously issued in compliance with Sections 5.1(a) and 4.4; (d) in connection with a dividend, split, combination or subdivision of units made on a proportionate basis to all holders of Class A Units and Class B-1 Units; (e) in connection with any recapitalization, reorganization, exchange or reclassification or similar transaction of the Company or any of its Subsidiaries; (f) pursuant to, or in connection with, a Change of Control or an IPO; (g) issued in connection with the implementation of a series structure in accordance with Section 5.1(a), in each case approved by the Board and the Baupost Investors if required pursuant to the terms of this Agreement; and (h) in connection with financing the exercise of any call right or redemption right of the Company with respect to the Units pursuant to this Agreement.

"Existing LLC Agreement" shall have the meaning set forth in the recitals hereto.

"Fair Market Value" shall mean with respect to any asset, property, Unit or equity securities of the Company or Company Offeror, as applicable, as of any date, the fair market value as of such specified date determined in good faith by the Board (following review and consultation by the Baupost Directors); *provided, however*, that with respect to Units or equity

securities of the Company or Company Offeror, such determination shall be based on the most recent independent third-party valuation of the Units or equity securities of the Company or Company Offeror conducted prior to the date of such determination, in accordance with GAAP, and taking into account (as determined in good faith by the Board) customary discounts as may be appropriate depending on the context for a company with no registration-type securities, such as for lack of marketability or lack of control as well as any relevant events occurring since such most recent independent third-party valuation.

"Family or Estate-Planning Transfer" shall mean a transfer of Units by a Management Holder or Member that is a natural Person for estate planning purposes or, upon death or disability of such first Person, in each case (a) to a Family Member of such first Person, (b) to a trust under which the distribution of such Units may be made only to such first Person and/or Family Members of such first Person while any of them is living (a "Family Trust"), (c) to charitable remainder trust, the income from which will be paid only to such first Person during his or her life, (d) to a corporation, the stockholders of which are only such first Person, Family Members of such first Person, and/or Family Trusts, (e) to a partnership or limited liability company, the partners or members of which are only such first Person, Family Members of such first Person and/or Family Trusts or (f) subject to Section 8.8, by will or by the laws of intestate succession to the executors, administrators, testamentary trustees, legatees or beneficiaries of any Member, provided, however, in the case of the foregoing clauses (b) through (e) that such first Person, while living and not under a disability, has and continues to have sole control of any decision to vote any interests in the entity referred to. "Family or Estate-Planning Transferee" shall have a corresponding meaning.

"Family Member" shall mean, with respect to any Management Holder or Member that is a natural Person, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, domestic partner designated in good faith by such individual, lineal descendants or antecedents of such individual, mother-in-law, father-in-law, son-in-law, or daughter-in-law, including adoptive relationships.

"Financial Advisor" shall have the meaning set forth in Section 8.9(b)(iii).

"Financing Documents" shall have the meaning set forth in Section 8.8(d).

"FINRA" shall mean the Financial Industry Regulatory Authority.

"Fiscal Year" shall have the meaning set forth in Section 7.4.

"Foreign Interest" shall have the meaning set forth in Schedule E.

"GAAP" shall mean United States generally accepted accounting principles, consistently applied.

"Governmental Authority" shall mean any federal, state, local, municipal, county or other governmental, quasi-governmental, administrative or regulatory authority, body, agency, court, tribunal, commission or other similar entity and any self-regulatory organization (including in each case any branch, department or official thereof).

“Holder’s Class A Pro Rata Distribution Amount” shall have the meaning set forth in the Synthetic Equity Agreement.

“Holder’s Class B-1 Pro Rata Distribution Amount” shall have the meaning set forth in the Synthetic Equity Agreement.

“Hurdle” shall mean (i) the Adjusting Multiple, multiplied by (ii) the trailing twelve (12) months revenue of the Company and its Subsidiaries, based on the most recent available financial information of the Company and its Subsidiaries, calculated as of the Hurdle Measurement Date, and mutually agreed between the Company and the Baupost Investors, or finally determined by the Hurdle Valuation Firm, in each case in accordance with the terms of this Agreement.

“Hurdle Calculation Statement” shall have the meaning set forth in Section 8.17(b).

“Hurdle Dispute Notice” shall have the meaning set forth in Section 8.17(b).

“Hurdle Dispute Period” shall have the meaning set forth in Section 8.17(b).

“Hurdle Measurement Date” shall mean the twentieth (20th) day prior to the date on which the Company or its designated Affiliate reasonably expects to enter into a definitive agreement to effect a Qualified Change of Control.

“Hurdle Valuation Firm” shall have the meaning set forth in Section 8.17(b).

“Indebtedness” shall mean, with respect to any Person, (a) all liabilities of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments and (c) all Indebtedness of others referred to in clauses (a) and (b) above guaranteed in any manner by such Person.

“Indemnified Person” shall have the meaning set forth in Section 12.2(a).

“Independent Director” means any Director who is neither (a) a director, officer employee or Affiliate of the Baupost Investors or the Management Holders or any of their Affiliates nor (b) any employee of the Company or any of its Subsidiaries.

“Indirect Management Purchase Units” shall have the meaning set forth in Section 8.15.

“Information Waiver” shall have the meaning set forth in Section 4.9(b)(ii).

“Initial Company Call Closing Date” shall have the meaning set forth in Section 8.9(b)(ii).

“Initial Subscribing Holder” shall have the meaning set forth in Section 5.3(e).

“Investors” shall mean, collectively, the Baupost Investors and Management Holdco.

“IPO” shall mean an initial bona fide underwritten public offering and sale of Units (or other equity securities of the Company or any of its Subsidiaries, or any successor of the

Company or any of its Subsidiaries) pursuant to an effective registration statement (other than on Form S-4, S-8 or comparable form) filed under the Securities Act of 1933, as amended, pursuant to which securities are to be listed on a national securities exchange or other public listing on an accredited exchange, whether by way of direct listing, merger with a special purpose acquisition vehicle or similar transaction.

"Joinder Agreement" shall have the meaning set forth in Section 8.1(c).

"Law" shall mean any law, statute, ordinance, rule, regulation, code, judgment, decree, order, award, decision, injunction, settlement, process, ruling, subpoena, verdict or governmental authorization (in each applicable case, whether temporary, preliminary or permanent) enacted, issued, promulgated, enforced or entered into by a Governmental Authority.

"Lien" shall mean any lien, mortgage, lease, easement, servitude, levy, right of way, charge, pledge, security interest, covenant, exclusive license, condition, restriction or other encumbrance of any kind, or any conditional sale contract, title retention contract or other contract or agreement creating any of the foregoing.

"Liquidity Event" shall mean (a) a Change of Control (including a Qualified Change of Control), (b) an Event of Dissolution, (c) a Qualified Sale or (d) an IPO.

"Lockup Period" shall mean the sixth anniversary of the date of this Agreement.

"Losses" shall have the meaning set forth in Section 12.2(a).

"Majority Interest" shall mean, as of any given date, an aggregate Voting Unit Percentage equal to more than fifty percent (50%) on such date.

"Management Directors" shall have the meaning set forth in Section 4.1(b)(i)(A).

"Management Holdco" shall have the meaning set forth in the recitals hereto.

"Management Holdco Class A Holder" shall mean any limited partner of Management Holdco owning Management Holdco Class A Units, in such member's capacity as such.

"Management Holdco Class A Unit" shall mean the Class A Units of Management Holdco, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in the Management Holdco Limited Partnership Agreement.

"Management Holdco Class B-1 Unit" shall mean the Class B-1 Units of Management Holdco, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in the Management Holdco Limited Partnership Agreement.

"Management Holdco Class B-2 Holder" shall mean any limited partner of Management Holdco owning Management Holdco Class B-2 Units, in such person's capacity as such.

"Management Holdco Class B-2 Unit" shall mean the Class B-2 Units of Management Holdco, having the powers, preferences, rights, qualifications, limitations and restrictions set forth in the Management Holdco Limited Partnership Agreement.

"Management Holdco Class B Holder" shall mean, collectively, any limited partner of Management Holdco owning Management Holdco Class B-1 Units or Management Holdco Class B-2 Units, in such person's capacity as such.

"Management Holdco Class B Unit" shall mean, collectively, the Management Holdco Class B-1 Units and the Management Holdco Class B-2 Units.

"Management Holdco Limited Partnership Agreement" shall mean the limited liability company agreement of Management Holdco, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"Management Holdco Units" shall mean Management Holdco Class A Units and Management Holdco Class B Units.

"Management Holder" shall mean any (a) employee or service provider of the Company or any of its Subsidiaries for such time as such employee or service provider is a holder of Units or Corresponding Management Holdco Units or (b) other Person that holds Corresponding Management Holdco Units.

"Management Initial Capital Contribution" shall have the meaning set forth in the recitals hereto.

"Management Repurchase Closing" shall have the meaning set forth in Section 8.8(c).

"Member" shall mean each Person listed as a member on Schedule A hereto as of the date hereof, and each other Person that is an Additional Member or Substitute Member, in each case, unless ceasing to be a Member pursuant to Section 8.6, and in the case of a Substitute Member, so long as constituting one hereunder.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain," as determined under Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt," as set forth in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as set forth in Regulations Section 1.704-2(i). The amount of Member Nonrecourse Deductions shall be determined as set forth in Regulations Section 1.704-2(i).

"Member Related Parties" shall have the meaning set forth in Section 15.12.

"Member's Quarterly Estimated Tax Amount" shall mean for any fiscal quarter, the excess (if any) of (x) the Tax Distribution Amount for such fiscal quarter, over (y) the excess (if any) of (A) the total amount of all Distributions previously paid to such Member pursuant to

Section 6.4(b) or Section 6.6 with respect to the Fiscal Year that includes such fiscal quarter over (B) the total amount of all Tax Distribution Amounts with respect to prior fiscal quarters of such Fiscal Year.

"Net Profits" and "Net Loss" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) any income of the Company that is exempt from federal income tax not otherwise taken into account in computing Net Profits or Net Loss shall be added to such taxable income or loss;

(ii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Loss shall be subtracted from such taxable income or loss;

(iii) income, gain or loss resulting from any disposition of, distribution to a Member of, or depreciation, amortization or other cost recovery deductions with respect to, Company property shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(iv) in the event the Book Value of any Company asset is adjusted pursuant to clause (ii) of the definition of Book Value above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits and Net Losses; and

(v) to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution (other than in liquidation of a Member's interest in the Company), the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses.

"Nonrecourse Debt" shall mean a "nonrecourse liability" as set forth in Regulations Section 1.704-2(b)(3).

"Nonrecourse Deductions" shall mean "nonrecourse deductions," as set forth in Regulations Sections 1.704-2(b) and 1.704-2(c). The amount of Nonrecourse Deductions shall be determined as set forth in Regulations Sections 1.704-2(b) and 1.704-2(c).

"Offer" shall have the meaning set forth in Section 5.3(a).

"Offered Units" shall have the meaning set forth in Section 8.11(a).

"Officers" shall have the meaning set forth in Section 4.5(a).

"Opportunity Holder" shall have the meaning set forth in Section 4.12.

"Other Indemnitors" shall have the meaning set forth in Section 12.4(b).

"Other Preemptive Rights Holder" shall have the meaning set forth in Section 5.3(e).

"Participation Notice" shall have the meaning set forth in Section 5.3(a).

"Partnership Audit Rules" shall mean Subchapter C of Chapter 63 of Subtitle F of the Code and any Regulations promulgated thereunder, each as amended from time to time, and any similar state and local rules and regulations.

"Partnership Representative" shall have the meaning set forth in Section 7.3(c).

"Percentage Interest" shall mean, as of any date of determination with respect to each Member, the percentage determined by dividing the number of Units held by such Member as of such date by the aggregate number of Units held by all Members as of such date (with Class A Units and Class B Units treated equally for this purpose); *provided, however*, that for purposes of Section 4.4, the Percentage Interests shall be calculated by dividing the number of Class B-1 Units and Class B-2 Units held by such Member as of such date by the aggregate number of Class B-1 Units and Class B-2 Units held by all Members as of such date; *provided, further,* that for purposes of Section 6.4(b) and Section 11.1(c), the respective Percentage Interests of the Class B-1 Units, on the one hand, and the Class B-2 Units, on the other hand, shall be calculated by dividing the aggregate number of Class B-1 Units or Class B-2 Units, as applicable, outstanding as of the distribution date by the sum of the aggregate number of Class B-1 Units and Class B-2 Units outstanding as of such date (with each Member's pro rata share of such respective Percentage Interest determined in accordance with its number of Class B-1 Units or Class B-2 Units, as applicable, held on such date), and shall be adjusted as appropriate to ensure that the Class B-1 Units solely bear, on a pro rata basis, the cost of Holder's Class B-1 Pro Rata Distribution Amounts paid by the Company pursuant to the Synthetic Equity Agreement. For the avoidance of doubt, any issuance of additional Units by the Company after the date hereof shall dilute the Class B-1 Units and Class B-2 Units on a pro rata basis and shall be taken into account in determining any Member's Percentage Interest.

"Permitted Transfer" shall have the meaning set forth in Section 8.1(d).

"Permitted Transferee" shall mean (a) any Family or Estate-Planning Transferee, (b) in the case of a Member that is a trust, a beneficiary of the trust, provided that the transfer is made in accordance with the provisions of the instrument governing the trust and (c) in the case of a Member that is not a natural Person or a trust, such Member's (i) controlled Affiliates or (ii) Affiliates of the Member that are part of the same family of funds, that owe fiduciary duties to their respective investors and that advise funds or other investment vehicles of Affiliates of such Person; *provided, however*, that such Affiliates shall continue at all times to be Affiliates of the Member that makes such Transfer; *provided, further*, that (x) the Permitted Transferee of a

Member who became a Member by virtue of being a Permitted Transferee must be a Permitted Transferee of the individual or entity who originally made the transfer of such interests in the first instance; and (y) any direct or indirect Transfer of interests (including equity or beneficiary interests) of a Permitted Transferee which became a Member must be to a Permitted Transferee of the individual or entity who originally made the transfer of such interests in the first instance.

"Person" shall mean any individual, firm, corporation, partnership, limited liability company, trust or other entity.

"Preemptive Portion" shall mean an amount equal to (x) the number of additional securities proposed to be issued *multiplied by* (y) a fraction, the numerator of which is the number of Class A Units, Class B-1 Units and vested Class B-2 Units held by the Applicable Holder and their Permitted Transferees and the denominator of which is the number of then issued and outstanding Class A Units, Class B-1 and vested Class B-2 Units.

"Preemptive Right" shall have the meaning set forth in Section 5.3(a).

"Preemptive Right Period" shall have the meaning set forth in Section 5.3(a).

"Preemptive Securities" shall have the meaning set forth in Section 5.3(e).

"Prepayment Amount" shall have the meaning set forth in Section 6.4(a).

"Prime Rate" shall mean a fluctuating interest rate per annum equal at all times to the interest rate published from time to time in *The Wall Street Journal* and designated therein as the prime rate.

"Pro Rata Share" shall have the meaning set forth in Section 8.16(b)(i).

"Profits Interest" shall mean an interest in the future profits of the Company satisfying, as of the date of issuance, the requirements for a partnership profits interest transferred in connection with the performance of services, as set forth in IRS Revenue Procedures 93-27 and 2001-43, or any future IRS guidance or other authority that supplements or supersedes the foregoing Revenue Procedures.

"Promissory Note" shall have the meaning set forth in Section 8.8(d)

"Purchase Agreement" shall have the meaning set forth in the recitals hereto.

"Purchaser" shall have the meaning set forth in the recitals hereto.

"Qualified Change of Control" shall mean a Change of Control in which the aggregate equity valuation of the Company and its Subsidiaries, *plus* any special pre-closing distributions payable to holders of Units solely in connection with such Change of Control transaction, collectively, is equal to or greater than the Hurdle (calculated as of the Hurdle Measurement Date).

"Qualified Change of Control Definitive Agreement" shall have the meaning set forth in Section 8.17(b).

"Qualified Offering" shall mean, any time upon the occurrence of or following an IPO, the Baupost Investors, directly or indirectly, in the aggregate, beneficially own Units (or equity interests of any direct or indirect holding company or parent entity or Subsidiary of the Company or any successor of any of the foregoing) representing less than fifty percent (50%) of the total outstanding voting power in the election of directors (or equivalent governing body) of such entity as compared to the voting power directly or indirectly held by the Baupost Investors immediately prior to the consummation of the IPO.

"Qualified Sale" shall have the meaning set forth in Section 8.9(b)(iii).

"Qualified Sale Election" shall have the meaning set forth in Section 8.9(a).

"Registration" shall have the meaning set forth in Section 9.3(b).

"Regulations" shall mean the U.S. Treasury Regulations.

"Resolution Period" shall have the meaning set forth in Section 8.17(b).

"ROFO Available Units" shall have the meaning set forth in Section 8.10(c).

"ROFO Offer Notice" shall have the meaning set forth in Section 8.10(a).

"ROFO Offer Price" shall have the meaning set forth in Section 8.10(a).

"ROFO Offeree" shall have the meaning set forth in Section 8.10(a).

"ROFO Review Period" shall have the meaning set forth in Section 8.10(a).

"ROFO Sale" shall have the meaning set forth in Section 8.10(c).

"ROFO Sale Closing Date" shall have the meaning set forth in Section 8.10(b).

"ROFO Sale Offer" shall have the meaning set forth in Section 8.10(a).

"ROFO Selling Member" shall have the meaning set forth in Section 8.10(a).

"ROFO Selling Member Units" shall have the meaning set forth in Section 8.10(a).

"Sale Notice" shall have the meaning set forth in Section 8.11(b).

"Securities Act" shall mean the Securities Act of 1933.

"Seller" shall have the meaning set forth in the recitals hereto.

"Specified Repurchases" shall have the meaning set forth in Section 4.4(n).

"Spousal Consent" shall have the meaning set forth in Section 8.1(c).

"Subscription" shall have the meaning set forth in the recitals hereto.

"Subscription Agreements" shall have the meaning set forth in the recitals hereto.

"Subscription and Contribution Agreement" shall have the meaning set forth in the recitals hereto.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, joint venture, association or other entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, joint venture, association or other entity (other than a corporation), a majority of limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, joint venture, association or other entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, joint venture, association or other entity gains or losses or shall be or control any managing member, general partner or analogous controlling Person of such limited liability company, partnership, joint venture, association or other entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Substitute Member" shall mean an Assignee who has been admitted to all of the rights of membership pursuant to Section 8.3(b) or Section 8.5.

"SVB Medacorp" shall have the meaning set forth in the recitals hereto.

"SVBFG" shall have the meaning set forth in the recitals hereto.

"SVBS" shall have the meaning set forth in the recitals hereto.

"SVBS Acquisition" shall have the meaning set forth in the recitals hereto.

"Synthetic Equity Agreement" means that certain Synthetic Equity Agreement, dated as of October 2, 2023, by and between the Company and SVB Financial Group, a Delaware corporation, as may be amended from time to time in accordance with the terms thereof.

"Tag-Along Election Notice" shall have the meaning set forth in Section 8.11(b).

"Tag-Along Portion" shall have the meaning set forth in Section 8.11(a).

"Tag-Along Purchaser(s)" shall have the meaning set forth in Section 8.11(a).

"Tag-Along Right" shall have the meaning set forth in Section 8.11(a).

"Tag-Along Rightholder" shall have the meaning set forth in Section 8.11(a).

"Tag-Along Sale" shall have the meaning set forth in Section 8.11(a).

"Tagged Member" shall have the meaning set forth in Section 8.11(a).

"Tagging Member" shall have the meaning set forth in Section 8.11(b).

"Target Earned Compensation Ratio" shall mean the annual compensation-to-revenue ratio of the Company and its Subsidiaries, which shall be sixty percent (60%) in each annual budget, subject to adjustment as reasonably determined by the Board, subject to Section 4.4(m) below.

"Tax Distribution Amount" shall mean, for a given Member for a given fiscal quarter, the product of (a) the excess (if any) of (1) the net taxable income or gain of the Company that will be allocated to such Member (taking into account Section 704(c) of the Code and any tax basis adjustments applicable to such Member pursuant to Section 754 of the Code) with respect to the applicable fiscal quarter as estimated by the Board in its reasonable discretion, over (2) the cumulative net taxable losses (taking into account Section 704(c) of the Code and any tax basis adjustments applicable to such Member pursuant to Section 754 of the Code) allocated to such Member for prior Fiscal Years or prior fiscal quarters of the current Fiscal Year and not previously applied to reduce such Member's Tax Distribution Amount but only to the extent such losses could be applied to offset income or gain described in clause (1), whether under Section 172 of the Code or otherwise and based on the assumption that the Member's sole source of income, gain, loss or credit were from the Company, *multiplied by* (b) the Tax Rate applicable to the Fiscal Year that includes such fiscal quarter.

"Tax Distributions" shall have the meaning set forth in Section 6.6.

"Tax Rate" shall mean the sum of the highest applicable U.S. federal, state and local income tax rate applicable to the taxable income of an individual resident in New York City, New York, in each case taking into account the character of such income, gain or loss (e.g., capital gains or losses, dividends, ordinary income, etc.) and, if applicable, the deductibility of state and local income taxes for U.S. federal income tax purposes during each applicable Fiscal Year.

"Tax Return" shall mean any return, election, declaration, report, schedule, document, or statement, including any amendments or attachments thereof, which are required to be submitted to any Governmental Authority having authority to assess taxes.

"Termination" shall mean, with respect to any Management Holder, such Management Holder's termination of employment or service (including as a Director) with the Company or any of its Subsidiaries for any reason.

"Transfer" shall mean any direct or indirect (including by way of transfers of equity interests in a Member (if such Member is an entity) or of such Member's upstream Affiliates),

transfer, synthetic transfer, voluntary or involuntary sale, donation, contribution, assignment, grant of participation in or reference under a derivatives contract or any other arrangement, pledge, mortgage, encumbrance or other disposition, whether in whole or in part, by operation of law or otherwise. Notwithstanding anything to the contrary provided herein, the transfer of any equity securities in the Baupost Investors or any indirect equityholder in the Baupost Investors, or any controlled or affiliated fund vehicles of the Baupost Investors, shall not be considered a "Transfer" for any purposes herein.

"Unit Consideration" shall have the meaning set forth in Section 5.1(f).

"Units" shall have the meaning set forth in Section 5.1(a).

"Unreturned Capital" shall mean, as to any holder of Class A Units, the Capital Contributions made in respect of such Class A Units, *decreased* by the applicable aggregate amounts distributed to such holder in respect of such Class A Units pursuant to Section 6.4(a), as applicable. For the avoidance of doubt, all Capital Contributions listed on Schedule A shall be deemed made in respect of Class A Units for all purposes of this Agreement.

"Unvested Class B-2 Unit" shall mean, on any date of determination, any Class B-2 Unit that is not a Vested Class B-2 Unit.

"Vested Class B-2 Unit" shall mean, on any date of determination, any Class B-2 Unit that corresponds to a Management Holdco Class B-2 Unit that is "vested" in accordance with the Applicable Class B-2 Award Agreement applicable to such Management Holdco Class B-2 Unit.

"Voting Unit Percentage" shall mean, with respect to any Member holding Voting Units as of a specified date, the percentage determined by dividing (a) the aggregate number of Voting Units held by such Member as of such date, by (b) the aggregate number of issued and outstanding Voting Units as of such date.

"Voting Units" shall mean the Class B Units (including Class B-1 Units and Class B-2 Units), together with any other class of Units issued after the date hereof that the Board designates as Voting Units.

"Warrantor" shall have the meaning set forth in Section 15.16.

1.2 Interpretive Provisions. Unless the express context otherwise requires:

(a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c) the terms "dollars" and "$" mean U.S. dollars;

(d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement;

(e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(f) references herein to any gender shall include each other gender;

(g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however*, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(h) references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity;

(i) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(j) references herein to any Act, Law or Disclosure Law shall be deemed to refer to such Act, Law or Disclosure Law, as the case may be, as amended, modified, codified, reenacted, supplemented or superseded in whole or in part and in effect from time to time, and also to all rules and regulations promulgated thereunder;

(k) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement; and

(l) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

## ARTICLE II
## THE LIMITED LIABILITY COMPANY

2.1 Formation. The Company has been formed as a limited liability company pursuant to the provisions of the Act. A Certificate of Formation for the Company (the "Certificate of Formation") has been filed in the Office of the Secretary of State of the State of Delaware in conformity with the Act. The Company and, if required, each of the Members shall execute or cause to be executed from time to time all other instruments, certificates, notices and documents and shall do or cause to be done all such acts and things (including keeping books and records and making publications or periodic filings) as may now or hereafter be required for the formation, valid existence and, when appropriate, termination of the Company as a limited liability company under the Laws of the State of Delaware and as may be necessary in order to protect the liability of the Members as members under the Laws of the State of Delaware.

2.2 Name. The name of the Company shall be "Leerink Holdings LLC," and its business shall be carried on in such name with such variations and changes as the Board shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

2.3 Business Purpose. The Company is formed for the purpose of engaging in any business or activity for which limited liability companies may be formed under the Act.

2.4 Registered Office and Agent. The location of the registered office of the Company shall be c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19801. Until such time as the Board has appointed a different Person to act in the State of Delaware as the registered agent of the Company for service of process, the Company's registered agent at such address shall be Corporation Trust Center.

2.5 Term. The term of the Company commenced on the date of filing of the Certificate of Formation in the Office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved pursuant to Article X.

2.6 Company Powers. In furtherance of the business purpose specified in Section 2.3 and without limiting the generality of Section 4.1, the Company and the Board, acting on behalf of the Company, shall be empowered to do or cause to be done any and all acts, deemed by the Board (or, in the case of acts which are expressly reserved hereunder to one or more of the Members for decision, such Member(s)) to be necessary or advisable in furtherance of the business purpose of the Company, including the power and authority to:

(a) acquire, hold, manage, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of the Company's interest in securities or any other investments made or other property held by the Company, including investments in capital stock, bonds, notes, debentures and other obligations, investment contracts, partnership shares, limited liability company shares, options, warrants, other securities, interests in technology, intellectual property rights and other proprietary processes, products or services;

(b) borrow funds, in the name and on behalf of the Company, to enter into agreements and other instruments evidencing the Company's obligations in connection therewith and to pledge the Company's assets as collateral to secure the Company's obligations thereunder;

(c) establish, have, maintain or close one or more offices within or without the State of Delaware and in connection therewith to rent or acquire office space and to engage personnel;

(d) open, maintain and close bank and brokerage accounts, including the power to draw checks or other orders for the payment of moneys, and to invest such funds as are temporarily not otherwise required for the Company's business purpose;

(e) bring and defend actions and proceedings at law or in equity or before any Governmental Authority;

(f) hire consultants, custodians, attorneys, accountants and such other agents, officers and employees of the Company as it may deem necessary or advisable, and to authorize each such agent and employee to act for and on behalf of the Company;

(g) make all elections, investigations, evaluations, and decisions, binding the Company thereby, that may, in the judgment of the Board, be necessary or appropriate for the accomplishment of the Company's business purposes;

(h) enter into, perform, and carry out contracts and agreements of every kind necessary or incidental to the accomplishment of the Company's business purpose, and to take or omit to take such other action in connection with the business of the Company as may be necessary or desirable to further the business purpose of the Company; and

(i) carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Company's business purpose.

2.7 Business Transactions of a Member or Director with the Company. Subject to Section 4.4 and Section 4.11, a Member or Director may transact business with the Company and, subject to applicable Law, shall have the same rights and obligations with respect to any such matter as a Person who is not a Member or a Director.

2.8 Principal Place of Business. The principal place of business of the Company shall be at such location as the Board may, from time to time, select.

2.9 Title to Company Property. Legal title to all property of the Company shall be held and vested and conveyed in the name of the Company, and no real or other property of the Company shall be deemed to be owned by any Member individually. The Units of the Members in the Company shall constitute personal property.

## ARTICLE III
## THE MEMBERS

3.1 The Members. The name, address, number and type of Units and Voting Unit Percentage and the Capital Contribution of each Member is set forth on Schedule A hereto, as such Schedule may be amended from time to time to reflect the admission of any Additional Members or Substitute Members, the acquisition of additional Units by any Member, and the transfer, repurchase, forfeiture or exchange of Units, each as permitted or required by the terms of this Agreement.

3.2 No Participation in Management. Except as otherwise provided in this Agreement, no Member shall, in his, her or its capacity as a Member, participate in the control, management, direction or operation of the affairs of the Company.

3.3 Member Meetings.

(a) Actions by the Members; Meetings. Meetings of the Members or of the Members of any class of Units may be held for any purpose, unless otherwise prohibited by law or this Agreement, and may be called upon the written request of any Director or by a

Member or Member of a class of Units, as applicable. Such written request need not state the purpose of the proposed meeting.

(b) Action by Written Consent. Any action may be taken by the Members without a meeting if authorized by the written consent of the Members holding Voting Units sufficient to approve such action pursuant to the terms of this Agreement. In no instance where action is authorized by written consent will a meeting of the Members be required to be called or notice be required to be given.

(c) Quorum; Voting. For any meeting of the Members, the presence in person or by proxy of the Members owning Voting Units representing at least a Majority Interest shall constitute a quorum for the transaction of any business. Except as otherwise provided in this Agreement, the affirmative vote of the Members owning Voting Units representing at least a Majority Interest shall constitute approval of any action.

(d) Exclusion of Certain Members. Notwithstanding anything to the contrary in this Section 3.3, any Member that is, directly or indirectly, an employee, officer, director, trustee, member, consultant, owner or partner of, or otherwise performs services for, a Competitor of the Company or any of the Company's Subsidiaries (or where a limited partner of Management Holdco is any of the foregoing, Management Holdco) shall be excluded from the portion of any meeting of the Members and shall not be entitled to receive any materials or minutes of such meeting or relating to any written consent of the Members, in each case, to the extent such meeting, consent, materials or minutes include competitively sensitive information, as reasonably determined by the Board in good faith; *provided* that the foregoing shall not provide any separate obligations to provide any of the above referenced information to any Member and provision of any such information shall be at the discretion of the Board; *provided, further*, the Baupost Investors shall in no instance be deemed a Competitor, despite them or their Affiliates holding equity in a Company that may be competitive with the Company or its Subsidiaries and, therefore, this Section 3.3(d) shall not apply to the Baupost Investors.

3.4 Liability of Members. All debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member.

3.5 Pass-Through Rights and Obligations.

(a) Management Holdco is a special purpose investment vehicle through which its limited partners indirectly own Class A Units and Class B Units. In furtherance of the foregoing, the Members hereby acknowledge and agree that it is their intent that (i) the Management Holdco Class A Holders have the same rights and obligations as they would if they held the Class A Units owned by Management Holdco directly in the same amount as the proportion of Management Holdco Class A Units they own directly, and (ii) the Management Holdco Class B Holders have the same rights and obligations as they would if they held the Class B Units owned by Management Holdco directly in the same amount as the proportion of Management Holdco Class B Units they own directly. Accordingly, for purposes of this Agreement, (1) the Class A Units held by Management Holdco shall, at any time, together

with the rights and obligations set forth in the Management Holdco Limited Partnership Agreement, give the holders of Management Holdco Class A Units the same rights and obligations that they would have if they were admitted directly to the Company holding the Class A Units in the Company as the Management Holdco Class A Units, respectively, that they own at such time, subject to the terms provided in the Management Holdco Limited Partnership Agreement, (2) the Class B Units held by Management Holdco shall, at any time, together with the rights and obligations set forth in the Management Holdco Limited Partnership Agreement, give the holders of Management Holdco Class B Units the same rights and obligations that they would have if they were admitted directly to the Company holding the Class B Units in the Company as the Management Holdco Class B Units, respectively, that they own at such time, except as otherwise determined by Management Holdco, and (3) each such Management Holdco Class A Holder and Management Holdco Class B Holder will be treated as a Management Holder for purposes of this Agreement. In implementing the foregoing stated intent in this Section 3.5 and in order to determine equitably the rights and obligations of the Company and the Members, the Company shall treat each limited partner of Management Holdco for all applicable purposes of this Agreement as if such limited partner of Management Holdco were a Member holding Class A Units and Class B Units as provided in the immediately preceding sentence of this Section 3.5 and, without limiting the foregoing, the provisions of, with respect to Management Holders, Sections 3.2, 4.12, 15.3, Article VIII, and Article IX shall apply *mutatis mutandis* to the Management Holdco Limited Partnership Agreement as if they were incorporated therein, with any reasonable modifications as the Board deems necessary to give effect to this Section 3.5.

(b) This Section 3.5 is not intended to result in any Person being treated as a "partner" of the Company for U.S. federal income tax purposes if such Person would not otherwise be so treated, including any Management Holdco Class A Holder or Management Holdco Class B Holder, and this Section 3.5 shall be interpreted and applied consistent with this intent.

3.6 Corresponding Management Holdco Units. It is the intent of the Company that upon issuance of each Class A Unit, Class B-1 Unit, Class B-2 Unit or other class of Unit owned by Management Holdco, a corresponding Management Holdco Class A Unit, Management Holdco Class B-1 Unit, Management Holdco Class B-2 Unit or such other class of Unit (the "Corresponding Management Holdco Unit") shall be issued by Management Holdco. Without limiting Section 3.5, if the Company shall make any subdivision (by any Unit split, Unit dividend or distribution, reclassification, reorganization, recapitalization, exchange or otherwise) or combination (by reverse Unit split, reclassification, reorganization, recapitalization, exchange or otherwise) of any Class A Units, Class B Units or other class of Units owned by Management Holdco, Management Holdco shall make corresponding equitable adjustments to the Corresponding Management Holdco Units, as applicable.

## ARTICLE IV
## THE BOARD AND OFFICERS

4.1 Management by the Board of Directors.

(a) General. The business and affairs of the Company shall be managed, operated, and controlled by and under the direction of the board of directors (the "Board") (and not the Members), and the Board (and not the Members) shall be responsible for policy setting, approving the overall direction of the Company, and making all decisions affecting the business and affairs of the Company. The Board shall have and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement and the Act. It is the intent of the parties hereto that each director of the Company (each, a "Director") shall be deemed to be a "manager" of the Company (as defined in Section 18-101(12) of the Act) for all purposes under the Act. The Board shall consist of the number of Directors from time to time as may then be designated in accordance with Section 4.2 below. Each Director shall serve until the earlier death, disability, resignation, or removal of such Director.

(b) Composition of the Board.

(i) Director Designees. The Board shall consist of between five (5) and eleven (11) Directors, with the number of Directors constituting the Board to be determined by resolution of the Board from time to time (provided, any increase or decrease shall be subject to approval by the Baupost Investors). The Board shall initially be comprised as follows:

(A) five (5) Directors appointed from time to time by Management Holdco (collectively, the "Management Directors");

(B) two (2) Directors appointed from time to time after the date hereof by the Baupost Investors (collectively, the "Baupost Directors"); and

(C) two (2) Independent Directors appointed from time to time after the date hereof by, and upon the mutual consent of, Management Holdco, on the one hand, and the Baupost Investors, on the other hand.

(ii) The Board shall initially consist of nine (9) Directors. The names of the Directors as of the date hereof are set forth on Schedule C.

(iii) Indemnification. At the request of any Director, the Company shall enter into an indemnification agreement with such Person, in customary form and substance acceptable to the Company and reasonably acceptable to the Board.

(c) Removal.

(i) A Director may only be removed (for or without Cause) from the Board by the applicable Person or Persons entitled to appoint such Director pursuant to Section 4.1(b)(i). Each Director shall hold office until his or her successor shall have been appointed and qualified or until his or her earlier resignation, removal, death or disability.

(d) Vacancies. If at any time a vacancy is created on the Board by reason of the death, removal or resignation of any Director, a designee shall be appointed to fill such vacancy or vacancies by the Person or Persons entitled to appoint such Director pursuant to Section 4.1(b)(i).

(e) Compensation. Except for the payment of salaries, benefits, and other compensation to those Directors who are employees of the Company or one of its Subsidiaries and except for the reimbursement of expenses as provided in Section 4.2(g), no compensation shall be paid to any Director for serving as a Director of the Company or any of its Subsidiaries; *provided* that nothing contained herein shall be construed to preclude the Board of Directors (with approval by the Baupost Directors) from establishing compensation for the Directors as such, and provided further that nothing herein shall preclude any Director from receiving compensation for services to the Company or any of its Affiliates in any other capacity.

(f) Confidentiality Agreement. As a condition to any employee or other service provider of the Company serving as a Director, or any observer attending meetings of the Board, such individual shall be required to enter into a customary confidentiality agreement with the Company.

4.2 Meetings of the Board.

(a) Frequency. Subject to Section 4.2(c), the Board shall meet at such times and at such places as may be necessary for the Company's business; *provided* that the Board shall meet at least four (4) times annually unless otherwise agreed by the Baupost Directors.

(b) Quorum. The presence of a majority of the Directors then in office, which shall include at least one (1) Baupost Director or its designee, shall be required to constitute a quorum at any meeting of the Board; *provided* that if neither of the Baupost Directors nor their designees are in attendance at any two (2) consecutive meetings, then no Baupost Director or its designee will be required to constitute a quorum at such second consecutive meeting. If a quorum is not present at any meeting of the Board, the Directors present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(c) Notice; Waiver of Notice. The Board shall meet at such times as may be necessary for the Company's business on at least twenty-four (24) hours' prior written notice to each Director at his or her address including the time and place of such meeting. Notice of any Board meeting may be waived by any Director either before or after such meeting.

(d) Required Vote. Each Director shall be entitled to one vote. Subject to Section 4.4 and as otherwise set forth in this Agreement, all actions of the Board shall require the affirmative vote of a majority of the Directors present at a duly called meeting at which a quorum is present. Any reference in this Agreement to the affirmative vote of a majority of the Directors shall be deemed to mean a majority of the votes cast by all Directors.

(e) Meetings. Meetings of the Board (including, any committees thereof) may be conducted in person or by conference telephone, videoconference facilities, or other communications equipment by means of which all the persons participating in the meeting can hear and communicate with each other at the same time. Each Director shall be entitled to participate in any meeting of the Board (whether or not conducted in person) by telephone.

(f) Action by Written Consent. Any action required or permitted to be taken at any meeting of the Board in accordance with the terms of this Agreement may be taken without a meeting if such number of Directors sufficient to approve such action pursuant to the terms of this Agreement consent thereto in writing (including by use of electronic portable document format (.pdf), DocuSign or other equivalent alternatives), and the writing or writings are filed with the minutes of proceedings of the Board. The Company shall use its reasonable best efforts to provide at least twenty four (24) hours prior written notice to all Directors before the Board takes any action by written consent. Notwithstanding the foregoing, if the Company, acting in good faith, is not able to comply with, or it would be commercially impracticable to comply with, the time period set forth in this Section 4.2(f), the applicable action by written consent may nonetheless be taken and authorized by the Board. Any such action shall be delivered to all Directors promptly thereafter along with a copy of such written consent.

(g) Reimbursement. The Company or one of its Subsidiaries shall reimburse each Director for the reasonable out-of-pocket travel and accommodation costs incurred by such Director to attend meetings of the Board or a committee thereof or the board of directors (or similar governing body) of a Subsidiary of the Company, in each case, as approved in good faith by the Board. In the case of Directors that are officers or employees of the Baupost Investors or their Affiliates, such reimbursement may be paid to the Baupost Investors.

(h) Subsidiary Boards. All boards or similar governing bodies of Subsidiaries of the Company shall consist of the same persons as then serving on the Board of the Company.

4.3 Authority of the Board; Power to Bind Company. Only the Directors, agents and Officers (as defined below) of the Company (to the extent such agents and Officers are duly authorized by the Board pursuant to the terms hereof and the other governing documents of the Company) shall have the authority to bind the Company. The Directors may obligate the Company only as to matters within the scope of authority granted hereunder, subject to the written direction of the Board of Directors. No Member who is not either a Director or otherwise authorized as an agent or officer shall take any action to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Any Person dealing with the Company or a Director may rely upon a certificate signed by such Director as to the identity and authority of the Director or any agent or officer authorized by the Directors, subject to the terms hereof.

Notwithstanding the foregoing, no Director (acting in his or her capacity as such) shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board by the affirmative vote required for such matter pursuant to this Agreement.

4.4 Major Decisions. In addition to and without limitation of the other rights provided to the Baupost Investors in this Agreement, the following actions shall require (i) a majority vote of the Board and (ii) approval by the Baupost Investors (which approval may be given or withheld in the Baupost Investors' sole discretion), for so long as the Baupost Investors (including any of their Permitted Transferees) hold a Percentage Interest of at least ten percent (10%) (the "Minimum Baupost Ownership"):

(a) any Change of Control (or change of control with respect to Management Holdco) or IPO, except a Qualified Sale or Qualified Change of Control;

(b) any voluntary liquidation, bankruptcy, dissolution or similar insolvency proceedings of the Company or any Subsidiary of the Company;

(c) any (i) acquisition by the Company or any of its Subsidiaries of any other legal entity for a purchase price in excess of $5,000,000, (ii) disposition by the Company or any of its Subsidiaries of assets with a total value in excess of $5,000,000 or (iii) entry into a joint venture between the Company and any Person, other than a Subsidiary of the Company, involving consideration payable by the Company in excess of $5,000,000;

(d) any alteration of or revision to the certificate of formation, bylaws limited liability company agreement, operating agreement or other organizational documents of the Company or any of its Subsidiaries that would have a material or adverse impact on the Baupost Investors or any of their rights or obligations set forth therein, including, without limitation, any of the approval rights of the Baupost Investors set forth in this Section 4.4 or the distributions mechanics set forth in Sections 6.4, 6.5 and 6.6;

(e) any change to the size or composition of the Board, as set forth in Section 4.1(b) of this Agreement;

(f) any change to the accounting practices, the Accounting Firm or auditor of the Company or any Subsidiary of the Company;

(g) any fundamental change to the nature of the business of the Company or any Subsidiary of the Company such as the addition of a material business line or expanding the business in any foreign jurisdiction in which the Company or its Subsidiaries is not presently conducting business at such time, including to the extent such change will require a filing, or the submission of an application with either FINRA, pursuant to NASD Rule 1017, or the Securities and Exchange Commission, except in all cases with respect to or in connection with the formation of an asset management business (however, the Baupost Investors shall be notified of any decision by the Board to form an asset management business);

(h) the settlement, agreement to settle, waiver or compromise by the Company or any Subsidiary of the Company of any litigation, action, suit, arbitration, or similar

proceeding (other than relating to any action by a Governmental Authority) for an amount in excess of $5,000,000;

(i) any authorization, issuance or sale of any debt or equity securities (including Units and Profits Interests or any other equity or equity-based award granted under a management equity incentive compensation plan) of the Company or any Subsidiary of the Company or any securities convertible or exchangeable into equity interests of the Company or any Subsidiary of the Company (including, without limitation, pursuant to Section 5.1(f)), in each case that are senior to the Class A Units in right of payment of distributions or upon liquidation of the Company, except in connection with any management equity incentive compensation plan approved prior to the date of such authorization, issuance or sale; *provided* that, for the avoidance of doubt, any authorization, issuance or sale of any other debt or equity securities shall be subject to Section 5.3;

(j) making or changing any tax election that would reasonably be expected to be materially and disproportionately adverse to the Baupost Investors;

(k) any material amendment to a management equity incentive compensation plan that was approved by the Company as of or prior to the date hereof, including any Applicable Class B-2 Award Agreement but not including any deferred cash compensation plans of the Company or any Subsidiary of the Company;

(l) the adoption of a new management equity incentive plan following the date hereof that allows for (i) the issuance of any Company equity to any Member who is a Management Holder as of the date hereof, (ii) the issuance of Company equity to employees hired by the Company or a Subsidiary of the Company following the date hereof in an amount in excess of 10% of the outstanding equity of the Company as of the date hereof on a fully diluted basis, or (iii) the issuance of any Company equity that is not limited, in all circumstances, to participate only in future appreciation of the Company above the Fair Market Value of the Company determined as of the date of such issuance;

(m) any increase to (i) the Target Earned Compensation Ratio in excess of seventy percent (70%) or (ii) the $20 million annual budget for total compensation costs or other initiatives incurred in connection with hiring new full-time employees (which, for the avoidance of doubt, does not include the hiring of any new employee that will act as a replacement for a former employee, but only to the extent that the compensation cost attributable to such new employee is not greater than the compensation cost attributable in the ordinary course to such replaced employee (without regard to any compensation cost attributable to such replaced employee's commencement or termination of employment));

(n) making any distributions on, paying any dividends on, or effect any redemptions of, any Units or other equity interests of the Company or any of its Subsidiaries, other than distributions, dividends and redemptions made in accordance with Sections 6.4, 6.5, 6.6 or 8.8, other than repurchases of Class B-2 Units with a Call Price equal to Fair Market Value made in accordance with Section 8.8 that (i) occur within two (2) years following the issuance of such Class B-2 Unit or (ii) are payable in any form other than by the issuance of a Promissory Note payable in three (3) equal annual installments in accordance with Section 8.8(d)

(such repurchases of Class B-2 Units, "Specified Repurchases"), which Specified Repurchases, for the avoidance of doubt and notwithstanding anything to the contrary in this Agreement or otherwise, shall constitute "Major Decisions" that are subject to the voting and approval requirements applicable thereto pursuant to this Section 4.4;

(o) conversion of the Company or any Subsidiary to any form other than a limited liability company, other than a conversion in connection with any IPO pursuant to the terms of this Agreement;

(p) the adoption or amendment to any treasury policies (or other related policies with respect to the safeguarding of cash and other liquid assets) of the Company and its Subsidiaries or any material changes to their policies on risk limits in securities holdings;

(q) make any loan or advance to any Director or Officer of the Company or any of its Subsidiaries, except loans or advances of less than $250,000 done in the ordinary course of business consistent with past practice;

(r) any consent or waiver pursuant to Section 8.1(a) with respect to the Transfer of Units; and

(s) any agreement to, or commitment to do, any of the foregoing.

4.5 Officers and Related Persons. The Board shall have the authority to appoint and terminate officers of the Company and the Board shall take all necessary actions to cause such appointment or termination of such officers. The Board shall have the authority to retain and terminate employees, agents and consultants of the Company and to delegate such duties to any such officers, employees, agents and consultants as the Board deems appropriate, including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of their respective duties.

(a) General. The officers of the Company shall be chosen by the Board. The Board may, as it deems appropriate, choose a Chairman, a Chief Executive Officer, a President, a Treasurer, a Secretary, and one or more Vice Presidents (and, in the case of each Vice President, with such descriptive title, if any, as the Board shall determine), Assistant Secretaries, Assistant Treasurers and other officers (the "Officers"). Any number of offices may be held by the same person, unless otherwise prohibited by Law. The Officers of the Company need not be Members of the Company nor, except in the case of the Chairman of the Board, need such officers be Directors of the Company. The Officers as of the date hereof shall be set forth on Schedule D hereto.

(b) Election. The Officers shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board; and all officers of the Company shall hold office until their successors are chosen, or until their earlier death, disability, resignation or removal. Any Officer elected by the Board may be removed at any time, with or without Cause, by the affirmative vote of the Board. Any vacancy occurring in any office of the Company shall be filled by the Board. The salaries of all Officers shall be fixed by the Board. The Board may delegate such duties to any such Officers or other employees, agents and consultants of the Company as the Board deems appropriate,

including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of their respective duties.

4.6 Committees. The Board may designate one or more committees and delegate thereto such power and authority as is permitted by Law and is set forth in the resolutions creating any such committee; *provided* that the Baupost Directors shall have the right, but not the obligation, to at any time appoint at least one of the Baupost Directors to any such committee. Each committee shall keep regular minutes and report to the Board when required; *provided* that any Director may be excluded from the portion of any meeting of any such committee and shall not be entitled to receive any materials or minutes of such meeting, in each case, to the extent (a) such meeting, materials or minutes relate to the compensation of such Director or (b) required to avoid any conflict of interest or to maintain the privileged status of such discussion or materials.

4.7 Reliance by Third Parties. Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Board.

4.8 No Fiduciary Duties.

(a) Except as otherwise expressly provided herein or in any written agreement entered into by such Person and the Company and to the maximum extent permitted by the Act, no present or former Director nor any such Director's Affiliates, employees, agents or representatives shall be liable to the Company or to any Member for any act or omission performed or omitted by such Person in its capacity as a Director; *provided* that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's fraud or bad faith as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). Each Director shall be entitled to reasonably rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by such Director in good faith reliance on such advice shall in no event subject such Person or any of such Person's Affiliates, employees, agents or representatives to liability to the Company or any Member.

(b) To the fullest extent permitted by the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of Law or equity, none of the Members nor any Director, solely in their capacity as such, nor any Affiliate, director, officer, stockholder, member, manager, partner, or employee of any of the foregoing, as applicable (collectively, the "Covered Persons" and, each, a "Covered Person"), shall have any duties at law or in equity (including any fiduciary duties) to the Company or any Member or Director, or any other Person arising out of, relating to, or in connection with the Company, the conduct of the Company's business and affairs, or any action or omission taken or omitted to be taken, or consent or approval given or withheld, in each case, in such Person's capacity as a Covered Person, whether pursuant to this Agreement or otherwise, other than those duties (if any) expressly set forth in this Agreement; *provided* that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing, to the extent applicable. To the fullest extent permitted by Law, each Member hereby acknowledges, agrees

and consents to the foregoing waiver of duties (including fiduciary duties) and agrees not to make or threaten to make, and shall cause its controlled Affiliates not to make or threaten to make any claim or bring any action, suit or other proceeding or take any similar action, in each case alleging that any Covered Person shall have breached any such duty (including any fiduciary duty). Notwithstanding any provision to the contrary in this Section 4.8, nothing herein will limit (i) Section 4.12 or (ii) any duties of any officer or employee of the Company or any of its Subsidiaries.

(c) Notwithstanding any other provision of this Agreement or any applicable provision of Law or in equity, whenever the Board or any Covered Person takes any action (or omits to take any action), or is permitted or required to make any decision or determination with respect to the Company or its business and affairs, whether pursuant to the terms of this Agreement or otherwise, then, to the fullest extent permitted by Law, the Board and each Covered Person shall be entitled to take such action (or omit to take such action), or to make such decision or determination, in its sole and absolute discretion, and shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company, any of the Members, any of their respective Affiliates or any other Person, and shall not be subject to any other or different standards that may otherwise apply under applicable Law or in equity. For all purposes of this Agreement, each Covered Person (acting in its capacity as such) and the Board, acting on behalf of the Company or in connection with the Company's business and affairs, shall be conclusively presumed to be acting in good faith if such Person (or, in the case of the Board, a majority of the Directors participating in the decision) subjectively believe(s) that the action taken (or omitted to be taken), the consent or approval given or withheld, or the decision or determination made or not made, is in or is not opposed to the best interests of the Company.

(d) A Director (in his or her capacity as a Director) shall not be required to manage the Company as his or her sole and exclusive function, and he or she may have other business interests and may engage in other activities in addition to those relating to the Company; *provided, however*, except as expressly authorized by the Board, any Management Director who is also an Officer of the Company or one of its Subsidiaries shall devote substantially all of his or her business time and effort to the management of the Company and its Subsidiaries; *provided, further*, that subject to Section 4.12, so long as such time and effort is devoted, such Management Directors may attend in a reasonable manner to his or her personal investments and board memberships (provided such activities are not opposed to the interests of the Company and its Subsidiaries). Each other Director shall devote reasonable time and effort to management duties as provided hereunder.

4.9 Corporate Opportunities.

(a) Neither the Baupost Investors nor any of their Permitted Transferees nor any of their Affiliates, other equityholders, representatives or, unless also an employee of the Company or its Subsidiaries, Directors appointed by the Baupost Investors (the "Applicable Persons") shall have any duty to communicate or present an investment or business opportunity or prospective economic advantage to the Company in which the Company may otherwise have an interest or expectancy (a "Corporate Opportunity"). No Applicable Person

shall be deemed to have breached any fiduciary or other duty or obligation to the Company by reason of the fact that any such Applicable Person pursues or acquires a Corporate Opportunity for itself, its Affiliates or its Permitted Transferees directs, sells, assigns or transfers such Corporate Opportunity to another Person or does not communicate information regarding such Corporate Opportunity to the Company.

(b) The Company and each Member acknowledges that the Applicable Persons may be engaged in the business of investing in private and public companies in a wide range of industries, including the industry segment in which the Company and its Subsidiaries operate (the "Company Industry Segment"). Accordingly, the Company, its Subsidiaries, and the Members each acknowledge and agree that the Applicable Persons shall:

(i) have no duty to the Company or any other Member to refrain from participating as a director, investor or otherwise with respect to any company or other Person that is engaged in the Company Industry Segment or is otherwise competitive with the Company or any of its Subsidiaries; and

(ii) in connection with making investment decisions, to the fullest extent permitted by Law, have no obligation of confidentiality or other duty to the Company or any Members to refrain from using any general information, such as market trend and market data, which comes into the Applicable Persons' possession, whether as a director, investor or otherwise (the "Information Waiver"); *provided* that the Information Waiver shall not apply, and therefore such Member shall be subject to such obligations and duties of confidentiality as would otherwise apply to such Member under applicable Law, if the information at issue (A) constitutes non-public or confidential information concerning the Company or any of its Subsidiaries; *provided* that, prior to being furnished material non-public information with respect to the Company, the Baupost Investors or Baupost Directors, as applicable, shall first be informed of the nature of such information and be given the opportunity to refuse receipt of such information, or (B) to the extent covered by a contractual obligation of confidentiality to which the Company is a party. Notwithstanding anything in this Section 4.9(b)(ii) to the contrary, nothing herein shall be construed as a waiver of any Member's obligation of confidentiality with respect to the disclosure of confidential information of the Company or any of its Subsidiaries.

(c) Any Person purchasing or otherwise acquiring any interest in any Units shall be deemed to have notice of and to have consented to the provisions of this Section 4.9.

4.10 Insurance. As determined by the Board, the Company may maintain one or more key-person insurance policies for certain employees of the Company and/or its Subsidiaries with the Company as beneficiary of such policy. Such policy shall contain terms and conditions (including the amount of coverage and other similar matters) satisfactory to the Board. The Members shall cooperate reasonably with the Company, and shall use reasonable efforts to cause employees proposed to be or otherwise subject to any such key-person insurance policies to cooperate with the Company, in order for the Company to establish any such key-person insurance policies, including by submitting to reasonably required examinations and tests

and by preparing, signing and delivering such applications, statements of health, and other documents as may be reasonably required. In addition, the Company shall at all times maintain customary directors' and officers' liability insurance to cover its and its Subsidiaries' directors and officers in amounts satisfactory to the Board.

4.11 Affiliate Transactions. Without the approval of a majority of the disinterested Directors (the "Disinterested Party Approval"), which approval shall include the Baupost Directors to the extent the Baupost Directors are disinterested Directors, neither the Company nor any of its Subsidiaries shall enter into, amend or grant a waiver with respect to any transactions between the Company or any of its Subsidiaries, on the one hand, and the Investors or any of their Affiliates (other than the Company and its Subsidiaries), on the other hand. Notwithstanding the foregoing, no Disinterested Party Approval shall be required for (A) transactions which are entered into in the ordinary course of business and are on terms and conditions not less favorable, in the aggregate, to the Company and its Subsidiaries than those which would be obtained in a comparable arms' length transaction with a person that is not the Investors or any Affiliate thereof, (B) transactions otherwise contemplated by the Purchase Agreement or this Agreement, including any Transfer or Change of Control in accordance with Article VIII, Article IX and Section 15.1, (C) payments to any Directors; *provided* that such payments are substantially equivalent to the payments received by the other Directors, (D) decisions relating to severance or termination arrangements for employees of the Company or its Subsidiaries (which must be made in the reasonable good faith discretion of the Board), (E) decisions relating to repurchases of Units in the event of a Management Holder's death or Disability (which must be made in the reasonable good faith discretion of the Board), and (F) decisions relating to purchasing and/or maintaining key man life insurance policies for employees of the Company or its Subsidiaries (which must be made in the reasonable good faith discretion of the Board).

4.12 Investment Opportunity. Each Management Holder (such Management Holder, the "Opportunity Holder") shall bring all Corporate Opportunities relating to the Business that the Company could reasonably be expected to pursue, other than passive investments in an entity that represent less than five percent (5%) of the fully diluted equity of such entity, to the Company for its consideration and may not develop such Corporate Opportunity for his or her own purpose or divert such opportunity to any other Person, unless a majority of the disinterested Directors, including the Baupost Investors (so long as the Baupost Investors hold Minimum Baupost Ownership), shall have expressly waived such Corporate Opportunity. Any Corporate Opportunity brought to the Company shall be accompanied by a written notice which discloses in reasonable detail all material information relating thereto. The Company shall use reasonable efforts to provide the Opportunity Holder with a decision regarding such Corporate Opportunity as promptly as practicable after receipt of notice thereof. This Section 4.12 shall not supersede the terms of any written employment agreement or other written agreement between a Management Holder and the Company or any of its Subsidiaries.

## ARTICLE V
## CAPITAL STRUCTURE AND CONTRIBUTIONS

5.1 Capital Structure.

(a) General. Subject to the terms of this Agreement, the Company is authorized to issue equity interests in the Company designated as "Units," which shall constitute limited liability company interests under the Act and shall include initially Class A Units, Class B-1 Units and Class B-2 Units (whether any such Units are issued on or after the date hereof). Subject to Section 4.4, the Board shall have the authority to cause the Company to issue such number of Units of any class, series or tranche as may be determined by the Board from time to time. The Company is authorized to issue options or warrants to purchase Units, restricted Units, Unit appreciation rights, phantom Units, and other securities convertible, exchangeable or exercisable for Units, on such terms as may be determined by the Board from time to time, subject to the limitations set forth in Section 4.4. If the Board authorizes any subdivision, split, combination or reclassification of Units or any other similar action, if necessary or appropriate, the Board shall, acting in good faith, appropriately adjust the economic provisions of this Agreement to reflect such action, including by amending the distribution provisions of Section 6.4 and associated definitions. Other than as set forth in this Agreement or in the instruments governing the terms of any Units issued pursuant to this Section 5.1(a), each Unit shall be identical in all respects with each other Unit.

(b) Class A Units. The Class A Units shall have such rights to allocations and Distributions as may be authorized and set forth under this Agreement. The relative rights, powers, preferences, duties, liabilities and obligations of holders of the Class A Units shall be as set forth herein. The Class A Units shall not be entitled to vote for any purpose hereunder.

(c) Class B-1 Units. The Class B-1 Units shall have such rights to allocations and Distributions as may be authorized and set forth under this Agreement. The relative rights, powers, preferences, duties, liabilities and obligations of holders of the Class B-1 Units shall be as set forth herein. Any Class B-1 Units which are forfeited or repurchased by the Company pursuant to the terms of this Agreement, shall be available for reissuance for an amount in cash equal to the Fair Market Value of such Units as of the date of such reissuance, which reissuance, for the avoidance of doubt, shall be an Excluded Issuance and shall not be subject to approval by the Baupost Investors. Each holder of Class B-1 Units shall be entitled to vote, in person or by proxy, on a pro rata basis in accordance with the Voting Unit Percentage for each Member as of the applicable date and time on all matters upon which Members have the right to vote as set forth in this Agreement and provided under the Act; *provided* Class B-1 Units shall not be used for the calculation of a Member's Voting Unit Percentage for any vote solely concerning any change to the terms of the outstanding Class A Units or Class B-2 Units.

(d) Class B-2 Units. The Board may provide for the issuance and terms of Class B-2 Units and corresponding Management Holdco Class B-2 Units representing up to thirty-one percent (31.0%) of the Class B Units taken as a whole, to provide equity incentive compensation to selected Directors, executives and other service providers of the Company and its Affiliates (including its Subsidiaries). It is the intention of the parties to this

Agreement that each Class B-2 Unit and Management Holdco Class B-2 Unit constitutes a Profits Interest. Subject to Section 4.4, the Board shall have the authority to issue such number of Class B-2 Units and corresponding Management Holdco Class B-2 Units as the Board shall from time to time determine with such terms, conditions, rights and obligations, including vesting, forfeiture and repurchase, as may be determined by the Board as set forth herein, in the Management Holdco Limited Partnership Agreement and in the related Applicable Class B-2 Award Agreements pursuant to which any Management Holdco Class B-2 Unit may be awarded. Any Class B-2 Units which are forfeited or repurchased by the Company pursuant to the terms of an Applicable Class B-2 Award Agreement, shall be available for reissuance in accordance with this Section 5.1(d), and such reissued Class B-2 Units shall not reduce the thirty-one percent (31.0%) limit described herein. Each holder of Class B-2 Units shall be entitled to vote, in person or by proxy, on a pro rata basis in accordance with the Voting Unit Percentage for each Member as of the applicable date and time on all matters upon which Members have the right to vote as set forth in this Agreement and provided under the Act. The Company shall be permitted to take all actions, including amending this Agreement, to the extent necessary or appropriate, to cause the Class B-2 Units (or any subsequent series of Units intended to be Profits Interests) to be treated as Profits Interests for all U.S. federal income tax purposes, to be valued based on liquidation value or similar principles, and to permit allocations of income to be made to such Members to be respected even if such interests are subject to risk of forfeiture, including any action required by the Company under Rev. Proc. 2001-43, unless superseded by further IRS guidance, in which case, such consent shall allow the Company to take any and all actions as may be necessary or desirable pursuant to such notice, final or temporary regulations that may be promulgated to bring into effect the Proposed Treasury Regulations (Prop. Treas. Reg. §§ 1.83-3, 1.704-1, 1.706-3, 1.707-1, 1.721-1, 1.761-1) set forth in the notice of proposed rulemaking (REG–105346–03), and any similar or related authority.

(e) Section 83(b) Election. Notwithstanding any provision of this Agreement to the contrary, each Member shall execute and deliver a valid and timely election under Section 83(b) of the Code to both the Internal Revenue Service and the Company within thirty (30) days of the date of receipt of any Unit which is issued subject to a substantial risk of forfeiture.

(f) Issuance of Additional Units; Series Structure. Subject to Section 4.4(i) and Section 5.3, the Company is authorized to issue Units to any Person at such prices per Unit as may be determined by the Board and in exchange for contributions of cash or property, the provision of services or other consideration (collectively, "Unit Consideration"), as may be determined in good faith by the Board. The number of Units held by each Member shall not be affected by any (i) issuance by the Company of Units to other Members or (ii) change in the Capital Account of such Member. If necessary or appropriate, the Board shall, acting in good faith, appropriately adjust the economic provisions of this Agreement to reflect the issuance of additional Units pursuant to this Section 5.1(f) that are of a new class not previously reflected in this Agreement, including by amending the distribution provisions of Section 6.4 and associated definitions.

(g) Certificates; Legend. In the sole discretion of the Board, the issued and outstanding Units may be represented by certificates. In addition to any other legend required with respect to a particular class, group or series of Units or pursuant to any other

agreement among Members and the Company, each such certificate shall bear the following legend:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, GRANTED A PARTICIPATION IN OR REFERENCE UNDER A DERIVATIVES CONTRACT OR ANY OTHER ARRANGEMENT, PLEDGED, MORTGAGED, ENCUMBERED OR OTHERWISE DISPOSED OF ("TRANSFERRED") WITHOUT COMPLYING WITH, THE PROVISIONS OF THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, BY AND AMONG THE MEMBERS OF LEERINK HOLDINGS LLC (THE "COMPANY"), AS IT MAY BE AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE WITH THE COMPANY. IN ADDITION TO THE RESTRICTIONS ON TRANSFER SET FORTH IN SUCH AGREEMENT, NO TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS IN EFFECT THEREUNDER, AND ALL APPLICABLE STATE SECURITIES LAWS OR (B) IF SUCH TRANSFER IS PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF THE AFORESAID AGREEMENT."

5.2 Unit Schedule. The number and type of Units issued to Members shall be listed on Schedule A hereto, which shall be amended from time to time as required to reflect issuances of Units to Additional Members, Transfers of Units to Substitute Members, acquisition of additional Units by Members, repurchase of Units and to reflect the cessation or withdrawal of Members.

5.3 Preemptive Rights.

(a) General. If, prior to an IPO (but not applicable to a Change of Control), the Company issues any (i) debt securities, (ii) equity securities, or (iii) any securities exercisable for, or convertible or exchangeable into other equity or debt securities of the Company (all items referred to in clauses (i) through (iii) collectively referred to as "Additional Securities"), each Class A Holder, Class B-1 Holder and vested Class B-2 Holder (the "Applicable Holders") shall have the right to purchase, upon the same terms and conditions (the "Preemptive Right"), up to its Preemptive Portion of such Additional Securities; *provided* that each Applicable Holder holding only Class B-1 Units or vested Class B-2 Units shall have the Preemptive Right only to purchase up to its Preemptive Portion of additional Class B-1 Units or vested Class B-2 Units or, as applicable, securities exercisable for, or convertible or exchangeable into Class B-1 Units or vested Class B-2 Units. Nothing in this Section 5.3(a) shall apply to any Excluded Issuance. Such Preemptive Right will be offered to each Applicable Holder by written notice (a "Participation Notice") given by the Company to the Applicable Holders at least fifteen (15) days prior to the proposed issuance date specifying therein the

amount of the Additional Securities being offered, the purchase price and other terms and conditions of such offer (such offer, the "Offer"). Each Applicable Holder shall have a period of ten (10) days from and after the date of the Participation Notice within which to irrevocably accept such Offer in whole or in part (the "Preemptive Right Period"). If an Applicable Holder fails to give written notice to the Company within the Preemptive Right Period, such Applicable Holder shall be deemed to have declined such Offer. Notwithstanding the foregoing, if the Company offers Additional Securities and the Company is not able to comply with, or it would be commercially impracticable to comply with, the time period above prior to the closing of the issuance, with respect to such Additional Securities, the Company shall comply with its obligations to the Applicable Holders under this Section 5.3(a) as promptly as reasonably practicable following the closing of such issuance.

(b) Closing. The closing with respect to any Additional Securities to be purchased by an Applicable Holder shall be held within thirty (30) days of the date of such Applicable Holder's election to purchase or on such other date as the Company and such Applicable Holder shall agree; *provided, however*, that the Company may, in its discretion, hold one closing with respect to the purchase of all Additional Securities on a date determined by the Company to be not less than fifteen (15) and not more than sixty (60) days after the last Applicable Holder accepts or declines (or the applicable offer period expires with respect to) any Offer in connection with the same offering of Additional Securities.

(c) Offer and Sale. If any Applicable Holders fail to accept the Offer with respect to any Additional Securities in whole within the Preemptive Right Period (the "Non-Participating Applicable Holders"), any of such Additional Securities not purchased by a Non-Participating Applicable Holder pursuant to such Offer (the amount of any such Additional Securities not purchased by the Non-Participating Applicable Holders, in the aggregate, the "Undersubscription Amount") shall be offered to all Applicable Holders other than the Non-Participating Applicable Holders (the "Participating Applicable Holders") in proportion to the amount of Additional Securities each such Participating Applicable Holder purchased pursuant to clauses (a) and (b) above to the total amount of Additional Securities being offered for purchase in the Offer (such subsequent offer to the Participating Applicable Holders, the "Subsequent Offer"). The provisions of clauses (a) and (b) above shall apply, mutatis mutandis, with respect to the Subsequent Offer as applied to the Offer described above. In the event there remain unsubscribed Additional Securities following the Subsequent Offer, any remaining Additional Securities may be offered for sale and sold by the Company to any other Person as determined by the Board for a period of ninety (90) days from the last day of the Preemptive Right Period, but only for an amount not lower than the price per security set forth in the initial Offer (to the extent known) (and on other terms that are not materially more favorable to such other Person from those offered to the Applicable Holders) to the Applicable Holders made in accordance with this Section 5.3(c).

(d) Securities Law Considerations. In the event that the issuance of Additional Securities to an Applicable Holder would require under applicable Law the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where such registration or qualification is not otherwise required for such issuance, such Applicable Holder shall not have the right to participate in the issuance. Without limiting the generality of the foregoing, it is understood and agreed that neither the

Applicable Holders nor the Company shall be under any obligation to effect a registration of such securities under the Securities Act or similar state statutes except as otherwise specifically provided herein.

(e) Other Preemptive Rights Holder. Notwithstanding anything to the contrary contained herein, in the event Management HoldCo or the Baupost Investors (acting in good faith and on behalf of the Company) determine that first complying with the mechanics of Section 5.3(a), 5.3(b) and 5.3(c) could adversely affect the Company or could adversely affect an opportunity that Management HoldCo or the Baupost Investors in good faith deem beneficial to the Company at such time, the Company may, in order to expedite the issuance of the Additional Securities subject to this Section 5.3 (the "Preemptive Securities"), issue all or a portion of such Additional Securities to one or more Persons (each, an "Initial Subscribing Holder"), without complying with the provisions of this Section 5.3; *provided* that the Company agrees to offer to sell an additional amount of such Additional Securities to each Applicable Holder who is not an Initial Subscribing Holder (each such holder, an "Other Preemptive Rights Holder") in an amount and manner which provides such Other Preemptive Rights Holder with rights substantially similar to the rights outlined in Section 5.3(a), 5.3(b) and 5.3(c). Such Additional Securities shall be offered to the Other Preemptive Rights Holders in a manner such that such Other Preemptive Rights Holders shall be in substantially the same position as they would have been in if the preemptive rights process in Section 5.3(a) had been effected. The Company shall offer to sell such Additional Securities to each Other Preemptive Rights Holder within ten (10) days after the closing of the purchase or issuance of the Preemptive Securities by or to the Initial Subscribing Holder.

(f) Further Assurances. Each Applicable Holder shall take or cause to be taken all such reasonable actions as may be necessary or reasonably desirable in order to consummate expeditiously each issuance pursuant to this Section 5.3, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments; filing applications, reports, returns, filings and other documents or instruments with Governmental Authorities; and otherwise reasonably cooperating with the Company and any prospective purchaser.

5.4 No Withdrawal of Capital Contributions. Except upon a dissolution and liquidation of the Company effected in accordance with Article X and XI, no Member shall have the right to withdraw its Capital Contributions from the Company.

5.5 No Other Capital Contributions. No Member shall be obligated to make any cash or non-cash contribution to the Company's capital. Except with the approval of the Board and the Baupost Investors (subject to and in accordance with Section 4.4) and subject to compliance with Section 5.4, no Member shall be permitted to make any cash or non-cash contribution to the Company's capital.

5.6 Capital Accounts.

(a) The Company shall establish and maintain a separate capital account (each, a "Capital Account") for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv) and this Section 5.6(a) shall be interpreted and applied in a manner consistent

with such regulations. No Member shall have any obligation to restore any portion of any deficit balance in such Member's Capital Account, whether upon liquidation of its interest in the Company, liquidation of the Company or otherwise. From and after the date of this Agreement, each Member's Capital Account shall be credited with (i) the amount of any money contributed by such Member to the capital of the Company, (ii) the Fair Market Value of any property contributed (or deemed contributed, whether by the terms of this Agreement or upon a determination by the Board) by such Member, as determined by the Board and the contributing Member at arm's-length at the time of contribution (net of liabilities assumed by the Company or subject to which the Company takes such property), (iii) such Member's share of Net Profits (or items of income or gain) and (iv) the amount of any Company liabilities that are considered assumed by such Member or which are secured by any property distributed to such Member. Each Member's Capital Account shall be decreased by (x) the amount of any money distributed, (y) the Fair Market Value of any property distributed to such Member at the time of distribution, and (z) such Member's share of Net Loss (or items of loss, expense or deduction).

(b) If any Units or other interest in the Company (or portion thereof) is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent such Capital Account is attributable to transferred Units or other interest in the Company (or portion thereof).

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS.

6.1 Allocations.

(a) Allocations to Capital Accounts. Subject to Section 6.1(b), the Net Profit and Net Loss of the Company, including each item of income, gain, loss, credit and deduction, for each Fiscal Year or other applicable period, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such Fiscal Year or other applicable period if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its Book Value (except that any Company asset that is sold in such Fiscal Year shall be treated as if sold for an amount of cash equal to the sum of (A) the amount of any net cash proceeds actually received by the Company in connection with such disposition and (B) the Book Value of any property actually received by the Company in connection with such disposition); (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability); (iv) each Unvested Class B-2 Unit outstanding at the end of such Fiscal Year or such other applicable period were a Vested B-2 Unit; and (v) the net assets of the Company were distributed in accordance with Section 11.1 to the Members immediately after giving effect to such allocation.

(b) The following special allocations shall be made in the following order prior to any allocations under Section 6.1(a):

(i) Company Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding the provisions of

Section 4.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.1(b)(i) is intended to comply with the partnership minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted and applied consistently therewith.

(ii) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article VI, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, any Member with a share of that Member Minimum Gain attributable to such a Member Nonrecourse Debt (as determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.1(b)(ii) is intended to comply with the partner minimum gain chargeback requirements in the Regulations and shall be interpreted and applied consistently therewith.

(iii) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit as quickly as possible; *provided, however*, that an allocation pursuant to this Section 6.1(b)(iii) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this Article VI have been tentatively made as if this Section 6.1(b)(iii) were not in this Agreement. This Section 6.1(b)(iii) is intended to comply with the qualified income offset provision in Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied consistently therewith.

(iv) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate such deficit as quickly as possible; *provided, however*, that an

allocation pursuant to this Section 6.1(b)(iv) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided in this Article VI have been tentatively made as if Section 6.1(b)(iii) and this Section 6.1(b)(iv) were not in this Agreement.

(v) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in proportion to their ownership of Class B Units and each Member's share of excess Nonrecourse Debt shall allocated be in the same manner.

(vi) Member Nonrecourse Deductions. Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.752-3. If more than one Member bears the economic risk of loss for a Member Nonrecourse Debt, any Member Nonrecourse Deductions attributable to that Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the economic risk of loss.

(vii) Limitation on Allocation of Net Loss. To the extent that any allocation of Net Loss (or items of loss or deduction) would cause or increase an Adjusted Capital Account Deficit as to any Member, such allocation of Net Loss (or items of loss or deduction) shall be reallocated to the holders of Class B-1 Units in proportion to their respective Percentage Interests, subject to the limitations of this Section 6.1(b)(vii).

(viii) Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Sections of Regulations.

(c) Construction. If the Board determines that it is necessary to modify the manner in which the balances of the Capital Accounts are computed or the items of Net Profits and Net Losses are determined in order to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder, the Board may make such modification.

6.2 Tax Allocations.

(a) Items of Company income, gain, loss and deduction shall be allocated, for United States federal, state, and local income tax purposes, among the Members in

the same manner as the items of income, gain, loss and deduction were allocated pursuant to the other sections of this Article VI; *provided, however*, that notwithstanding any other provision of this Agreement, the Company shall cause income, gain, loss and deductions (including any depreciation and/or cost recovery deductions) attributable to property contributed by a Member or revalued by the Company to be allocated among the Members for income tax purposes in accordance with Code Section 704(c) and Regulations promulgated thereunder. Notwithstanding the foregoing, the Board shall make such allocations for tax purposes as it determines in its reasonable discretion to be appropriate to ensure allocations are made in accordance with a Member's interest in the Company.

(b) Allocations pursuant to this Section 6.2 are solely for purposes of United States federal, state, and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of items of income, gain, loss and deduction.

(c) The Members are aware of the tax consequences of the allocations made by this Section 6.2 and agree to be bound by the provisions of this Section 6.2 in reporting their shares of items of Company income, gain, loss and deduction.

6.3 No Right to Distributions. No Member shall have the right to demand or receive Distributions of any amount, except as expressly provided in this Article VI.

6.4 Distributions. Subject to Section 6.6, the Company shall make distributions to the Members (together with any payments made pursuant to the Synthetic Equity Agreement) on an annual basis of an aggregate amount equal to 85% of the aggregate annual operating income of the Company and its Subsidiaries and, in addition thereto, shall make additional distributions to the Members (i) at the discretion of the Board or (ii) promptly following the receipt of proceeds from a Liquidity Event; *provided* in all such cases, such amounts shall be distributed or paid in the following order and priority:

(a) first, to the Class A Holders in proportion to their Unreturned Capital, until such time as they have received cumulative Distributions under this Section 6.4(a) equal to (i) for each relevant year, the annual amortization amount set forth on Schedule I for such year, plus any unpaid annual amortization amounts from any prior years outstanding and owed to the Class A Holders pursuant to this Section 6.4(a) or (ii) any such greater amount as the Board may approve (any additional payment on top of the payment required in clause (i), a "Prepayment Amount"); *provided* that, if a Prepayment Amount is paid to Class A Holders in any year pursuant to this Section 6.4(a)(ii), each annual amortization amount set forth on Schedule I for each subsequent year shall be ratably reduced by the amount by which the Prepayment Amount exceeded the annual amortization amount owed to the Class A Holders as forth on Schedule I at such time the Prepayment Amount was paid, and Schedule I shall be deemed amended to reflect such ratably reduced amortization amounts for subsequent years and such amended Schedule I shall apply for any Distributions under Section 6.4 in any subsequent years; *provided, further*, that to the extent the Company's annual Distributions are insufficient to satisfy the amounts set forth in clauses (i) for the relevant year, any such deficiency shall be paid to such Class A Holders out of subsequent Distributions in addition to any other amounts then-owed pursuant to this Section 6.4(a); *provided, further*, that Distributions shall only be made

pursuant to this Section 6.4(a) until such date that the Unreturned Capital of the Class A Holders is equal to zero; *provided, further*, that (for the avoidance of doubt) upon a Liquidity Event all proceeds shall first be paid to the Class A Holders in proportion to their (if and to the extent any) Unreturned Capital prior to any other Distributions being made (including any Distributions pursuant to clause (b) below); and

(b) second; *provided* that the Class A Holders have received cumulative Distributions under Section 6.4(a) in an amount equal to at least $25,000,000 (and the Company has satisfied its corresponding obligation to pay the Holder's Class A Pro Rata Distribution Amount under the Synthetic Equity Agreement), to the Class B-1 Holders and the Class B-2 Holders, pro rata in accordance with their respective Percentage Interests.

Any payments made pursuant to the Synthetic Equity Agreement in connection with distributions made pursuant to this Section 6.4 shall be in addition to the corresponding amounts distributed to the Class A Units and Class B-1 Units, as applicable, pursuant to this Section 6.4 and shall not reduce such amounts.

6.5 Distributions to Holders of Class B-2 Units.

(a) Notwithstanding anything to the contrary set forth in this Agreement, the Board shall, if necessary, limit distributions in respect of any Class B-2 Units to the extent necessary to ensure that such Class B-2 Units (the "Limited Class B-2 Units") constitute Profits Interests, as determined by the Board. If distributions in respect of any Class B-2 Units are reduced pursuant to the preceding sentence (and not for any other reason), the amount so reduced (the "Reduced Amount") shall instead be distributed to the holders of the Class B-1 Units and, if applicable, to the holders of Class B-2 Units in respect of Class B-2 Units, if any, that are not Limited Class B-2 Units (such Class B-1 Units and eligible Class B-2 Units, together, the "Excess Distribution Units") under Section 6.4 and the Board may in its discretion authorize appropriate adjustments to future distributions on some or all of the Limited Class B-2 Units under Section 6.4, as applicable, so that such Limited Class B-2 Units would receive (consistent with the principles of this Section 6.5(a)) an amount equal to the Reduced Amount out of amounts that, but for this sentence, would have been distributed with respect to the Excess Distribution Units.

(b) Notwithstanding anything to the contrary set forth in this Agreement, a Member holding an Unvested Class B-2 Unit shall only be entitled to receive a Distribution in respect of such Unvested Class B-2 Unit in an amount equal to the Tax Distributions (if any) made with respect to such Unvested Class B-2 Unit, in accordance with Section 6.6. If distributions in respect of any Class B-2 Units are reduced pursuant to the preceding sentence (and not for any other reason), such amounts shall instead be distributed to the holders of the Class B-1 Units and, if applicable, to the holders of Class B-2 Units in respect of Vested Class B-2 Units. Upon any Unvested Class B-2 Unit becoming a Vested Class B-2 Unit, the Management Holdco Class B-2 Holder shall, subject to Section 6.5(a), be entitled to receive a "catch-up distribution" in respect of such newly Vested Class B-2 Units from any funds being distributed under Section 6.4(b) before any other amounts are distributed pursuant to Section 6.4(b), of the amount such Management Holdco Class B-2 Holder would have received if such Vested Class B-2 Unit was vested on the date of grant.

6.6 Tax Distributions. Notwithstanding any other provision herein to the contrary, so long as the Company is treated as a partnership for federal income tax purposes, the Company shall, subject to having cash available after taking into account reserves as determined in the good faith discretion of the Board, make quarterly advance cash distributions to each Member in an amount equal to the Member's Quarterly Estimated Tax Amount for such quarter ("Tax Distributions"), and the Board shall use commercially reasonable efforts to cause such Tax Distributions to be made at least five (5) days before estimated U.S. federal income tax payments for individuals are due. If, on the date of a quarterly estimated distribution, the cash available to the Company (as determined in the good faith discretion of the Board) is not sufficient to distribute to each Member the full amount of such Member's Tax Distribution that would otherwise be required under this Section 6.6, then (A) distributions shall be made by the Company to the Members pursuant to this Section 6.6 to the extent of the cash so available in proportion to the amounts that would have been distributed to each Member pursuant to this Section 6.6 if there had been a sufficient amount of cash available to the Company to make such Tax Distribution in full, (B) the Company shall make future distributions as soon as reasonably practicable following the date on which there exists an amount of cash available to the Company after taking into account reserves as determined in the good faith discretion of the Board sufficient to pay the remaining portion of such Member's required Tax Distribution and (C) the Company shall not, until the remaining portion of each such Member's required Tax Distribution is so distributed, make a Distribution other than pursuant to this sentence. The Company shall make commercially reasonable efforts to ensure that any financing documents allow for full Tax Distributions. Each Tax Distribution made to a Member pursuant to this Section 6.6 shall be treated as an advance against, and thus reduce, the amount of the next succeeding Distribution or Distributions which would otherwise have been paid to such Member pursuant to Section 6.4(b) or Section 11.1(c), if applicable.

6.7 Withholding. The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority with respect to any distribution or allocation of income or gain or otherwise with respect to such Member and to withhold (or deduct) the same from distributions to such Member. Any funds withheld from a distribution or paid in respect of a Member by reason of this Section 6.7 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this Section 6.7, to the extent not paid, shall bear interest at a rate of the Prime Rate as of such due date, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this Section 6.7 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member;

*provided* that the Baupost Investors shall not indemnify and hold harmless the Company and the other Members with respect to any such penalties that arise from the gross negligence or willful misconduct of the Company. Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

6.8 Restrictions on Distributions. Notwithstanding anything to the contrary provided herein, no Distribution or Tax Distribution shall be made if, and for so long as, such Distribution or Tax Distribution would violate (x) any Law then applicable to the Company or (y) any contractual covenant or agreement between the Company or any of its Subsidiaries and any third-party lender or other bona fide third-party source of financing.

6.9 Determinations by the Board. Subject to the provisions of this Agreement, all matters concerning the computation of Capital Accounts, the allocation of items of Company income, gain, loss, deduction and expense for all purposes of this Agreement and the adoption of any accounting procedures, to the extent not provided for by the terms of this Agreement, shall be determined by the Board. Without in any way limiting the scope of the foregoing, if and to the extent that, for income tax purposes, any item of income, gain, loss, deduction or expense of any Member or the Company is constructively attributed to, respectively, the Company or any Member, or any contribution to or Distribution by the Company or any payment by any Member or the Company is recharacterized, the Board may, with the consent of the Baupost Directors, specially allocate items of Company income, gain, loss, deduction and expense and/or make correlative adjustments to the Capital Accounts of the Members in a manner so that the net amount of income, gain, loss, deduction and expense realized by each relevant party (after taking into account such special allocations) and the net Capital Account balances of the Members (after taking into account such special allocations and adjustments) shall, as nearly as possible, be equal, respectively, to the amount of income, gain, loss, deduction and expense that would have been realized by each relevant party and the Capital Account balances of the Members that would have existed if such attribution and/or recharacterization and the application of this Section 6.9 had not occurred. Notwithstanding anything to the contrary in this Agreement (other than Section 6.2), in the event the Board determines that it would be prudent to modify the manner in which the Capital Accounts and the allocation of net income or loss (including items thereof, and other tax items), are computed in order to effectuate the intended economic sharing arrangement of the Members or to comply with Section 704 and the Regulations thereunder, the Board may, with the consent of the Baupost Directors, make such modification.

## ARTICLE VII
## ACCOUNTS

7.1 Books. The Board shall cause to be maintained complete and accurate books of account of the affairs of the Company and its Subsidiaries at the Company's principal place of business. Such books shall be kept on such method of accounting as the Board shall reasonably and in good faith determine best for the Company. For purposes of the Company's consolidated financial statements, the assets and liabilities of the Company and its Subsidiaries

and statements of operations and cash flows shall be prepared in conformity with GAAP. The Company's accounting period shall be as determined by the Board.

7.2 Reports. The books of account of the Company shall be closed after the close of each Fiscal Year. Prior to an IPO, the Company shall provide Management Holdco and the Baupost Investors:

(a) as promptly as practical after they are provided to the Board, a consolidated annual audited balance sheet of the Company and its Subsidiaries as of the end of each Fiscal Year and the related consolidated annual audited statements of operations, members' equity and cash flows for such Fiscal Year, setting forth in each case the figures for the previous Fiscal Year, certified without qualification by the Accounting Firm as fairly presenting the financial condition and results of operations of the Company and its Subsidiaries and as having been prepared in accordance with GAAP applied on a consistent basis;

(b) as promptly as practical after they are provided to the Board, an unaudited consolidated quarterly balance sheet of the Company and its Subsidiaries as of the end of each fiscal quarter and the related unaudited consolidated quarterly statements of operations, members' equity and cash flows for such fiscal quarter (in each case, which shall be subject to revision at the end of the applicable Fiscal Year); and

(c) as promptly as practical after they are provided to the Board, a monthly management reporting package in a form reasonably satisfactory to the Company, the Board and the Baupost Investors.

Management Holdco and the Baupost Investors shall only share such information with such Person(s) and such information shall be subject to the confidentiality restrictions set forth in this Agreement and the Management Holdco Limited Partnership Agreement. Notwithstanding anything to the contrary in this Section 7.2, any Member (other than the Baupost Investors) that is, directly or indirectly, an employee, officer, director, trustee, member, consultant, owner or partner of, or otherwise performs services for, a Competitor of the Company or any of the Company's Subsidiaries shall not be entitled to receive any materials, reports or information otherwise required to be provided hereunder to the extent any such materials, reports or information are determined in good faith by the Board to constitute competitively sensitive information; *provided, however*, that any such Member shall be entitled to receive any such materials, reports or information that are necessary for purposes of such Member's income tax reporting; *provided, further*, that the foregoing restrictions shall not apply to ownership of less than three percent (3%) of the outstanding securities of any class of any publicly traded securities of a corporation that is a Competitor so long as such Member does not, directly or indirectly, have any active participation in the management or other business of such corporation.

7.3 Tax Matters.

(a) The Company shall arrange for the preparation of all income and other Tax Returns of the Company and shall cause the same to be filed in a timely manner. The Company shall use commercially reasonable efforts to furnish to each Member an estimate of taxable income for each Fiscal Year not later than October 10 of such Fiscal Year, reporting

ordinary income items separately from items of capital gain. Following the end of each Fiscal Year for which the Company is treated as a partnership for U.S. federal income tax purposes, the Company shall furnish to each Member (i) no later than February 28 following such Fiscal Year, a draft form of Schedule K-1 reflecting a good faith estimate of the Member's allocable share of income or loss for such taxable year based upon the information reasonably available to the Company at such time and (ii) no later than April 30 following such Fiscal Year, (A) a final Schedule K-1, Schedule K-2, and Schedule K-3, as applicable (or any successor form and any corresponding form and schedule required to be issued under state or local income tax law), (B) a schedule necessary for identifying the "unrelated business taxable income" (within the meaning of Section 512 of the Code), if applicable, and (C) a schedule necessary for identifying the state apportionment of net income or loss for such Fiscal Year, in each case of (B) and (C), to the extent such information is not otherwise identifiable from the forms or other schedules delivered pursuant to this Section 7.3(a). The Board shall cause the Company to use commercially reasonable efforts to provide any other U.S. or non-U.S. tax reporting information as may reasonably be requested by the Baupost Investors provided that the information requested is in the Company's possession (or can be obtained with reasonable efforts without incurring any material cost that would not be reimbursed by the Baupost Investors) and can be provided without undue burden or the violation of any applicable legal or contractual restrictions, policies or confidentiality obligations relating to such information. The Company shall be entitled to make any tax elections allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company and monitor any governmental tax authority in any audit that such authority may conduct of the Company's books and records or other documents.

(b) At the request of the Company, each Member shall provide the Company with such information, representations, waivers, certificates and duly completed forms as the Company may reasonably deem necessary for it and its Affiliates to comply with any withholding, reporting or other tax obligation.

(c) Management Holdco shall act as the "partnership representative" (as defined in Section 6223(a) of the Code) for the Company (the "Partnership Representative") and shall be authorized to represent the Company (at the Company's expense) in connection with any tax audit or other tax proceeding, and may appoint an individual to act as a "designated individual" on behalf, and subject to the direction and control, of the Partnership Representative in accordance with Treasury Regulation Section 301.6223-1. The Partnership Representative shall be authorized to take any actions necessary under the Partnership Audit Rules (or any similar state, local or foreign law) that it deems appropriate in its reasonable discretion (subject to the specific requirements of this Section 7.3(c)), including making an election under Section 6226(a) of the Code with respect to any imputed underpayment. Each Member shall cooperate with the Company and the Partnership Representative, and undertake any action reasonably requested by the Company or the Partnership Representative in connection with any tax elections made by the Partnership Representative or as determined to be necessary by the Partnership Representative under the Partnership Audit Rules. The Board and the Partnership Representative shall use commercially reasonable efforts to conduct any tax audit of the Company, or cause any tax audit of any entity which the Company controls to be conducted, in a manner that minimizes the economic burden that the Baupost Investors or any of their direct or indirect owners bear as a result of any adjustment pursuant to such tax audit, including using commercially reasonable efforts to secure any available reduction in any tax that may be economically borne by the

Baupost Investors (or any of the Baupost Investors' direct or indirect owners) as a result of a partnership audit, including any available reduction with respect to any imputed underpayment within the meaning of Section 6225 of the Code (or similar or analogous amount under state, local or non-U.S. law) that is available by reason of the Baupost Investors' status or facts and circumstances relating to a Baupost Investor (or the status of, or facts and circumstances relating to, any Baupost Investor's direct or indirect owners) provided that each Baupost Investor promptly provides to the Company and the Partnership Representative any such information or documentation (including any information or documentation with respect to such Baupost Investor's direct or indirect owners) that is reasonably necessary for the Partnership Representative to minimize the economic burden that the Baupost Investors or any of their direct or indirect owners bear as a result of any such adjustment, including any information and documentation relating to such Baupost Investor's status or facts and circumstances relating to a Baupost Investor (or the status of, or facts and circumstances relating to, any Baupost Investor's direct or indirect owners). To the extent the Partnership Representative, Company, or applicable controlled entity secures any available reduction in any tax that would otherwise be borne by or allocated to a Member in connection with any audit of the Company or applicable controlled entity, the Board and the Partnership Representative shall allocate or otherwise take actions to provide the benefit of any such reduction to the applicable Member in respect of whose status or facts and circumstances (or the facts and circumstances of such Member's direct or indirect owners) the reduction relates to. The Board and Partnership Representative shall use commercially reasonable efforts to ensure that neither a Baupost Investor nor the direct or indirect beneficial owners of a Baupost Investor will economically bear any portion of any amount that is attributable to another Member, as reasonably determined by the Board. The Partnership Representative shall promptly notify the Baupost Investor of any material audit or examination of, or other tax proceeding relating to, the Company and to keep each Baupost Investor reasonably informed of all material developments in any such audit, examination or proceeding. In no event shall the Baupost Investors (or their direct or indirect beneficial owners) be required pursuant to this Agreement or in connection with a proceeding under the Partnership Audit Rules to file an amended tax return.

(d) The Members intend that the Company shall be treated as a partnership for federal, state and local income and franchise tax purposes, as applicable, and the Company shall not elect, and the Board shall not permit the Company to elect, to be treated as an association taxable as a corporation for federal income tax purposes under Regulations Section 301.7701-3. Each Member and the Company shall file all tax returns consistent with such treatment. This characterization, solely for such tax purposes, does not create or imply a general partnership among the Members for state law or any other purpose. The Company will not elect into any state or local law "pass-through entity tax" or similar regime that would result in the imposition of entity-level income taxes on the Company; *provided* that nothing herein shall prevent Management Holdco from electing into any such regime on its own behalf. It is intended that Class A Units will be treated as equity of the Company for U.S. federal, state, and local income tax purposes.

(e) The Company will not, and the Board will use commercially reasonable efforts to cause the Company to not, take any action or engage in any activity, including making, holding or disposing of an investment, that would subject a Member (or any of its direct or indirect beneficial owners) to (i) a tax return filing obligation or (ii) a requirement

to directly pay any tax, in each case in a jurisdiction outside of the United States solely as a result of such Member's interest in the Company. If notwithstanding such reasonable best efforts, the Board or the Company becomes aware that a Member (or any of its beneficial owners) has any such tax return filing or payment obligation, it will promptly notify the Member of such obligation and shall reasonably assist such Member with respect to such tax return filing obligation or payment obligation.

(f) The Members acknowledge that the Baupost Investors may from time to time include Blockers. Each of the Members and the Company shall use reasonable best efforts to, in connection with a Liquidity Event (including pursuant to the exercise of Tag-Along Rights), structure the transaction or series of transactions constituting the Liquidity Event such that the purchaser or purchasers acquire(s) separately each of the following: (i) Units other than Units held directly or indirectly by the Blockers; and (ii) outstanding equity securities of Blockers ("Blocker Securities") that hold Units in the Company directly at the time of the Liquidity Event (such Liquidity Event, a "Blocker Sale"). In the event that a Liquidity Event is structured as a Blocker Sale, the Company shall instruct its investment bank or financial advisor assisting with the Liquidity Event to request, in the bid process letter or otherwise, that each prospective purchaser in any Blocker Sale indicate such prospective purchaser's proposed purchase price to acquire Units in (i) solely a direct purchase of Units and (ii) a Blocker Sale (the excess of the aggregate amount the purchaser or purchasers would pay in a transaction described in (i) over the aggregate amount the purchaser or purchasers would pay in a Blocker Sale, the "Discount"). If the ultimate purchaser does not provide information sufficient to determine the Discount or acts in bad faith with respect to any request to provide such information, then the Company shall retain a nationally recognized valuation firm selected by the Board (and approved by the Baupost Directors) (the "Discount Valuation Firm") to determine the Discount. Each Member shall act in good faith to cause the Discount Valuation Firm to promptly determine the Discount, including by providing any information in such Member's possession that is reasonably requested by the Discount Valuation Firm, which may include information provided by any of the prospective purchasers in respect of the Discount, and the determination of the Discount Valuation Firm shall be final and binding upon the Members. The fees, costs and expenses of the Discount Valuation Firm shall be borne by the Company. If the Liquidity Event is structured as a Blocker Sale, the holders of Blocker Securities shall bear the Discount as identified by the purchaser in good faith or determined by the Discount Valuation Firm in accordance with this Section 7.3(f), as applicable, through adjustments to the proceeds from such Liquidity Event payable to the holders of Blocker Securities, on the one hand, and to the Members selling Units, on the other hand. The applicable holders of Blocker Securities shall also bear any adjustments to the purchase price on account of any Indebtedness, tax liabilities or other liabilities of a Blocker in a Blocker Sale. For the avoidance of doubt, no Liquidity Event shall be permitted except to the extent such transaction or series of transactions complies with this Section 7.3(f).

7.4 Fiscal Year. The fiscal year of the Company (the "Fiscal Year") for financial statement and federal income tax purposes shall end on December 31 of each calendar year, subject to Code Section 706 and the Regulations thereunder requiring an alternative taxable year in which case such taxable year shall be the Fiscal Year of the Company.

# ARTICLE VIII
## TRANSFER OF UNITS IN THE COMPANY

8.1 Prohibition.

(a) For the duration of the Lockup Period and subject to the other terms, provision and restrictions set forth in this Agreement, without the prior written consent of the Board (and approval by the Baupost Investors pursuant to Section 4.4), each Member and any Assignee or Permitted Transferee shall hold its Units and shall not Transfer any of such Units or any right or interest therein, other than Transfers:

(i) of such Units to a Permitted Transferee of such Member (or such Assignee or Permitted Transferee) in accordance with this Section 8.1; *provided* that any Transfer of a Member's Units to any Competitor shall require the Board's prior written consent (including the consent of the Baupost Directors);

(ii) of such Units to the Company pursuant to Section 8.8;

(iii) in connection with a Change of Control or IPO (in each case, with the consent of the Baupost Investors pursuant to Section 4.4);

(iv) any Transfer of Class B Units pursuant to a forfeiture, cancellation or repurchase provision of this Agreement or the Management Holdco Limited Partnership Agreement; or

(v) in connection with a Qualified Change of Control (which, notwithstanding anything to the contrary herein, shall not require the consent of the Baupost Investors or the Baupost Directors).

(b) Any attempted Transfer of Units by any Member, other than in strict accordance with this Article VIII, shall be null and void ab initio and the purported transferee shall have no rights as a Member or Assignee hereunder, and the Company shall not record such Transfer on its books or treat any purported transferee of such Units as the owner of such units for any purpose. No Member shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee, and any Transfer or attempted Transfer in violation of this covenant shall be null and void ab initio.

(c) If any Member wishes to Transfer Units to a Permitted Transferee, such Member shall give written notice to the other Members and the Board of their intention to make such a Transfer not less than ten (10) days prior to effecting such Transfer, which notice shall state the name and address of each Permitted Transferee to whom such Transfer is proposed, the relationship of such Permitted Transferee to such Member, the number of Units proposed to be Transferred to such Permitted Transferee and the other material terms and conditions of the Transfer; *provided* that, in connection with any Transfer pursuant to the foregoing, the Permitted Transferee (other than the Investors or the Company) must, prior to any such Transfer, have agreed in writing to be bound by the provisions of this Agreement and have executed and delivered a joinder agreement substantially in the form set forth on Exhibit A (a

"Joinder Agreement") or such other documents that may be reasonably requested by the Company. Except as otherwise determined by the Board, it shall be a condition precedent for admittance (and continued admittance) of any natural Person as a party to this Agreement that the spouse of such natural Person execute and deliver to the Company a Spousal Consent, substantially in the form set forth on Exhibit B (a "Spousal Consent").

(d) Permitted Transfer. Any Transfer permitted under this Section 8.1 is referred to herein as a "Permitted Transfer."

(e) IPO. This Section 8.1 shall terminate six (6) months following the consummation of an IPO.

8.2 Conditions to Permitted Transfers.

(a) Without limiting the restrictions on Transfers and other terms of Section 8.1, a Member shall be entitled to make a Permitted Transfer only upon satisfaction of each of the following conditions, unless waived by the Board (including the Baupost Investors):

(i) such Transfer does not require the registration or qualification of such Units pursuant to any applicable federal or state securities Laws;

(ii) such Transfer does not result in a violation of applicable Laws;

(iii) such Transfer would not cause the Company to become, with respect to any employee benefit plan subject to Title I of ERISA, a "party-in-interest" (as defined in ERISA Section 3(14)) or a "disqualified person" (as defined in Code Section 4975(c));

(iv) such Transfer would not, in the opinion of legal counsel to the Company, cause any portion of the assets of the Company to constitute assets of any employee benefit plan pursuant to Department of Labor Regulations Section 2510.2-101;

(v) such Transfer is in compliance with, and does not create a material risk that the Company would lose its status as a partnership for federal, or, where applicable, state or local, income tax purposes;

(vi) such Transfer is not made to any Person who lacks the legal right, power or capacity to own Units;

(vii) such Transfer does not create a material risk that the Company would become a "publicly traded partnership," as such term is defined in Code Section 469(k)(2) or Code Section 7704(b) and, to the extent requested by the Company, such Member provides to the Company an opinion of counsel that the transferee in such Transfer will be treated as a single partner for purposes of the safe harbor described in Treasury Regulations Section 1.7704-1(h);

(viii) such Transfer does not cause the Company to become a reporting company under the Exchange Act; and

(ix) such Transfer does not subject the Company to regulation under the Investment Company Act of 1940 or the Investment Advisors Act of 1940.

(b) Notwithstanding anything in Section 8.2(a) to the contrary, none of the conditions set forth in Section 8.2(a) shall apply to the following types of Transfers by Members: (i) any Transfer of Units or other securities of the Company to a Company Offeror that is formed for the purpose of engaging in the IPO or that otherwise acts as the issuer in the IPO, (ii) any Transfer in the IPO of Units or other securities of any Company Offeror that is formed for the purpose of engaging in the IPO or that otherwise acts as the issuer in the IPO, (iii) any Transfer of Units in connection with a Conversion Transaction, (iv) any Transfer of Units pursuant to Section 8.9, (v) any Transfer of Units in connection with a Qualified Sale or Change of Control (including a Qualified Change of Control), (vi) any Transfer of Units to a Tag-Along Purchaser pursuant to Section 8.11, (vii) any Transfer of Units to a Drag-Along Purchaser pursuant to Section 8.12, or (viii) any Transfer of Class B Units pursuant to a forfeiture, cancellation or repurchase provision of this Agreement or the Management Holdco Limited Partnership Agreement.

8.3 Effect of Transfers.

(a) Upon any Transfer effected in compliance with this Article VIII (other than Permitted Transfers to a Permitted Transferee), the Assignee of the transferred Units shall be entitled to receive the Distributions and allocations of income, gain, loss, deduction, credit or similar items to which the transferring Member would be entitled with respect to such Units, but shall not be entitled to exercise any of the other rights of a Member with respect to the transferring Member's Units unless and until such Assignee is admitted to the Company as a Substitute Member pursuant to Section 8.5.

(b) Upon any Permitted Transfer to a Permitted Transferee, the Assignee of the transferred Units shall be entitled to all rights of the transferor with respect to the transferred Units and shall become a Substitute Member hereunder subject to such Permitted Transferee's compliance with Section 8.1(c), Section 8.2 and Section 8.5.

8.4 Admission of Additional Members. A Person shall become an Additional Member pursuant to the terms of this Agreement only if and when each of the following conditions is satisfied:

(a) the Board consents (with the consent of the Baupost Investors) in writing to such Person's admission;

(b) the Board determines the nature and amount of the Unit Consideration to be paid by such Person;

(c) the Company has received such Person's Unit Consideration payable to the Company; and

(d) the Company receives written instruments, including a Joinder Agreement and to the extent applicable, a Spousal Consent, that are in a form reasonably satisfactory to the Board.

8.5 Admission of Assignees as Substitute Members. Except as otherwise provided in Section 8.3(b), an Assignee of all or any portion of the Units of a Member shall become a Substitute Member of the Company only if and when each of the following conditions are satisfied:

(a) such Assignee is a Permitted Transferee or the Board consents in writing to such Assignee's admission; and

(b) the Company receives written instruments, including a Joinder Agreement and to the extent applicable, a Spousal Consent, that are in a form reasonably satisfactory to the Board.

8.6 Cessation of Member.

(a) Events Resulting in Cessation of Member. Any Member shall cease to be a Member of the Company upon the earliest to occur of any of the following events:

(i) such Member's withdrawal from the Company pursuant to Section 8.7(a); or

(ii) as to any Member that is not an individual, the filing of a certificate of dissolution, or its equivalent, for such Member.

(b) Upon any Member's ceasing to be a Member pursuant to Section 8.6(a), such Member or its successor in interest shall become an Assignee of its Units, entitled to receive the Distributions and allocations of income, gain, loss, deduction, credit, or similar items to which such Member would have been entitled as a Member with respect to such Units but, subject to the proviso in Section 8.7(a), shall not be entitled to exercise any of the other rights of a Member in, or have any duties or other obligations of a Member with respect to, such Units unless and until such Assignee has been admitted as a Substitute Member in accordance with Section 8.5. No such Member shall have a right to a return of its Capital Contribution on account of such Member's withdrawal from the Company.

8.7 Withdrawal of Members Upon Transfer.

(a) If a Member has Transferred all of its Units in one or more Permitted Transfers or otherwise in compliance with this Agreement, then such Member shall withdraw from the Company on the date upon which each Assignee of such Units has been admitted as a Substitute Member in accordance with Section 8.3(b) or Section 8.5, and such Member shall no longer be entitled to exercise any rights or powers of a Member under this Agreement; *provided* (i) that no cessation of any Person as a Member shall relieve a Person that is not a natural person from their obligation hereunder to reacquire any Units from a Permitted Transferee that ceases to qualify as such hereunder (and if such Person ceases to hold Units due to transfers to one or more Permitted Transferees such Person shall also continue to be subject to

the Transfer restrictions in this Article VIII) and such obligations shall survive any termination of such Person's membership in the Company and (ii) all rights of such Person in Article XII shall survive any termination of such Person's membership in the Company.

(b) No Member shall have the right to withdraw from the Company other than pursuant to Section 8.7(a).

8.8 Call Rights.

(a) Call Right. With respect to any Management Holder, upon (i) a Termination of such Management Holder and/or (ii) such Management Holder's breach of any restrictive covenant agreement with the Company or any of its Subsidiaries, as applicable, the Company shall have the right, but not the obligation, during the two (2) year period commencing on the occurrence of the foregoing (i) and/or (ii), as applicable (the last day of such period, the "Call Notice Deadline"), to purchase from Management Holdco, and Management Holdco shall have the obligation to sell to the Company, all or any portion of the Class A Units, Class B-1 Units and the Vested Class B-2 Units held by Management Holdco, up to the amount of Class A Units, Class B-1 Units and Vested Class B-2 Units held by the applicable Management Holder (all of the Units which may be purchased by the Company pursuant to this sentence, the "Called Units"). The purchase price (the "Call Price") for any Called Units repurchased in accordance with this Section 8.8 shall be set forth in the Subscription Agreement or Applicable Class B-2 Award Agreement, as applicable, documenting the issuance of the Called Units (the "Call Right"). Management Holdco shall, concurrently with any purchase of Called Units hereunder, purchase the equivalent number and type of such Units from the Management Holder pursuant to the terms of the Management Holdco Limited Partnership Agreement.

(b) Call Notice. The Company may exercise its Call Right by delivery of a written notice to Management Holdco and the applicable Management Holder of the Company's election to exercise its Call Right on or prior to the Call Notice Deadline and setting forth the categories and number of Called Units it will purchase (the "Call Notice").

(c) Closing. The closing of any purchase and sale of Called Units shall take place within ninety (90) days following the delivery of the Call Notice at the principal office of the Company or at such other time and location as the parties to such repurchase may mutually determine (the "Management Repurchase Closing"); *provided* that the deadline for payment by the Company pursuant to this Section 8.8 may be extended as required from time to time by the Company's and its Subsidiaries' Financing Documents or for regulatory reasons. At the Management Repurchase Closing, Management Holdco and the applicable Management Holder shall be required to make customary representations and warranties to the Company, including as to Management Holdco and such Management Holder's authority to sell, the enforceability of agreements against such Person, that the Called Units shall be free and clear of any Liens (other than pursuant to U.S. federal and state (and other jurisdiction) securities laws) that it is the sole beneficial and record owner of such Called Units and that it has obtained or made all necessary consents, approvals, filings and notices from Governmental Authorities or third parties to consummate the sale and repurchase. At the Management Repurchase Closing, the Company shall deliver payment in full in immediately available funds for the Called Units purchased by it, subject to Section 8.8(d). At the Management Repurchase Closing, all of the

parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(d) Payment. Purchases of any Called Units shall, at the election of the Board, be settled in cash or with an unsecured promissory note on customary terms from the Company (the "Promissory Note") delivered in compliance with any credit agreement or other definitive documentation concerning the financing of the Company (the "Financing Documents") which shall (i) be payable in two (2) or three (3) equal annual installments (at the election of the Company) of principal and interest (with the first installment due on the first anniversary of the Management Repurchase Closing and the subsequent annual installment(s) due on the successive anniversary date(s) of the Management Repurchase Closing), with accelerated payment of the full amount due under the Promissory Note upon the occurrence of a Change of Control or IPO and (ii) be subordinated to the debt related to the Financing Documents on terms reasonably satisfactory to the holders of such debt.

(e) Other. Notwithstanding anything set forth in this Section 8.8 to the contrary, the Company shall not purchase any Called Units pursuant to the Call Right until the date that is six (6) months and one (1) day following the date of the issuance of such Called Units and in the event that any Called Units subject to the Call Right were issued within the six (6) months immediately preceding the Call Notice Deadline then the Call Notice Deadline with respect thereto shall become the date that is thirty (30) Business Days following the expiration of such six-(6)-month period. For the avoidance of doubt, the forgoing provisions of this Section 8.8 are subject to the provisions of Section 4.4(n) of this Agreement.

8.9 Company Call Option; Qualified Sale.

(a) Company Call Option. During the first three (3) year period following expiration of the Lockup Period (the "Company Call Period"), the Baupost Investors may deliver, on a one-time basis, a written notice to the Company indicating their desire for the Company to effect a Change of Control transaction (the "Baupost Request for Sale Notice"). If the Company does not desire to effect a Change of Control Transaction, then the Company may exercise its right to cause the Company to purchase (the "Company Call Option") 100% (and not less than 100%) of the Units held by the Baupost Investors at such time (the "Baupost Called Units") in accordance with Section 8.9(b), by delivering to the Baupost Investors (i) written notice, by the tenth (10th) day following the delivery of the Baupost Request for Sale Notice, of the Company's intent to exercise the Company Call Option (the "Company Intent to Redeem Notice") and (ii) within thirty (30) days thereafter, the Company's irrevocable election to exercise the Company Call Option (the "Company Call Notice") (the date of delivery of such Company Call Notice, the "Company Call Notice Date"); *provided*, however, in the event the Company does not deliver the Company Intent to Redeem Notice or the Company Call Notice within the required time periods provided above, the Baupost Investors shall have the right to require that the Company, Management Holdco, the Board and the other Members initiate a Qualified Sale in accordance with Section 8.9(b)(iii) by delivering written notice thereof to the Company (the "Qualified Sale Election") without otherwise complying with the other terms and provisions of Sections 8.9(a) and 8.9(b) (other than those that relate to the Qualified Sale process in Section 8.9(b)(iii)). The Company Call Option is only exercisable following receipt of the Baupost Request for Sale Notice in accordance with this Section 8.9(a). Upon the Baupost Investors' delivery of the Baupost Request for Sale Notice

pursuant to this Section 8.9(a), the Baupost Investors shall have no further right to request a sale of the Company and initiate the Company Call Option, other than with respect to a Qualified Sale in accordance the terms of Section 8.9(b)(iii).

(b) Company Call Procedures.

(i) The purchase price per Baupost Called Unit to be paid by the Company in accordance with paragraph (ii) below shall be no less than the amount that would be distributed in respect of such Baupost Called Unit under Section 6.4 if the Company were sold for cash at the Company Call Equity Value and all of the proceeds of such sale were distributed in accordance with Section 6.4 as though such event was deemed a Liquidity Event (the "Company Per Unit Call Price," and the aggregate consideration to be paid for all Baupost Called Units, the "Company Call Option Consideration"); *provided*, *however*, if the Baupost Investors have any outstanding Unreturned Capital owed to them under Section 6.4 as of the Company Call Notice Date, the Company Call Option Consideration shall be increased by the amount of any such Unreturned Capital owed to the Baupost Investors. The Company Call Equity Value and the Company Call Option Consideration shall be determined by the parties within thirty (30) days after delivery of the Company Call Notice ("Company Call Determination Date").

(ii) Subject to Section 8.9(b)(iii), the redemption by the Company of the Baupost Called Units pursuant to the exercise of the Company Call Option shall be settled and the Company Call Option Consideration shall be paid by the Company to the Baupost Investors no later than thirty (30) days following the Company Call Determination Date (or such later date, as may be required to obtain required regulatory approvals) (the end of such period, the "Initial Company Call Closing Date"); *provided*, *however*, that the Baupost Investors may determine, in their sole discretion, to withdraw the Baupost Request for Sale Notice at any time prior to the delivery of the Company Call Notice, by providing written notice of such withdrawal to Management Holdco.

(iii) Notwithstanding the foregoing, in the event that the Company lacks funds legally available to make payment of the Company Call Option Consideration in whole to the Baupost Investors (a "Company Call Prohibition Event"), the Initial Company Call Closing Date shall be delayed until the date (the "Delayed Company Call Closing Date") that is earlier of (A) the date that is 365 days following the Company Call Notice Date and (B) the date on which a Company Call Prohibition Event ceases to exist and the Company has sufficient funds legally available to make payment of the Company Call Option Consideration in whole; *provided* for the avoidance of doubt, notwithstanding anything to the contrary set forth herein, nothing in this Section 8.9 shall affect or diminish the rights of the Baupost Investors set forth in this Agreement prior to the consummation of the foregoing call transactions on the Initial Company Call Closing Date or the Delayed Company Call Closing Date, as the case may be, including, without limitation, the right of the Baupost Investors to participate in additional debt or equity issuances pursuant to Section 5.3 (*provided* that, for the avoidance of doubt, the Baupost Investors shall not have the right to participate in any additional debt or equity issuances pursuant to Section 5.3 to the extent such issuances are for the sole purpose of funding the Company Call Option Consideration in accordance with the terms of this Section 8.9), their ability to participate in a Tag-Along Sale pursuant to Section 8.11, and their ability to participate in a Drag-Along Sale pursuant to Section 8.12; *provided*, further, in the event there is a Change of Control transaction in the 365 days

following the Company Call Notice Date, (i) if the Company Call Option Consideration has not been paid by the time of the closing of the Change of Control transaction, the Baupost Investors shall have the right to receive their proceeds in such Change of Control transaction pursuant to the distribution provisions set forth in Section 6.4 (collectively, the "Baupost Change of Control Sale Proceeds") in lieu of the Company Call Option Consideration and (ii) if the Company Call Option Consideration has previously been paid, but the Baupost Change of Control Sale Proceeds would have been higher than the Company Call Option Consideration, in the aggregate, then upon the closing of such Change of Control transaction the Company shall cause to be paid to the Baupost Investors the difference between the aggregate Baupost Change of Control Sale Proceeds and the aggregate Company Call Option Consideration). If the Company has not purchased the Baupost Called Units and paid the Company Call Option Consideration because a Company Call Prohibition Event continues to exist on the Delayed Company Call Closing Date, the Baupost Investors shall have the right to require that the Company, Management Holdco, the Board and the other Members initiate a Qualified Sale in accordance with Section 8.9(b) by delivering a Qualified Sale Election. Upon the delivery of the Qualified Sale Election in accordance with Section 8.9(a) or 8.9(b)(iii), the Baupost Investors may seek to effectuate a sale of the Company on such terms as are reasonably satisfactory to the Baupost Investors and reasonably consistent with customary terms for comparable transactions (a "Qualified Sale"). In connection with a Qualified Sale, the Baupost Investors shall have the right to engage, on behalf of the Company, an investment bank (the "Financial Advisor") and a law firm (the "Deal Counsel") reasonably satisfactory to the Baupost Investors and Management Holdco (which may be the Company's existing investment bank and law firm, if any) and any other advisor deemed reasonably necessary and reasonably satisfactory to the Baupost Investors and Management Holdco to assist with the Qualified Sale. In connection with a Qualified Sale, the Board and the Company shall, and the Company shall cause each of its Subsidiaries and each of its and their respective officers, managers, directors, employees, financial advisors, consultants, attorneys and other agents and representatives to take all necessary or desirable actions in connection with the consummation of the Qualified Sale and any related transactions (including any auction or competitive bid process in connection with or preceding such Qualified Sale) as reasonably requested by the Baupost Investors, including (A) retaining other advisors; (B) participating in management meetings and preparing pitchbooks and confidential information memoranda; (C) furnishing information and copies of documents; (D) preparing and making filings with Governmental Authorities; (E) providing assistance with legal, accounting, tax, financial, benefits and other due diligence; and (F) otherwise cooperating with the Baupost Investors, the prospective buyer(s), any Financial Advisor, Deal Counsel, consultants or other professional advisors who have been retained in connection with such Qualified Sale and their respective representatives. Management Holdco and the Baupost Investors may mutually agree to initiate an auction or competitive bid process in connection with or preceding such Qualified Sale. The Financial Advisor and the Deal Counsel, as well as any other advisors engaged pursuant to this Section 8.9, shall represent the Company, and only the Company, in the Qualified Sale. The costs, fees and expenses of the Company and the reasonable, out-of-pocket third-party costs, fees and expenses of the Baupost Investors in connection with the Qualified Sale, including, with respect to the Company, the costs, fees and expenses of such advisors pursuant to the terms of engagement letters, shall be paid and, if incurred by the Baupost Investors or Management Holdco, reimbursed, by the Company. None of the Financial Advisor, Deal Counsel or any other advisor selected in accordance with this Section 8.9 shall be engaged or terminated by the Company without the

written consent of the Baupost Investors which consent shall not be unreasonably withheld, conditioned or delayed. Management Holdco, the Management Holders and any other Member shall be required to cooperate and participate in, and shall take all actions to effectuate (including voting its Units and/or causing its Directors to vote in favor of), a Qualified Sale on substantially the same terms (except as provided for in this Section 8.9) and at the same price as the Baupost Investors. Further, in connection with any such Qualified Sale, the Management Holders and other employees of the Company and its Subsidiaries may be required to execute a non-competition, non-hire and/or non-solicitation arrangement and/or a new employment agreement, in a form reasonably agreed upon by the parties thereto as part of such Qualified Sale. In connection with any Qualified Sale, the Baupost Investors shall have the right to drag any other Investors in such sale, in accordance with the terms set forth in Section 8.12 and the Baupost Investors shall be deemed to be a Dragging Member for purposes thereof and Management Holdco and the Management Holders shall cause the Management Directors to approve such Qualified Sale.

8.10 Right of First Offer.

(a) If, after the Lockup Period, the Baupost Investors have delivered a Qualified Sale Election in accordance with Section 8.9, which has not resulted in the consummation of a Qualified Sale, and any of the Baupost Investors (as the case may be, the "ROFO Selling Member"), desires to Transfer any of their respective Units to any unaffiliated third Person, other than to a Permitted Transferee, then the ROFO Selling Member shall first offer to Management Holdco (the "ROFO Offeree") to sell for cash all, but not less than all, of the Units proposed to be transferred (the "ROFO Selling Member Units"). The ROFO Selling Member shall give written notice (the "ROFO Offer Notice") to the ROFO Offeree that the ROFO Selling Member desires to sell the ROFO Selling Member Units pursuant to this Section 8.10, which notice shall specify an aggregate cash purchase price for the ROFO Selling Member Units determined by the ROFO Selling Member in the proposed transfer (the "ROFO Offer Price"), and contain an irrevocable offer of the ROFO Selling Member (the "ROFO Sale Offer") for the duration of the ROFO Review Period to sell the ROFO Offeree the ROFO Selling Member Units for the respective ROFO Offer Price and on such other terms specified in the ROFO Offer Notice. The ROFO Offeree shall have thirty (30) days after receipt of a ROFO Offer Notice in which to notify the ROFO Selling Member whether the ROFO Offeree accepts the ROFO Sale Offer (the "ROFO Review Period"). If the ROFO Offeree timely accepts the ROFO Sale Offer, then the ROFO Selling Member shall be obligated to sell, and the ROFO Offeree shall be obligated to purchase, the ROFO Selling Member Units pursuant to the procedures set forth in Section 8.10(b).

(b) If the ROFO Offeree timely accepts the ROFO Sale Offer within the ROFO Review Period, on the date that is sixty (60) days after the date of such acceptance (the date on which the sale of the Units pursuant to this Section 8.10 shall occur, the "ROFO Sale Closing Date"), the ROFO Offeree shall purchase the ROFO Selling Member Units of the ROFO Selling Member pursuant to a written agreement reflecting the terms set forth in the ROFO Offer Notice; *provided, however*, that if, as of the date that would otherwise be the ROFO Sale Closing Date as provided pursuant to this Section 8.10(b), the parties to any such transaction shall not have received all approvals of Governmental Authorities or other third-party approvals the failure of which to receive would be reasonably likely to have a material adverse effect on the

business, operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, then the ROFO Offeree in such transaction may, upon delivery of notice thereof to the Company and the ROFO Selling Member, delay the closing date therefor until the date that is no later than three (3) Business Days following the receipt of all such approvals of Governmental Authorities or other third parties (and the ROFO Offeree, the Company and the ROFO Selling Member shall use reasonable efforts to pursue and obtain all such approvals). On the ROFO Sale Closing Date, (i) the ROFO Selling Member shall Transfer to the ROFO Offeree all of the Units of the ROFO Selling Member free and clear of all liens, and (ii) the ROFO Offeree shall pay the applicable purchase price to the ROFO Selling Member by wire transfer of same day available funds to the account designated by the ROFO Selling Member. Unless provided to the contrary in the ROFO Offer Notice, each party shall pay its own costs and expenses in connection with the conveyance of the ROFO Selling Member Units, and any transfer, deed, documentary stamp or other tax due in connection with a transfer of the respective ROFO Selling Member Units pursuant to this Section 8.10(b) shall be paid by the ROFO Selling Member.

(c) If the ROFO Offeree elects during the ROFO Review Period not to purchase all of the ROFO Selling Member Units (the "ROFO Available Units"), then the ROFO Selling Member shall have the right for a period of one hundred and twenty (120) days to consummate the sale of the ROFO Available Units to any third Person(s) at a price equal to or higher than the ROFO Offer Price and on other terms substantially similar, in the aggregate, to the terms proposed in the ROFO Offer Notice (such sale to a third Person, a "ROFO Sale"). If a ROFO Sale is not consummated within the timeframe or on the terms set forth in this Section 8.10, then the provisions of this Section 8.10 shall again be required to be satisfied with respect to any proposed Transfer by a ROFO Selling Member as if no ROFO Notice had been given with respect thereto.

8.11 Tag-Along Rights.

(a) General. Subject to Section 8.10, if, following the expiration of the Lockup Period and prior to the consummation of the IPO, any of the Investors (such Investor for purposes of this Section 8.11(a), the "Tagged Member") proposes to Transfer Units (the "Offered Units"), then held by such Tagged Member (a "Tag-Along Sale"), to a Person other than an Affiliate or other equityholder of the Tagged Member or one of their Permitted Transferees (the "Tag-Along Purchaser(s)"), then each other Member (each, a "Tag-Along Rightholder") shall have the right (the "Tag-Along Right") to sell to such Tag-Along Purchaser, upon the terms and conditions set forth in this Section 8.11(a) and Section 8.16, such Tag-Along Rightholder's Tag-Along Portion of its Units in such Tag-Along Sale. A Tag-Along Rightholder's "Tag-Along Portion" is an amount obtained by multiplying (i) the number of Offered Units in a Tag-Along Sale by (ii) a fraction, the numerator of which is the number of Class A Units or Class B Units, as applicable, then held by such Tag-Along Rightholder and the denominator of which is the number of Class A Units or Class B Units, respectively, then issued and outstanding. In furtherance and not in limitation of the foregoing, any Member electing to exercise its right to sell its Units pursuant to this Section 8.11(a) shall receive the same per unit consideration for any of its Units that are actually included in the Tag-Along Sale pursuant to this Section 8.11(a) and agrees to otherwise participate in such Tag-Along Sale on economic terms and conditions no less favorable in any material respect than those that apply to the Tagged

Member; *provided* that such Member takes all necessary or desirable actions in connection with such Tag-Along Sale as reasonably requested by the Tagged Member. The consideration to be paid in respect of the Units owned by a Tag-Along Rightholder that are actually included in such Tag-Along Sale in accordance with this Section 8.11(a) shall be an amount equal to the aggregate amount that would be distributed to such Tag-Along Rightholder pursuant to Section 6.4 in respect of such Units in a hypothetical liquidation of the Company, which aggregate liquidation value of the Company shall be based on the aggregate purchase price to be paid in respect of the Units proposed to be sold by the Tag-Along Rightholders in the Tag-Along Sale. For the avoidance of doubt, nothing shall prohibit a Member, other than the Baupost Investors, from being subject to any non-competition, non-hire or non-solicitation arrangement as part of such Tag-Along Sale.

(b) Procedure. The Tagged Member shall give written notice (the "Sale Notice") to each Tag-Along Rightholder of any Tag-Along Sale giving rise to the rights pursuant to this Section 8.11(b) at least twenty (20) Business Days prior to the proposed consummation of such sale, setting forth the material terms of the proposed Tag-Along Sale, including in reasonable detail (to the extent known) (A) the number of Offered Units proposed to be sold by the Tagged Member, (B) the maximum number of Units that may be sold by such Tag-Along Rightholder, (C) the name of the proposed Tag-Along Purchaser, (D) the proposed amount and form of consideration and other material terms and conditions offered by such Tag-Along Purchaser, and (E) a representation that such Tag-Along Purchaser has been informed of the rights provided for in this Section 8.11(b). The rights provided by this Section 8.11(b) must be exercised by any Tag-Along Rightholder within fifteen (15) Business Days following receipt of the Sale Notice, by delivery of an irrevocable written notice (the "Tag-Along Election Notice") to the Tagged Member indicating such Tag-Along Rightholder's (each, a "Tagging Member") election to exercise its rights, in whole or in part, pursuant to this Section 8.11(b) and specifying the number of Units to be sold by such Tagging Member in the Tag-Along Sale or indicating that the Tagging Member wants to sell all of the Tagging Member's Units that it is permitted to sell (calculated in accordance with Section 8.11(a)). The failure of a Tag-Along Rightholder to respond within such fifteen (15) Business Day period shall be deemed to be a waiver of such Tag-Along Rightholder's rights under this Section 8.11(b). Any Tag-Along Rightholder may waive its rights under this Section 8.11(b) with respect to any Tag-Along Sale prior to the expiration of such fifteen (15) Business Day period by giving written notice to the Tagged Member, with a copy to the Company.

(c) Failure to Exercise. Each Tag-Along Rightholder who does not timely deliver a Tag-Along Election Notice shall be deemed to have waived its right to participate in such Tag-Along Sale, and the Tagged Member shall thereafter be free to Transfer to the Tag-Along Purchaser the applicable Units, at a price per unit (or, if not reasonably determinable, the maximum price per unit set forth in the Sale Notice) no greater than the price per unit set forth in the Sale Notice and on other terms which are not materially more favorable in the aggregate to the Tagged Member than those set forth in the Sale Notice, without any further obligation to such non-accepting Tag-Along Rightholder.

(d) Reduction of Units Transferred. The Tagged Member shall attempt to obtain the inclusion in the proposed Tag-Along Sale of the entire number of Units which each of the Tagging Members requested to have included in the Tag-Along Sale (as

evidenced, in the case of the Tagged Member, by the Sale Notice and, in the case of each Tagging Member, by such Tagging Member's Tag-Along Election Notice). In the event that the Tagged Member shall be unable to obtain the inclusion of such entire number of Units in the proposed Tag-Along Sale, the number of Units to be sold in the proposed Tag-Along Sale shall be allocated among the Tagged Member and the Tagging Members in proportion to the respective number of Units specified for Transfer in accordance with this Section 8.11(d) by the Tagged Member and each Tagging Member (as evidenced, in the case of the Tagged Member, by the Sale Notice and, in the case of each Tagging Member, by such Tagging Member's Tag-Along Election Notice).

(e) Scope. The provisions of this Section 8.11 shall not apply to (i) Transfers to any Affiliate of the Tagged Member or any director, officer or employee of the Company or any of its Subsidiaries, (ii) any Transfer of Units upon exchange of such Units pursuant to a Conversion Transaction, (iii) any Transfer of Drag-Along Units to a Drag-Along Purchaser pursuant to Section 8.12, (iv) any Transfer in connection with an IPO or (v) any Transfer pursuant to Section 8.8. The provisions of this Section 8.11 are in addition to, and not in limitation of, any other restrictions on Transfers of Units contained in this Agreement.

(f) Other. When used in this Section 8.11, the phrase "same per unit consideration" shall not include any employment, consulting, change of control, non-compete or any other arrangements applicable to the Tagging Member or the Tagged Member and their Affiliates, whether in connection with such Tag-Along Sale or otherwise.

8.12 Drag-Along Rights.

(a) General. Subject to Section 8.13, if, (i) at any time prior to an IPO any of the Investors holding at least fifty percent of the Units in connection with a Qualified Change of Control, (ii) following expiration of the Lockup Period and prior to an IPO, the Baupost Investors in connection with a Qualified Sale or (iii) following the expiration of the Lockup Period and prior to an IPO, any of the Investors holding at least fifty percent of the Units in connection with a Change of Control approved in accordance with the terms of this Agreement (such Investor(s) for purposes of this Section 8.12, the "Dragging Member") proposes to Transfer any of its Units in a transaction that would result in such Change of Control (including a Qualified Change of Control) or Qualified Sale (which, for the avoidance of doubt, may be initiated by the Baupost Investors pursuant to Section 8.9 above) (whether by merger, consolidation, sale of assets, sale of equity, public offering or otherwise), in each case, to any Person that is not an Affiliate or equityholder of the Dragging Member (a "Drag-Along Sale"), the Dragging Member may require each other equityholder of the Company (each, a "Dragged Member") to Transfer its Drag-Along Portion of such equityholder's Units to the prospective purchaser (the "Drag-Along Purchaser") on terms and conditions which are not economically less favorable to the Dragged Members in any material respect than those applicable to the Dragging Member (without regard to any participation or non-participation in a "rollover" transaction in connection with a Drag-Along Sale); *provided* that (x) each Dragged Member will receive in such Drag-Along Sale in respect of its Units the aggregate amount that would be distributed pursuant to Section 6.4 to such Dragged Member in respect of such Units in a hypothetical liquidation of the Company pursuant to Section 6.4, which aggregate liquidation value of the Company shall be based upon the aggregate purchase price to be paid in the Drag-

Along Sale, in each case in the same form or combination of forms as the consideration proposed to be paid to the Dragging Member in the Drag-Along Sale and (y) nothing shall prohibit a Dragged Member, other than the Baupost Investors, from being subject to any reasonable non-competition, non-hire or non-solicitation arrangement as part of such Drag-Along Sale. Each Member acknowledges and agrees that depending upon the aggregate consideration to be distributed in connection with the Drag-Along Sale (in accordance with Section 6.4 hereof), certain classes or series of Units may receive less consideration per Unit than other classes or series of Units, and certain classes or series may receive no consideration in the Drag-Along Sale; *provided* that the Dragging Member shall have sole discretion as to whether it or any Dragged Members participate in a "rollover" transaction in connection with a Drag-Along Sale or receive the transaction consideration otherwise payable in lieu of such participation; *provided* that the Dragging Member shall not be able to force the Baupost Investors (if the Dragged Member) or Management Holdco (if the Dragged Member), as applicable, to participate in a "rollover" transaction in connection with a Drag-Along Sale.

(b) Drag-Along Notice. The Dragging Member shall send written notice (the "Drag-Along Notice") of the exercise of its rights pursuant to this Section 8.12 to each Dragged Member at least twenty (20) days prior to the consummation of the Drag-Along Sale. The Drag-Along Notice shall set forth the material terms and conditions of the Drag-Along Sale, including (i) the consideration to be paid for the Units and (ii) the identity of the Drag-Along Purchaser. If the Dragging Member consummates the Drag-Along Sale to which reference is made in the Drag-Along Notice, each Dragged Member shall be bound and obligated to Transfer the applicable Drag-Along Portion of its Units (the "Drag-Along Units") in such Drag-Along Sale subject to the terms and conditions set forth in this Section 8.12 and Section 8.16. Any Drag-Along Notice may be rescinded by the Dragging Member at any time prior to consummation of the Drag-Along Sale by the Dragging Member delivering written notice thereof to each Dragged Member.

(c) Consideration. Subject to Section 8.12(a) and Section 8.16, in connection with any Drag-Along Sale, the Dragged Members shall receive the same per unit consideration as the Dragging Member with respect to such Dragged Members' Units of the same class. If the Dragging Member is given an election as to the form and amount of consideration to be received, the same election will be given to the Dragged Members. When used in this Section 8.12, the phrase "same per unit consideration" shall not include any employment, consulting, change of control or any other consideration payable to the Dragged Members or the Dragging Member and their Affiliates pursuant to any other arrangements, whether in connection with such Drag-Along Sale or otherwise, and the phrase "same form or combination of forms as the consideration proposed to be paid to the Dragging Member in the Drag-Along Sale" and "same election" shall not apply to any Units in connection with a "rollover" of equity in exchange for equity (at the same per unit consideration) in such Drag-Along Sale.

(d) No Transfers. Notwithstanding anything herein to the contrary, no Transfer by any Dragged Member shall be permitted from the time that a Drag-Along Notice is received until the consummation or termination of the proposed Drag-Along Sale referenced in such Drag-Along Notice (other than any Transfer by the Dragged Members in such Drag-Along Sale) without the consent of the Dragging Member.

8.13 Effect of Notices. Notwithstanding any provision hereof to the contrary, the giving to the holders of Units of any Drag-Along Notice or any Sale Notice shall not obligate the Investors to consummate or effect any transaction referred to therein.

8.14 After-Acquired Securities. All of the provisions of this Agreement shall apply to all of the Units now owned or which may be issued or Transferred hereafter to a Member or other equity holder of the Company in consequence of any additional issuance, purchase, exchange or reclassification of any of such Units, corporate reorganization, or any other form of recapitalization, consolidation, merger, share split or share dividend, or which are acquired by a Member or other equity holder of the Company in any other manner.

8.15 Management Holdco Purchase Rights. If Management Holdco is required pursuant to this Agreement, the Management Holdco Limited Partnership Agreement or an agreement approved by the manager or other managing body of Management Holdco, or the manager or other managing body of Management Holdco otherwise elects or agrees, to repurchase membership interests of Management Holdco (the "Indirect Management Purchase Units") held by a limited partner of Management Holdco, then the Company shall repurchase from Management Holdco all of the Units held by Management Holdco that are attributable to the Indirect Management Purchase Units (the "Corresponding Direct Management Units") at a price per Corresponding Direct Management Unit equal to the per unit price paid for each Indirect Management Purchase Unit. The repurchase described in this Section 8.15 may be effected by causing the Indirect Management Purchase Units being repurchased to be exchanged for Corresponding Direct Management Units followed by a repurchase of such interests by the Company.

8.16 Certain Terms and Conditions applicable to Drag-Along Sales, Tag-Along Sales and Qualified Sales. The following provisions shall be applied to any proposed Transfer of Units or other transaction to which Section 8.8, Section 8.9, Section 8.11 or Section 8.12 applies (each, an "Article 8 Transaction"), except to the extent any provision of this Section 8.16 by its terms only applies to a specified subset of such Sections:

(a) Securities as Consideration. If the consideration to be paid in exchange for Units includes securities, the Dragging Member, the Tagged Member or, in the case of a Qualified Sale, the Baupost Investors (the "Article 8 Investor") shall have the right, but not the obligation, to cause to be paid to each Dragged Member, Tagging Member or, in the case of a Qualified Sale, any equityholder of the Company other than the Baupost Investors (each an "Article 8 Seller") in lieu thereof, against surrender of the Units which would have otherwise been Transferred by such Article 8 Seller in the Article 8 Transaction, an amount in cash equal to the Fair Market Value of such Units as of the date such securities would have been issued in exchange for such Units, in each case, to the extent (x) any such Article 8 Seller is a non-accredited investor or (y) if the issuance of such securities to such Article 8 Seller would otherwise violate securities laws.

(b) Efforts. Each Article 8 Seller, whether in such Person's capacity as a Member, equityholder, officer, director or employee of the Company, shall, to the maximum extent permitted by Law, take all actions customary, necessary or desirable in order to consummate expeditiously any Article 8 Transaction and any related transactions, including

executing, acknowledging and delivering any applicable equity purchase agreement, merger agreement, consents, assignments, waivers, releases, letters of transmittal, and other documents or instruments necessary (including a release of claims, furnishing information and copies of documents, filing applications, reports, returns, filings and other documents or instruments with Governmental Authorities) and otherwise cooperate with the Article 8 Investor and any Tag-Along Purchaser or Drag-Along Purchaser. Without limiting the generality of the foregoing:

(i) each Article 8 Seller shall, on a several and not joint basis (in accordance with their pro rata portion (determined based on the respective proceeds payable to each Article 8 Seller in connection with such Article 8 Transaction in accordance with Section 6.4) (the "Pro Rata Share")) (A) make customary individual fundamental representation and warranties as to (1) such Article 8 Seller's own organization, (2) such Article 8 Seller's power, authority capacity and legal right to enter into and consummate any applicable agreement to which such Article 8 Seller becomes party, (3) the unencumbered title to such Article 8 Seller's Units, (4) the absence of any conflict with respect to such Article 8 Seller's Units or the Transfer thereof or its ability to enter into and consummate any applicable agreement to which such Article 8 Seller becomes a party, (5) the binding effect and enforceability of any applicable agreement to which such Article 8 Seller becomes a party, (6) the absence of any governmental or third party notices, filings and approvals in connection with entering into or consummating any applicable agreement to which such Article 8 Seller becomes a party or the Transfer of its Units pursuant thereto, and (7) the absence of broker fees; and (B) provide customary indemnification with respect to a breach thereof (taking into account the limitations set forth in Section 8.16(b)(v));

(ii) subject to Section 8.16(b)(v), each Article 8 Seller shall, on a several and not joint basis (in accordance with its Pro Rata Share), be liable (whether by transaction expenses, purchase price adjustment, escrows, indemnity payments or other similar items) in respect of representations, warranties, covenants and agreements in respect of the Company and its Subsidiaries;

(iii) each Article 8 Seller will agree to reasonable confidentiality, non-competition, non-solicitation, non-hire and other similar provisions (and if requested by the Article 8 Investor, each Article 8 Seller will enter into standalone agreements in connection with any Change of Control, Qualified Sale, Drag-Along Sale or Tag-Along Sale providing the same) and further assurances covenants; *provided* that in no event will any Baupost Investor be required to agree to any non-competition, non-solicitation, non-hire and other similar provisions;

(iv) none of the Article 8 Sellers or the Article 8 Investor shall be liable for any individual representation, warranty, covenant or other agreements made by any other Article 8 Seller or the Article 8 Investor; and

(v) the aggregate liability of each Article 8 Seller shall in no event exceed the proceeds received (taking into account any amounts in escrow) by such Article 8 Seller in connection with such Article 8 Transaction. Further, no Article 8

Seller will be required to bear more than its Pro Rata Share of any escrows, holdbacks, adjustments or indemnification obligations.

(c) No Liability. All determinations as to whether to complete any Article 8 Transaction and as to the timing, manner, price and other terms and conditions (subject to the terms and conditions of this Agreement) of any such Article 8 Transaction shall be at the sole (but reasonable) discretion of the Article 8 Investor, and the Investors and their Affiliates shall not have any liability arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Article 8 Transaction, except to the extent the Investors fail to comply with the provisions of Section 8.8, Section 8.9, Section 8.11, Section 8.12, Section 8.13 or this Section 8.16.

(d) Closing. The closing of an Article 8 Transaction shall take place at such time and place as the Investors shall specify by written notice to each Article 8 Seller. At the closing of such Article 8 Transaction, each Article 8 Seller shall (if applicable) deliver the certificates evidencing the Units to be Transferred by such Article 8 Seller, duly endorsed, or with unit (or equivalent) powers duly endorsed for transfer with signature guaranteed, free and clear of any Liens (other than pursuant to U.S. federal and state (and other jurisdiction) securities laws).

(e) Expenses. In connection with the consummation of any Article 8 Transaction, the Investors and each Article 8 Seller shall bear its respective Pro Rata Share of the expenses incurred by the Company and its Subsidiaries in connection with such Article 8 Transaction.

(f) Disclosure of other Consideration. In connection with any Article 8 Transaction, each Article 8 Seller agrees to disclose in reasonable detail, any cash compensation or equity consideration or other compensation (excluding any employee health or other similar welfare benefits), including in respect of restrictive covenants, to be received by such Article 8 Seller in connection with any duties, responsibilities or obligations that such Article 8 Seller will assume after consummation of such Article 8 Transaction. In addition, without the prior approval of the Article 8 Investor, no Article 8 Seller will (i) enter into any agreement with any Tag-Along Purchaser or its Affiliates or any Drag-Along Purchaser or its Affiliates not on prevailing market terms, (ii) accept compensation in excess of prevailing market rates for the duties, responsibilities and obligations that such Article 8 Seller will assume after consummation of such Article 8 Transaction or (iii) accept any consideration for restrictive covenants unless such consideration is part of the consideration payable to the other Members participating in such Article 8 Transaction.

(g) Expiration. Section 8.8, Section 8.9, Section 8.11, Section 8.12, and this Section 8.16 (other than any unsatisfied or ongoing obligations pursuant to this Section 8.16 in connection with any Article 8 Transaction) shall expire upon the consummation of an IPO.

8.17 Change of Control.

(a) Except as otherwise provided in Section 8.9 in the event of a Qualified Sale and subject to the requirements set forth in Section 4.4, the Board (with the consent of the Baupost Investors pursuant to Section 4.4) shall, in its sole discretion, decide whether or not to pursue, consummate, postpone or abandon any proposed Change of Control or other transaction pursuant to Article VIII or Article IX and the terms and conditions thereof. Except as otherwise provided in Section 8.9 in the event of a Qualified Sale, the Board shall, in its sole discretion, choose any banker or other advisor in connection with any Change of Control or other transaction pursuant to Article VIII or Article IX. Neither the Directors nor any Affiliate of the Directors shall have any liability to any Member, Management Holder, or the Company arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of a Change of Control or any other transaction pursuant to Article VIII or Article IX.

(b) Prior to entering into an agreement to effect a Qualified Changed of Control, the Board shall provide the Baupost Investors with written notice of their intent to effect a Qualified Change of Control at least thirty (30) days prior to entering into a definitive agreement to effect the Qualified Change of Control (the "Qualified Change of Control Definitive Agreement"), and no less than twenty (20) days prior to entering into such Qualified Change of Control Definitive Agreement, the Board shall provide the Baupost Investors its calculation of the Hurdle and how the contemplated transaction qualifies as a Qualified Change of Control (the "Hurdle Calculation Statement"). Within five (5) days of receiving the Hurdle Calculation Statement (the "Hurdle Dispute Period"), the Baupost Investors may provide written notice to the Board disputing all or a portion of the Hurdle Calculation Statement ("Hurdle Dispute Notice"). If the Baupost Investors do not dispute the Hurdle Calculation Statement during the Hurdle Dispute Period, then the Hurdle Calculation Statement shall be deemed mutually agreed and Hurdle set forth therein shall be the final and binding. If the Baupost Investors dispute the Hurdle Calculation Statement within the Hurdle Dispute Period, then the parties shall negotiate in good faith for an additional five (5) days following the receipt of the Hurdle Dispute Notice and use reasonable best efforts to reach an agreement on the Hurdle. If the Company and the Baupost Investors are unable to reach an agreement on the Hurdle during such period, then the Company and the Baupost Investors shall immediately submit such disputed items to the dispute resolution group of nationally recognized, independent valuation firm reasonably acceptable to the Company and the Baupost Investors (the "Hurdle Valuation Firm"). The Company and the Baupost Investors shall instruct the Hurdle Valuation Firm to render a determination of the applicable dispute within seven (7) days (the "Resolution Period") after referral of such matter to the Hurdle Valuation Firm, which determination must be in writing and must set forth, in reasonable detail, the basis therefor. In resolving the disputed items, the Hurdle Valuation Firm (A) shall be bound by the terms of this Agreement (including the definitions related to calculation of the Hurdle as set forth herein), (B) shall limit its decision to such items as are in dispute and to only those adjustments as are necessary for the Hurdle calculations to comply with the provisions of this Agreement, and (C) shall act as an expert and not as an arbitrator. Such determination of the Hurdle Valuation Firm shall be conclusive and binding upon the Company and the Baupost Investors absent manifest error. At any time, including following the Resolution Period, the Company and the Baupost Investors may agree to settle any disputed item, including any disputed item submitted to the Hurdle Valuation Firm, which agreement shall be in writing and final and binding on the parties with respect to the subject matter of such disputed item so resolved. Only after the final resolution of the Hurdle

pursuant to the terms of this Section 8.17(b) can the Company enter into the Qualified Change of Control Definitive Agreement, subject to confirmation at such time that the aggregate equity value of the Company and its Subsidiaries resulting from the Qualified Change of Control contemplated in such Qualified Change of Control Definitive Agreement is equal to or greater than the Hurdle.

## ARTICLE IX
## INITIAL PUBLIC OFFERING; REGISTRATION RIGHTS

9.1 Public Offering Mechanics. Notwithstanding anything to the contrary in this Agreement:

(a) General. In connection with the consummation of an IPO, the Board, with the consent of the Baupost Investors, may (i) reorganize the Company into a corporation incorporated under the Laws of the State of Delaware or such other jurisdiction in such manner as the Board deems appropriate, efficient and in the best interests of the Company (and the Board shall use commercially reasonable efforts to effectuate such reorganization in a manner that is tax efficient for both the Company and its Members and the owners of such Members), subject to the requirements of this Section 9.1, including by way of conversion, merger, recapitalization, exchange or asset and liability transfer, in each case, giving effect to the same economic and voting rights contained in this Agreement after taking into consideration the structure of the Company and the Company's Subsidiaries and their respective classes of securities (the transactions described in this clause (i) being referred to herein as a "Conversion Transaction"); (ii) cause the exchange of Units for shares of common stock or other equity securities of a holding company formed to hold all or substantially all of the operating assets of the Company's Subsidiaries or any other Company Offeror that will be the issuer in such IPO; or (iii) take any such other action as the Board may determine in good faith to create an appropriate vehicle to effectuate an IPO; *provided* that, to the extent that it would not adversely affect or materially delay the consummation of any transaction described in any of clauses (i) through (iii), the Company and the Members shall use reasonable best efforts to structure any such transactions such that holders of Blocker Securities may exchange such Blocker Securities for equity interests of any successor corporation, holding company, or other vehicle described in clauses (i) through (iii) of this Section 9.1(a) (either in a contribution governed by Code Section 351 or a merger or similar transaction treated as a reorganization under Code Section 368) that correspond with the Units held by the Blockers such Blocker Securities relate to.

(b) Conversion Transaction. Prior to or upon consummation of an IPO involving a Conversion Transaction, this Agreement shall be replaced by a stockholders agreement (or agreements) executed by the Company Offeror and the Members containing terms and conditions substantially similar to those set forth herein, except that all references to the Class A Units and the Class B Units respectively, in this Agreement shall be deemed to refer to the corresponding class, series or tranche of equity securities, if any, into which such Class A Units, and Class B Units were converted or exchanged in such Conversion Transaction, respectively, and all references to the Company herein shall be deemed to refer to the Company's successor; *provided* that, to the extent that it would not adversely affect or materially delay the consummation of any such IPO and any such Conversion Transaction, the Company and the Members shall use reasonable best efforts to structure any such transactions such that holders of

Blocker Securities may exchange such Blocker Securities for equity interests of any successor corporation, holding company, or other vehicle described in clauses (i) through (iii) of Section 9.1(a) (either in a contribution governed by Code Section 351 or a merger or similar transaction treated as a reorganization under Code Section 368) that correspond with the Units held by the Blockers such Blocker Securities relate to. The certificate of incorporation and bylaws of the Company Offeror shall be in such form as is approved by the Board; *provided* that they not conflict with or vary the terms and conditions of the replacement agreement (or agreements) described in the preceding sentence, and provided, further, that the certificate of incorporation of the Company Offeror shall contain a corporate opportunity provision substantially similar to the one contained in Section 4.8(d) and provisions reflecting the Company Offeror's election to not be governed by Section 203 of the Delaware General Corporation Law (or similar provision, if the Company Offeror is incorporated in a jurisdiction other than Delaware). The terms of any such stockholders agreement (or agreements) to be entered into among the Company Offeror and the Members in connection with a Conversion Transaction shall, to the extent practicable and permitted by applicable Law, rule, regulation or historical standard, and except as otherwise provided herein, replicate the provisions of this Agreement with respect to (i) the Board designation rights set forth in Article IV (except to the extent that any of the rights granted therein would be inconsistent with the requirements of any securities exchange on which the Company's securities will be traded or quoted after the IPO, in which case the rights granted herein shall be replicated to the greatest extent practicable consistent with the requirements of such exchange), (ii) the exculpation and indemnification provisions set forth in Article XII and (iii) the amendment provisions set forth in Article XIII, in each case, with appropriate modification to reflect the corporate structure of the Company Offeror.

(c) IPO of Company Offeror. If the IPO is structured as an offering of the securities of a Company Offeror other than the Company, then this Agreement shall remain in place, substantially on the terms set forth herein, except that (i) this Agreement shall be amended to (A) provide for (I) the exchange of Class A Units, Class B-1 Units and vested Class B-2 Units for shares of common stock of the Company Offeror; *provided* that such exchange shall be effected in a manner consistent with Section 9.2, and (II) the treatment of Unvested Class B-2 Units in connection with such IPO as determined by the Board, (B) adjust the provisions of this Agreement relating to Distributions and allocations to the extent necessary to permit the exchange of Class A Units and treatment of Class B Units contemplated by clause (A) immediately above, (C) remove the information rights granted in Section 7.2, and (D) make such other changes as the Board determines to be reasonable and prudent to facilitate such IPO of such Company Offeror's securities without adversely affecting the relative rights of any Member hereunder in a manner disproportionate (recognizing the priorities and preferences of the Units held by any Member relative to the Units held by any similarly situated Member as of the date hereof as set forth in Section 6.4) as compared to the relative rights of other Members similarly situated; and (ii) the Company shall enter into arrangements with such Company Offeror, in such form as the Board shall deem appropriate, providing for the exercise by the Company of registration rights no less favorable than the registration rights described in Section 9.3 with respect to the common stock or other equity securities of such Company Offeror to be received by the Members upon exchange of Class A Units and Class B Units of the Company. Upon any exchange of Class A Units and Class B Units (if applicable) for shares of capital stock of such Company Offeror, such Units shall no longer be subject to the terms of this Agreement and shall instead become subject to the terms of the certificate of incorporation and bylaws of such

Company Offeror. Notwithstanding the consummation of an IPO effected by a Company Offeror (other than the Company), in an IPO structured as an "UP-C," the exculpation and indemnification rights and obligations of the Company and the Members set forth in Article XII and the amendment provisions set forth in Article XIII shall each survive such IPO and continue to apply to the Units under this Agreement.

(d) Fractional Units. Fractional shares of common stock of a Company Offeror issuable pursuant to a Conversion Transaction or upon exchange of Units for shares of a Company Offeror shall be rounded, cashed out, or aggregated and sold in connection with such IPO in an equitable manner, as determined by the Board.

(e) Cooperation of the Board and the Members. In connection with and in order to facilitate an IPO, the Board shall take all such action as is reasonably necessary in order to effect amendments to the Company Offeror's organizational documents as are customary for a company which is to engage in an initial public offering of its equity securities and which are reasonably requested by the managing underwriters in order to expedite or facilitate the disposition of the equity securities of the Company Offeror in connection with such offering and any Conversion Transaction. Each Member hereby (i) consents to any such Conversion Transaction or exchange of Units involving a Company Offeror and (ii) agrees to execute, acknowledge and deliver any further agreements, documents or instruments requested by the Company (or any successor thereto) reasonably necessary or customary in connection with this Section 9.1; *provided, however*, that no Member holding a certain type or class of Units shall be required to take any actions not required from the other Members holding the same type or class of Units.

9.2 Treatment of Units in Conversion Transaction.

(a) Conversion Rate. For purposes of the conversion of Units pursuant to a Conversion Transaction or upon the exchange of Units for shares or equity securities, of a Company Offeror, each Unit shall be converted at a conversion rate based upon the percentage of the aggregate pre-tax value to be received by each holder of Units being converted that would otherwise have been received if the aggregate equity value of the Company Offeror at the price implied by the IPO had been distributed in accordance with Article VI as a Distribution following a Liquidity Event.

(b) Acknowledgement. If an IPO is effected, in whole or in part, by means of a public offering of the securities of a Company Offeror that is a Subsidiary of the Company, each of the Members and the Company hereby acknowledges and agrees that such IPO shall be effected to the greatest extent practicable in a manner that gives effect to this Section 9.2.

9.3 Registration Rights.

(a) Registration Rights Agreement. Prior to an IPO, the Members (and, if applicable, equityholders of such Members) shall enter into a registration rights agreement that shall contain customary registration rights, including the provisions set forth in Sections 9.3(a) and 9.3(b). All Members (or, as applicable, the equityholders of such Members)

shall have customary "piggyback" registration rights with pro rata cutbacks. From and after an IPO, the Company will provide reasonable and customary assistance to any Member (or, as applicable, equityholder of such Member) seeking to offer and sell its securities in the public market so as to enable such Member (or, as applicable, equityholders of such Member) to sell its securities pursuant to Rule 144 under the Securities Act or any similar rules or regulations hereinafter adopted by the Securities and Exchange Commission, including reasonably cooperating with such Member (or, as applicable, equityholders of such Member) to facilitate the timely preparation and delivery of certificates representing the securities to be sold and not bearing any Securities Act legend in connection with any such sale.

(b) Lock-Up. Each Member (or, as applicable, the equityholders of such Members) shall not Transfer any securities of the Company or a Company Offeror for a period (i) commencing on the date marketing commences with respect to an IPO and ending one hundred eighty (180) days following the closing of such IPO, and (ii) commencing on the date the Company or applicable Company Offeror notifies such Member (or, as applicable, equityholders of such Member) of its intention to conduct any subsequent registered offering of equity securities on its own behalf or on behalf of any other holder and ending on the date that is ninety-one (91) days after the completion of the offering with respect thereto or, in each case, (x) such longer period of time as may be reasonably requested by the Company's underwriter in connection with such IPO or any effective registration statement under the Securities Act (a "Registration") and (y) if such IPO or Registration is in connection with a Change of Control, such longer period of time as may be set forth in any lock-up or market stand-off agreement. Each Member (or, as applicable, the equityholders of such Members) agrees to execute and deliver such other agreements as may be reasonably requested by the Company or its underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or any representative of the underwriter, each Member shall provide, within ten (10) Business Days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a Registration. The Company may impose stop-transfer instructions with respect to the equity securities subject to the foregoing restriction until the end of the applicable period.

(c) Underwriter. The Board shall have sole discretion to select any underwriter in connection with an IPO.

## ARTICLE X
## EVENTS OF DISSOLUTION

10.1 Dissolution. The Company shall be dissolved upon the occurrence of any of the following events (each, an "Event of Dissolution"):

(a) A determination by the Board (with the consent of the Baupost Investors pursuant to Section 4.4) to dissolve the Company; or

(b) A judicial dissolution of the Company under Section 18-802 of the Act.

The Members hereby agree that the Company shall not dissolve prior to the occurrence of an Event of Dissolution and that no Member shall seek a dissolution of the Company under Section 18-802 of the Act. No other event, including the retirement, withdrawal, insolvency, liquidation, dissolution, insanity, resignation, expulsion, bankruptcy, death, incapacity, or adjudication of incompetency of a Member, shall cause a dissolution of the Company or cause the existence of the Company to terminate.

## ARTICLE XI
## TERMINATION

11.1 Liquidation. If an Event of Dissolution shall occur, then the Company shall be liquidated and its affairs shall be wound up. All proceeds from such liquidation shall be distributed as set forth below, in accordance with the provisions of Section 18-804 of the Act:

(a) to creditors, including Members who are creditors to the extent permitted by Law, in satisfaction of the Company's liabilities;

(b) next, to the Class A Holders in proportion to their Unreturned Capital; and

(c) thereafter, to the Class B-1 Holders and the Class B-2 Holders, pro rata in accordance with their respective Percentage Interests and subject to Section 6.5.

11.2 Final Accounting. In the event of the dissolution of the Company, prior to any liquidation, a proper accounting shall be made to the Members from the date of the last previous accounting to the date of dissolution.

11.3 Distribution in Kind. If the Board (with the consent of the Baupost Investors) determines in connection with the liquidation of the Company that a portion of the Company's assets are best distributed in kind to the Members, then such assets shall be so distributed in kind to the Members in undivided shares therein as tenants in common in the manner specified in Section 6.1.

11.4 Certificate of Cancellation. Upon the completion of the winding up of the Company's affairs and distribution of the Company's assets, the Company shall be terminated and the Members shall cause the Company to execute and file a Certificate of Cancellation in accordance with Section 18-203 of the Act.

## ARTICLE XII
## EXCULPATION AND INDEMNIFICATION

12.1 Exculpation. Notwithstanding any other provisions of this Agreement, but subject to Section 4.8(a), to the fullest extent permitted by the Act, none of the Covered Persons nor any former Covered Person shall be liable to the Company or any Member, Director or other Person who is a party to or bound by this Agreement for any Losses (as defined below) arising out of or relating to any act or omission, or any consent or approval given or withheld, in each case, in relation to the management of the Company or otherwise relating to the conduct of the Company's business and affairs; *provided* that nothing herein shall limit the liability of any

Person for any act or omission by such Covered Person that constitutes fraud, a willful breach of applicable Law, willful misconduct, an intentional breach of such Person's obligations under this Agreement (if any) or a bad faith violation of the implied contractual covenant of good faith and fair dealing (to the extent applicable).

12.2 Indemnification.

(a) To the fullest extent permitted by the Act, the Company shall indemnify and hold harmless each current and former (i) Covered Person and (ii) executive officer of the Company and its Subsidiaries (collectively, the "Indemnified Persons" and each individually an "Indemnified Person") from and against any and all losses, claims, demands, liabilities, reasonable out-of-pocket expenses (including attorneys' fees), judgments, fines, settlements, and other amounts ("Losses") incurred by such Person in connection with any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative in which such Indemnified Person may be involved, or threatened to be involved, as a party, a witness or otherwise, by reason of, or in connection with, any act or omission, or any consent or approval given or withheld, in each case, in relation to the management of the Company or otherwise relating to the conduct of the Company's business and affairs ("Claims"). Notwithstanding the foregoing, no current or former Indemnified Person shall be entitled to indemnification under this Section 12.2 with respect to (i) any act or omission by such Indemnified Person that constitutes fraud, a willful breach of applicable Law, willful misconduct, or an intentional breach of this Agreement or a bad faith violation of the implied contractual covenant of good faith and fair dealing (to the extent applicable), or (ii) any Claim initiated by such Indemnified Person unless such Claim (or part thereof) was (A) brought to enforce such Indemnified Person's rights to indemnification or advancement of expenses hereunder or (B) authorized or consented to by the Board prior to the initiation of such Claim.

(b) Reasonable, documented, out-of-pocket expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Claim shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Indemnified Person to repay the amount advanced if it shall be ultimately determined in a final, non-appealable determination of a court of competent jurisdiction that such Indemnified Person is not entitled to be indemnified by the Company as authorized by Section 12.2(a). If the Company indemnifies any Indemnified Person or former Indemnified Person pursuant to Section 12.2(a), it shall be subrogated to the rights of such Indemnified Person or former Indemnified Person against, and shall be entitled to seek contribution from, any third party, including any insurance company, to recover the amount of such indemnification (or such portion thereof as to which the Company shall be entitled to contribution) after the Indemnified Person or former Indemnified Person shall have been fully and completely indemnified (whether pursuant to this Agreement or otherwise) in respect of the Claim which gave rise to such indemnification. Any such Indemnified Person or former Indemnified Person shall fully cooperate with the Company at the Company's expense in its efforts to enforce against any such third party the rights to which it is so subrogated.

12.3 Effect of Modification. Any repeal or modification of this Article XII shall not adversely affect any rights of such Indemnified Person pursuant to this Article XII, including the right to indemnification and to the advancement of expenses of an Indemnified

Person existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

12.4 Non-exclusivity of Rights.

(a) The rights conferred on any Indemnified Person by this Article XII shall not be exclusive of any other rights that such Indemnified Person may have or hereafter acquire under any statute, provision of this Agreement, agreement, vote of members or disinterested directors or otherwise.

(b) The Company hereby acknowledges that the Baupost Directors may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Baupost Investors, and certain of their respective Affiliates (collectively, the "Other Indemnitors"). The Company hereby agrees, with respect to matters for which such Baupost Directors have indemnity rights under this Agreement, (i) that it is the indemnitor and expense advancer of first resort with respect to the Baupost Directors (i.e., its obligations to the Baupost Directors are primary and any obligation of the respective Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Baupost Directors is secondary), (ii) that it shall be required to advance the full amount of expenses incurred by the Baupost Directors and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights a Baupost Director may have against the Other Indemnitors and (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of a Baupost Director with respect to any claim for which such Baupost Director has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Baupost Director against the Company. The Company and each of the Members acknowledge that the Other Indemnitors are express third-party beneficiaries of the terms of this Section 12.4(b).

## ARTICLE XIII
## AMENDMENT TO AGREEMENT

13.1 Amendments. Amendments, modifications or supplements to this Agreement and to the Certificate of Formation shall be approved in writing by the Board in accordance with Section 4.2(d) (subject to approval by the Baupost Investors in accordance with Section 4.4); *provided, further,* that any amendments, modifications, supplements, restatements to or waivers of this Agreement in a manner that would have a material disproportionate adverse impact on any right or obligation unique to a class of securities shall require the consent of a majority of the then outstanding Voting Units of such class.

## ARTICLE XIV
## [Reserved.]

## ARTICLE XV
## GENERAL PROVISIONS

15.1 Expenses. The Company shall pay, or cause one of its Affiliates to pay, to such accounts of third-party service providers, the aggregate amount of any fees, costs and expenses incurred or subject to reimbursement by the Company in connection with the transactions contemplated by the Purchase Agreement payable to such third-party service providers on the date hereof. At or promptly following consummation of the transaction contemplated by the Purchase Agreement, the Company shall pay the aggregate transaction fees and expenses (i) of the Baupost Investors (including, without limitation, legal, accounting and financial advisor fees, including the fees of Willkie Farr & Gallagher LLP, as the counsel for the Baupost Investors, and the fees of other transaction advisors), and (ii) of Skadden, Arps, Slate, Meagher & Flom LLP, as the counsel for Management HoldCo and the Management Holders, in each case as incurred in connection with the transactions contemplated by the Purchase Agreement and the preparation of this Agreement and (iii) incurred in connection with obtaining a representation and warranties insurance policy in connection with the Purchase Agreement (including, without limitation, associated premiums, underwriting costs and diligence fees).

15.2 Notices. Any notice or other communication required or permitted under this Agreement shall be deemed to have been duly given and made if (a) in writing and served by personal delivery upon the party for whom it is intended; (b) if sent by electronic mail with either receipt confirmed or if concurrently also sent in accordance with clause (c); or (c) if sent by certified mail, registered mail or courier service, return-receipt received to the party at the address set forth below, to the Persons indicated:

If to the Company:

Leerink Holdings LLC
c/o Leerink Aggregator LP
53 State Street
Boston, MA 02109
Attention: Jeff Leerink and Steven Heineman
Email: jeff.leerink@leerink.com
steven.heineman@leerink.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention: Sven G. Mickisch and Dohyun Kim
Email: sven.mickisch@skadden.com
dohyun.kim@skadden.com

If to a Member, to the address of such Member specified on Schedule A hereto.

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this Section 15.2.

15.3 Publicity; Confidentiality. Except as may be required by applicable Disclosure Law, none of the parties hereto shall issue a press release or public announcement or otherwise make any disclosure concerning this Agreement or the transactions contemplated hereby or any other information, statements, reports, trade secrets, documents, and other materials concerning the Company, Management Holdco, any Member or any of their respective Affiliates that any Member may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) by or to such Member or any representative of such Member, or otherwise as a result of such Member's ownership of any Units. Each Member agrees that it will keep the terms of this Agreement and all information that it receives from the Company in its capacity as a Member confidential, except that it may disclose such information (a) as may be required in the course of obtaining legal advice or enforcement with respect to the rights and obligations created hereby; (b) to its legal, financial, accounting and other advisors; (c) as may be required in the preparation of tax returns or other governmental or regulatory filings; (d) as and to the extent that such Member's legal counsel determines that such disclosure is required by applicable Law; (e) to the extent required in the good faith performance of such Member's duties to the Company and its Subsidiaries as an employee thereof; and (f) to the extent reasonably necessary to enforce the terms of this Agreement; *provided, however*, notwithstanding anything to the contrary contained in this Agreement, the Baupost Investors may disclose such information to (i) any of their actual and prospective equityholders and lenders and that any equityholder of each thereof that is an investment fund may disclose such information to its actual and prospective limited partners or other investors (in each case provided that the recipient has been advised of the confidential and proprietary nature of such information and has agreed to comply with the provisions of this Section 15.3 with respect to such information or is otherwise subject to confidentiality obligations with respect to such information and that would require it to maintain the confidentiality of such information), (ii) any Person in connection with financings, acquisitions, divestitures and similar events involving the Company and its Affiliates and (iii) any of their directors, officers, employees or professional advisers to the extent that such disclosure is reasonably necessary in connection with the Baupost Investors' investment in the Company for use solely for such purpose. In the event of any disclosure as permitted above under clauses (a), (b) and (f) hereof to a Member's representatives and advisors, the disclosing party shall require any Person receiving such information to maintain its confidentiality and shall be responsible for any breach of the confidentiality provisions hereunder by any such Person receiving such information. Notwithstanding anything in this Section 15.3 to the contrary, except in connection with a Change of Control (including a Qualified Change of Control) or Qualified Sale, or with the approval of the Board, no Director or Member shall provide any information that it receives from the Company in its capacity as a Director or Member to any Person (including any officer, director, member, manager, partner, trustee, employee, or agent thereof) that, in the good faith reasonable judgment of the Board, is an actual or potential Competitor of the Company. The Baupost Investors may disclose on their worldwide web page the name of the Company, the name of the Chief Executive Officer of the Company and/or the Company's Subsidiaries, a brief

description of the business of the Company and/or the Company's Subsidiaries and the logo of the Company and/or the Company's Subsidiaries and the aggregate amount of such Members' investment in the Company.

15.4 Entire Agreement and Waiver. This Agreement, together with all exhibits and schedules hereto and all other agreements referenced herein and therein, shall constitute the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior contracts, agreements, discussions and understandings between them. No provision of this Agreement shall be deemed to modify, amend, waive, rescind or otherwise impact the terms of the Purchase Agreement. Any waiver (express or implied) of any default or breach of this Agreement must be in writing and shall not constitute a waiver of any other or subsequent default or breach.

15.5 Counterparts. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding on the parties hereto. Transmission of an executed counterpart by electronic transmission of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Agreement.

15.6 Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable for any reason, such provision shall be ineffective to the extent of such invalidity or unenforceability; *provided, however*, that the remaining provisions will continue in full force without being impaired or invalidated in any way unless such invalid or unenforceable provision or clause shall be so significant as to materially affect the Members' expectations regarding this Agreement. Otherwise, the Members agree to replace any invalid or unenforceable provision with a valid provision which most closely approximates the intent and economic effect of the invalid or unenforceable provision.

15.7 Governing Law. The substantive laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement, regardless of the law that might be applied under applicable principles of conflicts of laws.

15.8 WAIVER OF JURY TRIAL. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE OUT OF, OR WITH RESPECT TO, THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OR ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER VOLUNTARILY AND (D) IT HAS BEEN

INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS OF THIS SECTION 15.8. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

15.9 Binding Effect. This Agreement shall be binding upon, and inure to the benefit of, the Members.

15.10 Additional Documents and Acts. The Members shall from time to time execute or cause to be executed all other documents or cause to be done all filing, recording, publishing, or other acts as may be necessary or desirable to comply with the requirements for the operation of a limited liability company under the laws of the State of Delaware and all other jurisdictions in which the Company may from time to time conduct business.

15.11 No Third-Party Beneficiary. This Agreement is made solely for the benefit of the parties hereto and no other person shall have any rights, interest, or claims hereunder or otherwise be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise, except for the rights of the Member Related Parties pursuant to Section 15.12 or any Indemnified Person pursuant to Section 12.2.

15.12 Non-Recourse. Notwithstanding anything to the contrary in this Agreement, except in the case of fraud, this Agreement may only be enforced against, and any action, dispute, claim, suit or other proceeding for breach of this Agreement may only be made against, the entities that are expressly identified herein as parties and none of the former, current and future Affiliates, directors, officers, managers, employees, advisors, representatives, shareholders, members, managers, partners, successors and assigns of a Member or any Affiliate thereof or any former, current and future Affiliate, director, officer, manager, employee, advisor, representative, shareholder, member, manager, partners, successor and assign of any of the foregoing (collectively, "Member Related Parties") shall have any liability for any liabilities or obligations of the parties hereto for any action, dispute, claim, suit or other proceeding (whether in tort, contract or otherwise) for breach of this Agreement or in respect of any oral representations made or alleged to be made in connection herewith, the Company or any other Member or their respective Affiliates shall have no rights of recovery in respect hereof against any Member Related Party and no personal liability shall attach to any Member Related Party through such Member or otherwise, whether by or through attempted piercing of the corporate veil, by or through an action, dispute, claim, suit or other proceeding (whether in tort, contract or otherwise) by or on behalf of a Member against any Member Related Party, by the enforcement of any judgment, fine or penalty or by virtue of any statute, regulation or other applicable Law, or otherwise.

15.13 Successors and Assigns. This Agreement is personal to the parties hereto and shall not be capable of assignment; it being understood that the foregoing shall not be read to limit any Transfer pursuant to and in accordance with Article VIII. All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors and Permitted Transferees, if any.

15.14 Jurisdiction; Service of Process. JURISDICTION AND VENUE IN ANY SUIT, ACTION OR PROCEEDING (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE (INCLUDING, ANY SEEKING EQUITABLE RELIEF), SHALL PROPERLY AND EXCLUSIVELY LIE IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE (THE "COURT OF CHANCERY") OR, TO THE EXTENT THE COURT OF CHANCERY DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE AND THE APPELLATE COURTS HAVING JURISDICTION OF APPEALS IN SUCH COURTS (THE "DELAWARE FEDERAL COURT") OR, TO THE EXTENT NEITHER THE COURT OF CHANCERY NOR THE DELAWARE FEDERAL COURT HAS SUBJECT MATTER JURISDICTION, THE SUPERIOR COURT OF THE STATE OF DELAWARE (COLLECTIVELY, THE "CHOSEN COURTS"). NO PARTY HERETO SHALL BRING ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY JURISDICTION, VENUE OR OTHER FORUM OTHER THAN THE CHOSEN COURTS PURSUANT TO THE FOREGOING SENTENCE (OTHER THAN UPON APPEAL). BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE CHOSEN COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH SUIT, ACTION OR PROCEEDING. THE PARTIES HERETO IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN EACH OF THE CHOSEN COURTS, AND HEREBY WAIVE ANY OBJECTION THAT ANY SUCH CHOSEN COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH SUIT, ACTION OR PROCEEDING. DELIVERY OF ANY PROCESS REQUIRED BY ANY SUCH CHOSEN COURT IN ACCORDANCE WITH SECTION 15.2 SHALL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST EACH PARTY HERETO, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT.

15.15 Specific Performance. Each of the Members acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the non-breaching party or parties would be irreparably harmed and could not be made whole by monetary damages. The Members hereby agree that, in addition to any other remedy to which they may be entitled at law or in equity, they shall be entitled to compel specific performance of this Agreement in any action instituted in any court set forth in Section 15.14.

15.16 Representations and Warranties. Each Person that becomes an Additional Member or a holder of Units on or after the date hereof (each, a "Warrantor") represents and warrants, as of the date such Warrantor becomes an Additional Member or acquires Units, to the Company as set forth on Schedule E hereto.

15.17 Survival of Representations and Warranties; Termination of Covenants. All representations and warranties contained in this Agreement or made in writing by any party hereto in connection herewith shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. In the event any provision of this

Agreement is terminated, such termination shall not relieve any party hereto from liability for such party's prior breach of this Agreement or for failure by such party to perform such party's obligations hereunder.

[*Signature Pages Follow*]

64032214.34

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**BAUPOST INVESTORS:**

BAUPOST LIMITED PARTNERSHIP 1983 A-1
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:
By: ____________________
C1934CAE46844A1...
Name: Joshua A. Greenhill
Title: Partner

BAUPOST LIMITED PARTNERSHIP 1983 B-1
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:
By: ____________________
C1934CAE46844A1...
Name: Joshua A. Greenhill
Title: Partner

BAUPOST LIMITED PARTNERSHIP 1983 C-1
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:
By: ____________________
C1934CAE46844A1...
Name: Joshua A. Greenhill
Title: Partner

PB INSTITUTIONAL LIMITED PARTNERSHIP
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:
By: ____________________
C1934CAE46844A1...
Name: Joshua A. Greenhill
Title: Partner

BAUPOST VALUE PARTNERS, L.P.-I
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:
By: ____________________
C1934CAE46844A1...
Name: Joshua A. Greenhill
Title: Partner

64032214.34

BAUPOST VALUE PARTNERS, L.P.-II
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:

By: ____________________________

C1934CAE4684A1...

Name: Joshua A. Greenhill
Title: Partner

BAUPOST VALUE PARTNERS, L.P.-III
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:

By: ____________________________

C1934CAE4684A1...

Name: Joshua A. Greenhill
Title: Partner

BAUPOST VALUE PARTNERS, L.P.-IV
By: The Baupost Group, L.L.C., its Managing General Partner

DocuSigned by:

By: ____________________________

C1934CAE4684A1...

Name: Joshua A. Greenhill
Title: Partner

**<u>MANAGEMENT HOLDCO</u>:**

**LEERINK AGGREGATOR LP**

DocuSigned by:
By: Joseph Gentile
2FD86788CEC4418...
Name: Joseph Gentile
Title: Treasurer

## Schedule A

*As of October 2, 2023*

| Name | Class A Units | Class B-1 Units | Class B-2 Units | TOTAL Class B Units | Capital Contribution for Class A and B-1 and Initial Capital Accounts | Address |
|---|---|---|---|---|---|---|
| Baupost Limited Partnership 1983 A-1 | 6,035 | 4,164 | - | 4,164 | $6,035,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Limited Partnership 1983 B-1 | 2,000 | 1,380 | - | 1,380 | $2,000,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Limited Partnership 1983 C-1 | 12,900 | 8,901 | - | 8,901 | $12,900,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| PB Institutional Limited Partnership | 1,815 | 1,252 | - | 1,252 | $1,815,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Value Partners, L.P. - I | 2,900 | 2,001 | - | 2,001 | $2,900,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Value Partners, L.P. - II | 6,755 | 4,661 | - | 4,661 | $6,755,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Value Partners, L.P. - III | 1,880 | 1,297 | - | 1,297 | $1,880,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Baupost Value Partners, L.P. - IV | 15,715 | 10,844 | - | 10,844 | $15,715,000.00 | 10 St. James Ave., Suite 1700 Boston, MA 02116 |
| Management Holdco | 50,000 | 34,500 | 31,000 | 65,500 | $50,000,000.00 | 53 State Street, Boston, MA 02109 |
| Total: | 100,000 | 69,000 | 31,000 | 100,000 | $100,000,000.00 | |

## Schedule B

## Certain Management Holders

1. Adam Futterman
2. Andrew Berens
3. Burri Rao
4. Byron Webster
5. Daina Graybosch
6. Daniel Dubin
7. Daniel P. Lepanto
8. Gabriel P. Cavazos
9. Gregg Jurkiewicz
10. James Kelly
11. Jeffrey Leerink
12. Jonathan Chang
13. Joseph P. Schwartz
14. Joseph R. Gentile
15. Mani Foroohar
16. Marc Goodman
17. Maura Polak
18. Michael M. Gallagher
19. Michael Marco
20. Puneet Souda
21. RC 2023 Gift Trust
22. Robert Leerink
23. Steven Heineman
24. Thomas Smith

## Schedule C

## Directors

- Barry D. Blake
- Daniel B. Dubin
- Jeffrey A. Leerink
- Joseph R. Gentile
- Robert J. Leerink
- Joshua A. Greenhill
- John R. Gwin

**Schedule D**

**Officers**

- Jeffrey A. Leerink (CEO)
- Joseph R. Gentile (CAO and Treasurer)
- Steven Heineman (Secretary)

## Schedule E

## Representations and Warranties

(a) The Unit being acquired by such Warrantor is being purchased for such Warrantor's own account and not with a view to, or for sale in connection with, any distribution or public offering thereof within the meaning of the Securities Act or any applicable state securities laws. Such Warrantor understands that his, her or its Unit has not been registered under the Securities Act or any state securities laws by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements thereof, and that the reliance of the Company and others upon such exemptions is predicated in part by the representations and warranties of such Warrantor contained herein. Such Warrantor has not entered into any agreement, arrangement or understanding with any other Warrantor, any other potential investor or group of investors or the Company with respect to the subject matter of this Agreement other than the agreements contemplated by this Agreement or as otherwise disclosed to the Members prior to the date hereof.

(b) Such Warrantor has the requisite power and authority (whether corporate or otherwise) and legal capacity to enter into, and to carry out his, her or its obligations under, this Agreement. The execution and delivery by such Warrantor of this Agreement and the consummation by such Warrantor of the transactions contemplated hereby have been duly authorized by all necessary action (corporate or otherwise) on the part of such Warrantor.

(c) This Agreement has been duly executed and delivered by such Warrantor and constitutes a valid and binding obligation enforceable against such Warrantor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar law of general application affecting creditors and general principles of equity.

(d) Such Warrantor is not subject to, or obligated under, any provision of (i) any agreement, contract, arrangement or understanding, (ii) any license, franchise or permit, or (iii) any law, regulation, order, judgment or decree, that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance or other lien on any of such Warrantor's assets would be created, by such Warrantor's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

(e) No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any public body, court or other Governmental Authority or any other third party is necessary on such Warrantor's part for the consummation of the transactions contemplated by this Agreement that has not previously been obtained by such Warrantor.

(f) With respect to a Warrantor that is an entity, no foreign government, agency of a foreign government, or representative of a foreign government; no business enterprise or other entity organized, chartered or incorporated under the laws of any country other than the United States or its territories; nor any person who is not a citizen or national of the United States (each, a "Foreign Interest"), (a) individually or in the aggregate with other Foreign Interests, owns or has a beneficial ownership of five percent (5%) or more of the Company; or (b) has the power, direct or indirect, whether or not exercised, and whether or not exercisable through the

ownership of the Company, by contractual arrangements or other means, to direct or decide matters affecting the management or operations of the Company. Such Warrantor acknowledges the restrictions that affiliation with or significant influence by a Foreign Interest may put on the prospects of the Company and its Subsidiaries, and agrees to fully comply with the law with respect to mitigation of any such affiliation or influence of such Foreign Interest.

(g) No Person has or will have, as a result of any act or omission by such Warrantor, any right, interest or valid claim against the Company or any other Warrantor for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with any of the transactions contemplated by this Agreement.

(h) Such Warrantor, to the extent a Member (other than an employee of the Company or any of its Subsidiaries), is an "accredited investor" as defined in Rule 501 under the Securities Act. Such Member is acquiring his, her or its Unit based upon his, her or its own investigation, and the exercise by such Member of his, her or its rights and the performance of his, her or its obligations under this Agreement will be based upon his, her or its own investigation, analysis and expertise. Such Member has knowledge and experience in financial and business matters such that such Member is capable of evaluating the merits and risks of the investment contemplated by this Agreement and such Member is able to bear the economic risk of his, her or its investment in the Company (including a complete loss of his, her or its investment). During negotiation of the transactions contemplated herein, such Member has been afforded full and free access to books, financial statements, records, contracts, documents and other information concerning the Company and its Subsidiaries, and has been afforded the opportunity to ask questions concerning the business, operations, financial condition, assets and liabilities of the Company and its Subsidiaries and other relevant matters as such Member has deemed necessary or desirable and has been provided with all such information as has been requested.

(i) Such Warrantor recognizes that no public market exists for the Unit acquired hereunder, and no representation has been made to such Warrantor that any such public market will exist in the future. Such Warrantor understands that he, she or it must bear the economic risk of such Warrantor's investment in the Company indefinitely unless such Warrantor's Unit is registered pursuant to the Securities Act or an exemption from such registration is available, and unless the disposition of such Unit is registered or qualified under applicable state securities laws or an exemption from such registration or qualification is available, and that the Company has no obligation or intention of so registering or qualifying such Unit. Such Warrantor understands that there is no assurance that any exemption from the Securities Act will be available, or, if available, that such exemption will allow such Warrantor to dispose of or otherwise Transfer any or all of such Warrantor's Unit, in the amounts or at the times any such Warrantor might desire. Such Warrantor acknowledges that the Company is not presently under any obligation to register the Units under Section 12 of the Exchange Act or to make publicly available the information specified in Rule 144 under the Securities Act and that it may never be required to do so.

**Schedule I**

**Class A Units Annual Amortization**

[*See Attached*.]

# Schedule I[1 2]

| | 2024 | 2025 | 2026 | 2027 | 2028 | Total |
|---|---|---|---|---|---|---|
| Preferred equity amortization | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $100.00 |

[1] Subject to adjustments in accordance with Section 6.4 of the Agreement.

[2] Each year listed herein beginning January 1.

**Schedule II**

**Class A Units Annual Amortization**

**Comparable Companies for Adjusting Multiple**

Evercore Inc.
Jefferies Financial Group Inc.
Lazard Ltd
Perella Weinberg Partners
Piper Sandler Companies
Raymond James Financial, Inc.
Stifel Financial Corp.

**EXHIBIT A**

**Joinder Agreement**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Amended and Restated Limited Liability Company Agreement of Leerink Holdings LLC (the "Company"), a Delaware limited liability company, dated as of October 2, 2023 (as it may be amended and restated, the "A&R LLC Agreement"), by and between each of the Persons set forth on Schedule A of the A&R LLC Agreement (the "Members"). Capitalized terms used but not defined herein have the respective meanings ascribed to them in the A&R LLC Agreement.

By executing this Joinder Agreement and delivering it to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the A&R LLC Agreement applicable to the Members in the same manner as if the undersigned were an original signatory to the A&R LLC Agreement and in such capacity as a Member.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the ____ day of, ____________, 202_.

________________________________
Signature of Member

________________________________
Print Name of Member

________________________________
Street Address

________________________________
City State

Acknowledged and Agreed:

**LEERINK HOLDINGS LLC**

By: ________________________________

Name: ________________________

Title: _________________________

# EXHIBIT B

## Spousal Consent

The undersigned represents that the undersigned is the spouse of:

____________________
Name of Member

and that the undersigned is familiar with the terms of the Amended and Restated Limited Liability Company Agreement of Leerink Holdings LLC (the "Company"), a Delaware limited liability company, dated as of October 2, 2023 (the "Agreement"), by and between each of the Persons set forth on Schedule A of the A&R LLC Agreement (the "Members"). The undersigned hereby agrees that the interest of the undersigned's spouse in all property which is the subject of such Agreement shall be irrevocably bound by the terms of such Agreement and by any amendment, modification, waiver or termination signed by the undersigned's spouse. The undersigned further agrees that the undersigned's interest, including any marital property interest or right to an elective share, in all property which is the subject of such Agreement shall be irrevocably bound by the terms of such Agreement, and that such Agreement shall be binding on the executors, administrators, heirs and assigns of the undersigned. The undersigned further authorizes the undersigned's spouse to amend, modify or terminate such Agreement, or waive any rights thereunder, and that each such amendment, modification, waiver or termination signed by the undersigned's spouse shall be binding on the interest of the undersigned, including any marital property interest or right to an elective share, in all property which is the subject of such Agreement and on the executors, administrators, heirs and assigns of the undersigned, each as fully as if the undersigned had signed such amendment, modification, waiver or termination.

Dated: ____________________

______________________________
Signature

______________________________
Print Name

# EXHIBIT C

## Form of Applicable Class B-2 Award Agreement

[*See Attached*.]

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**
Final Form

**LEERINK AGGREGATOR, LP**
**CLASS B-2 UNIT AWARD AGREEMENT**

This Class B-2 Unit Award Agreement (this "**Agreement**") is made effective as of _______ (the "**Grant Date**"), by and between Leerink Aggregator LP (f/k/a Saffron Management Aggregator LP), a Delaware limited partnership ("**Management Aggregator**"), and the individual listed on the signature page attached hereto ("**Grantee**").

**RECITALS:**

**WHEREAS,** Management Aggregator may issue Class B-2 Units of Management Aggregator pursuant to the Amended & Restated Limited Partnership Agreement of Management Aggregator, dated as of ________ (as amended, restated, amended and restated or otherwise supplemented from time to time, the "**LP Agreement**");

**WHEREAS,** in connection with the grant of Class B-2 Units of Management Aggregator to Grantee hereunder, Leerink Holdings LLC (f/k/a Saffron HoldCo LLC) ("**Holdings**") has issued to Management Aggregator a corresponding number of Class B-2 Units of Holdings as set forth on the signature page attached hereto;

**WHEREAS,** capitalized terms used and not otherwise defined in this Agreement shall have the meanings set forth in the LP Agreement or the Amended and Restated Limited Liability Company Agreement of Holdings, dated as of _________ (as amended, restated, amended and restated or otherwise supplemented from time to time, the "**Holdings LLC Agreement**"), as applicable; and

**WHEREAS,** Management Aggregator desires to issue Class B-2 Units of Management Aggregator to Grantee, subject to the terms and conditions set forth in this Agreement, the LP Agreement and the Holdings LLC Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

**1. ISSUANCE OF CLASS B-2 UNITS**. Subject to the terms and conditions of the LP Agreement and the additional terms and conditions set forth in this Agreement, Management Aggregator hereby issues to Grantee the number of Class B-2 Units of Management Aggregator listed on the signature page attached hereto (the "**Grantee Units**").

**2. VESTING; TERMINATION AND FORFEITURE; REPURCHASES**.

a. The Grantee Units granted hereunder shall be fully vested on the Grant Date.

b. Notwithstanding anything contained herein to the contrary:

1. all of the Grantee Units shall be forfeited without consideration in the event that (a) Grantee's employment with or provision of services to Holdings or any

of its Subsidiaries is terminated for Cause or (b) Grantee materially breaches any non-competition or non-solicitation covenant contained in any agreement by and between Grantee and Holdings or any of its Affiliates ("**Restrictive Covenant Agreement**"); and

2. all of the Grantee Units shall be subject to any repurchase or similar policies as may be adopted or implemented by Holdings, Management Aggregator or any of their respective Affiliates from time to time, including, without limitation, as set forth in Section 8.8 and Section 8.15 of the Holdings LLC Agreement and Section 8.9, Section 8.10 and Section 8.11 of the LP Agreement.

c. For purposes of Section 8.8 of the Holdings LLC Agreement, in the event of Grantee's termination of services or employment with Holdings or any of its Subsidiaries other than by Holdings or its Subsidiaries for Cause (as defined in the Holdings LLC Agreement), the "**Call Price**" for each Class B-2 Unit shall be equal to the Fair Market Value (as defined in the Holdings LLC Agreement) of such Class B-2 Unit as of the date the Call Notice (as defined in the Holdings LLC Agreement) is delivered; provided, however, that in the event of Grantee's termination of services or employment with Holdings or any of its Subsidiaries by Holdings or its Subsidiaries without Cause or by Grantee for Good Reason, in each case, that occurs in the six (6) month period prior to (i) the execution of a definitive agreement that directly results in a Change of Control within nine (9) months of such execution or (ii) the public filing of a registration statement in connection with an IPO (as defined in the Holdings LLC Agreement), provided that such IPO occurs within six (6) months of such filing, the Call Price for the Class B-2 Units shall be equal to the Fair Market Value of such Class B-2 Units at the time of the consummation of such Change of Control or IPO (the "**Liquidity Event Call Price**"). If the Liquidity Event Call Price exceeds the Call Price actually paid to Grantee for any Called Units (as defined in the Holdings LLC Agreement), such excess amount shall be paid to Grantee in respect of such Called Units within thirty (30) days following the consummation of such Change of Control or IPO.

d. For purposes of this Agreement, "Good Reason" shall have the meaning set forth in Grantee's employment agreement with Holdings or its Subsidiaries or, if such employment agreement does not contain a definition of "Good Reason" or any similar concept, "Good Reason" shall have the meaning set forth in Holdings' deferred compensation plan, as in effect from time to time.

**3. RIGHTS AS GRANTEE; PROFITS INTERESTS**. Subject to the terms of the LP Agreement, Grantee shall be the record owner of the Grantee Units issued hereunder and as record owner, shall be entitled to all rights and subject to the obligations of a holder of Class B-2 Units of Management Aggregator as set forth in the LP Agreement. All Grantee Units are subject to certain restrictions as provided in the LP Agreement. The Grantee Units are intended to constitute "profits interests" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343 and Rev. Proc. 2001-43, 2001-2 C.B. 191.

**4. SECTION 83(B) ELECTION; WITHHOLDING**. As a condition subsequent to the issuance of the Grantee Units pursuant to this Agreement, Grantee shall execute and deliver to Management Aggregator and file with the Internal Revenue Service (the "**IRS**") a timely, valid protective election to include property in gross income pursuant to Section 83(b) of

the Code (the "**83(b) Election**"). Grantee understands that under Section 83 of the Code, regulations promulgated thereunder and certain IRS administrative announcements, in the absence of an effective election under Section 83(b) of the Code, the excess of the fair market value of the Grantee Units on the date on which any forfeiture restrictions applicable to such Grantee Units lapse over the price paid for the Grantee Units (which is $0) may be reportable as ordinary income at that time. For this purpose, the term "forfeiture restrictions" means the restrictions on transferability imposed under this Agreement and the LP Agreement. Grantee understands that (i) in making the 83(b) Election, Grantee may be taxed at the time the Grantee Units are acquired hereunder to the extent that the fair market value of the Grantee Units exceeds the purchase price for such Grantee Units (which is $0) and (ii) in order to be effective, the 83(b) Election must be filed with the IRS within thirty (30) days after the date upon which the Grantee Units were granted hereunder. Grantee hereby acknowledges that (a) the foregoing description of the tax consequences of the 83(b) Election is not intended to be complete and, among other things, does not describe state, local or foreign income and other tax consequences, (b) Management Aggregator has not provided, and is not hereby providing, Grantee with tax advice regarding the 83(b) Election and has urged Grantee to consult Grantee's own tax advisor with respect to the income taxation consequences thereof, and (c) Management Aggregator has not advised Grantee to rely on any determination by it or its representatives as to the fair market value specified in the 83(b) Election and will have no liability to Grantee if the actual fair market value of the Grantee Units on the date hereof exceeds the amount specified in the 83(b) Election.

**5. APPLICATION OF PROVISIONS OF HOLDINGS LLC AGREEMENT**. Pursuant to Section [3.3] of the LP Agreement, Management Aggregator is a special purpose investment vehicle through which the Class B-2 Holders (including Grantee) indirectly own the Class B-2 Units of Holdings issued to Management Aggregator. The provisions of the Holdings LLC Agreement shall apply *mutatis mutandis* to this Agreement as if they were incorporated herein with such modifications as board of directors of Holdings, in good faith, deems appropriate to this Agreement in furtherance of Section [3.3] of the LP Agreement.

**6. NOTICES**. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person or by telecopy (or similar electronic means with a copy following by nationally recognized overnight courier) or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth in the LP Agreement or at such other address as may hereafter be designated in writing by such party to the other parties.

**7. GRANTEE UNITS SUBJECT TO AGREEMENTS**. As a condition of the issuance of the Grantee Units, Grantee will become a party (if not already a party) to the LP Agreement. By entering into this Agreement, Grantee acknowledges and agrees that (i) Grantee has received and read the copy of the LP Agreement and the Holdings LLC Agreement enclosed with this Agreement, (ii) the Grantee Units are subject to the LP Agreement and Holdings LLC Agreement, the terms and provisions of which are hereby incorporated herein by reference, subject to any qualifications/modifications set forth herein, (iii) Grantee shall execute, and return to Management Aggregator, an executed copy of this Agreement and a joinder to the LP Agreement (if not already a party to the LP Agreement) and (iv) the Grantee Units are transferable only in accordance with the LP Agreement.

**8. LEGEND**. Each certificate (if certificated) evidencing Grantee Units and each instrument issued in exchange for or upon the transfer of any Grantee Units shall be stamped or otherwise imprinted with a legend in substantially the following form, or such similar legend as may be specified in any other agreement with Management Aggregator:

> **"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO (1) TERMS AS SET FORTH IN THE CLASS B-2 UNIT AWARD AGREEMENT DATED AS OF THE DATE HEREOF AND (2) CERTAIN TRANSFER AND OTHER RESTRICTIONS SET FORTH IN THE AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF MANAGEMENT AGGREGATOR, DATED AS OF _______, AND ONE OR MORE OTHER AGREEMENTS. THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT IN COMPLIANCE WITH SUCH TRANSFER RESTRICTIONS. COPIES OF SUCH AGREEMENTS ARE ON FILE WITH THE SECRETARY OF THE LIMITED PARTNERSHIP AND ARE AVAILABLE WITHOUT CHARGE UPON WRITTEN REQUEST THEREFOR. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF THE AFORESAID AGREEMENTS."**

**9. NO RIGHT TO CONTINUED SERVICE**. This Agreement shall not be construed as giving Grantee the right to be retained in the employ of, or to continue to provide services to Management Aggregator, Holdings or any of their affiliates.

**10. ENTIRE AGREEMENT**. This Agreement, the LP Agreement and the Holdings LLC Agreement constitute the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and therein and supersedes all prior communications, representations and negotiations in respect thereto.

**11. SIGNATURE IN COUNTERPARTS**. This Agreement may be signed in counterparts, each which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**12. GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the applicable Laws of the State of Delaware, without giving effect to any choice of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the applicable Laws of any jurisdiction other than the State of Delaware to be applied.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Grant Date.

**LEERINK AGGREGATOR LP**

By: ____________________
Name:
Title:

**GRANTEE**

____________________________
Name: ______________

Number of Class B-2 Units: [•]*

* The Class B-2 Units correspond to [•] Class B-2 Units of Holdings.